UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | | |
|---|---|---|
| CINCINNATI INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | No. 4:12-CV-32 |
| | ) | JURY DEMAND |
| LARRY BANKS AND | ) | |
| WANDA SUE BANKS, | ) | |
| | ) | |
| Defendants/Counter-Plaintiffs. | ) | |

### MEMORANDUM IN SUPPORT OF DAUBERT CHALLENGE AS TO EXPERT WITNESS, JEFFERY MORRILL

Comes now the plaintiff and counter-defendant, Cincinnati Insurance Company ("Cincinnati") and submits this <u>Daubert</u> challenge to the opinions of Jeffery Morrill identified as an expert witness on behalf of the defendants and counter-plaintiffs, Larry and Sue Banks.

### MORRILL'S ROLE IN THE CASE

Jeffery Morrill was disclosed to criticize the investigation of the origin and cause investigator retained by Cincinnati, Mark Sells, who determined the fire was incendiary in origin. In his opinions, Morrill critiqued the methodology of Mark Sells and criticized, in particular, two aspects of Sells' use of the scientific methodology included in NFPA 921, entitled "Guide for Fire & Explosion Investigations." (<u>See</u> Report of Jeffery Morrill attached as Exhibit 1). Notably, Morrill provided no opinions as to the methodology used by the local Fire Investigator, Jeremy Woods, who like Mark Sells, came to the conclusion that the fire was incendiary in nature. (Depo. of Jeffery Morrill P. 19, L. 25 thru P. 20, L. 1-18

attached as Exhibit 2; Report of Jeremy Woods attached as Exhibit 3). In fact, he had never read the opinions of Mr. Woods. (Depo. of Jeffery Morrill P. 19, L. 25 thru P. 20, L. 1-7). Likewise, he offered no critique or criticism of the opinions of State Fire Marshall, Russell Robinson, who also came to the opinion that the fire to the Banks' home was incendiary in nature. (Depo. of Jeffery Morrill P. 19, L. 25 thru P. 20, L. 1-18; Report of Russell Robinson attached as Exhibit 4)

Importantly, however, Morrill goes beyond criticizing the methods employed by Marks Sells and opines that the fire to the Banks' home should have been classified as "undetermined." (Depo. Jeffery T. Morrill P. 19, L. 22-24; P. 40, L. 25 thru P. 41, L. 1-5; P. 41, L. 8-12; P. 47, L. 8-12; Report of Jeffery Morrill at P. 8). This conclusion is in essence an opinion under NFPA 921. However, the methodology upon which Morrill reached this conclusion lacks sound scientific basis. Indeed, Morrill failed to conduct an investigation under the guidelines of an NFPA 921 which both he and this Court recognize as providing applicable guidelines. Travelers Indem. Co. v. Ind. Paper & Packaging Corp., 2006 WL 1788967, *4 (E.D. Tenn. June 27, 2006); (Depo. of Jeffery Morrill P. 24, L. 5-25 thru P. 25, L. 1-9; Report of Jeffery Morrill at P. 4).

### MORRILL'S TESTIMONY SHOULD BE EXCLUDED

Because the methodology underlying Morrill's opinion is not scientifically valid, it is unreliable and must be excluded pursuant to Federal Rule of Evidence 702. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993); Travelers, at *3. Moreover, Morrill's criticism of Mark Sells' methodology and conclusions should be excluded as his failure to follow the guidelines outlined in NFPA 921 and lack of licensure demonstrate he is not qualified to do so.

The Banks bear the burden of demonstrating Morrill's opinion the fire should have been classified "undetermined" comports with sound science and is therefore reliable. Travelers, at *3. The Court should carefully analyze Morrill's methodology, reasoning, and/or technique to ensure his opinion is based on scientifically valid principles pursuant to Federal Rule of Evidence 702. Id. This Court has elaborated:

> An expert's opinion may not be the expert's subjective belief or essentially unsupported speculation. *Smelser,* 105 F.3d at 303. In *Daubert,* the Supreme Court identified several factors to assist courts in evaluating whether a scientific theory or methodology constitutes reliable scientific knowledge. These include: (1) whether the theory or technique can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether a technique has a known or potential rate of error and whether there are standards controlling the technique's operation; and (4) whether the theory or method has general acceptance in the scientific community. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97. However, the analysis of reliability is flexible, and its indicators may vary from discipline to discipline. *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2786; *Abon, Ltd. v. Transcontinental Ins.,* 2005 WL 1414486 (Ohio Ct.App. 5th June 16, 2005), *appeal not allowed,* 105 Ohio St.3d 1408, 836 N.E.2d (2005); *see also, Moore v. Ashland Chem. Inc.,* 126 F.3d 679, 686–88 (5th Cir.1997).
>
> In this regard, the expert's opinion must be based on methods and procedures that meet the level of intellectual rigor demanded by the relevant discipline. *See In re: Paoli,* 35 F.3d 717, 742 (3rd Cir.1994). The proposed testimony must be supported by appropriate validation, otherwise stated, "good grounds" based on what is known. *Id.; Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795. The grounds for an expert's opinion merely have to be good; they do not have to be perfect. *Paoli,* 35 F.3d at 744.
>
> The Court recognizes that NFPA 921 is a peer reviewed and generally accepted standard in the fire investigation community. *Royal Inc. Co. of Am. v. Joseph Daniel Constr., Inc.,* 208 F.Supp .2d 423, 426–27 (S.D.N.Y.2002); *Travelers Prop. & Cas. Corp. v. Gen. Elec. Co.,* 150 F.Supp.2d 360, 366 (D.Conn.2001); *Abon, Ltd.,* 2005 WL 1414486 at *10. Section 2–3.6 of the NFPA 921 recognizes the process of deductive reasoning as an appropriate methodology for determining the cause and origin of a fire.

Id. at *3-4.

The methodology applicable to fire origin and cause investigations is summarized in the following figure from NFPA 921:



**FIGURE 18.2, NFPA 921**

Here, a fire occurred and the need to determine its cause is clearly recognized. The first substantive step of the scientific method set forth in NFPA 921 requires facts about the fire incident be collected "…by observation, experiment, or other **direct-gathering** means. This data is considered empirical data as it is capable of being verified." (Report of Jeffery Morrill at P. 4 quoting in part NFPA 921 § 4.3.3) (emphasis added). In regards as to what data should be collected, NFPA 921 § 18.3 provides in relevant part:

> Data should be collected to identify all potential fuel, ignition sources, and oxidants within the area or areas of origin. Data may also need to be collected from outside the area of origin. Examples of this would be unburned fuel samples or exemplar ignition sources located in other areas. Data on the circumstances bringing the fuel, ignition sources, and oxidants together may come from many different sources.

NFPA 921 § 18.3. NFPA 17.1.2 provides further insight into what information should be sought by a cause and origin investigator:

> **17.1.2** Determination of the origin of the fire involves the coordination of information derived from one or more of the following:
>
> (1) *Witness Information.* The analysis of observations reported by persons who witnesses the fire or were aware of conditions present at the time of the fire
>
> (2) *Fire Patterns.* The analysis of effects and patterns left by the fire (*See Chapter 6.*)
>
> (3) *Arc Mapping.* The analysis of the locations where electrical arcing has caused damage and the documentation of the involved electrical circuits (*See Section 8.10.*)
>
> (4) *Fire Dynamics.* The analysis of the fire dynamics, that is, the physics and chemistry of fire initiation and growth (*see Chapter 5*), and the interaction between the fire and the building's systems (*See Chapter 7.*)

NFPA 921 § 17.1.2.

Here, Morrill did not directly gather any facts or data about the fire which would enable him to identify all potential fuel, ignition sources, oxidants, unburned fuel samples, exemplar ignition sources, witness information, fire patterns, arc mapping, fire dynamics or other relevant circumstances. Specifically, Morrill failed to do the following:

- Examine the scene of the fire including electrical components or other articles found there (Depo. of Jeffery Morrill P. 6, L. 11-14; P. 20, L. 22-25 thru P. 21, L. 1-9; P. 33, L. 3-4),

- Perform any independent testing related to the fire (Depo. of Jeffery Morrill P. 6, L. 15-17),

- Interview any witnesses (Depo. of Jeffery Morrill P. 6, L. 19-21),

- Identify a source of ignition (Depo. fo Jeffery T. Morrill P. 13, L. 19-21),

- Review the opinions of fire investigators Jeremy Woods or Russell Robinson (Depo. of Jeffery Morrill P. 19, L. 25 thru P. 20, L. 1-18),

- Directly review chemist, Christine Foran's, report wherein she found 2 samples taken from the scene were positive for ignitable liquid residue identified as trace medium to heavy petroleum distillate (Depo. of Jeffery Morrill P. 23, L. 2-24; EFI Laboratory Report of Christine Foran attached as Exhibit 5), or

- Perform any analysis of the gas chromatography or mass spectrometry (Depo. of Jeffery Morrill P. 23, L. 21-24).

Moreover, despite taking issue with the collection methods employed by Marks Sells in layering through the fire debris, Morrill did not attempt his own collection efforts. (Depo. of Jeffery Morrill P. 6, L. 11-14; P. 18, L. 3-25 thru 19, 1-9). Rather, in forming his opinions, Morrill relied on Mark Sells' findings as outlined his expert reports and the exhibits thereto, Marks Sells' deposition testimony, the affidavit of John Lentini, pre and post loss photographs, and 4 pages of diagrams of the Banks' house. (Depo. Jeffery T.

Morrill P. 6 thru 7, Report of Jeffery Morrill P. 3). While some reliance on data collected by others may be permissible, Morrill's complete and utter failure to directly observe, experiment, or gather any other information supporting his conclusion constitutes insufficient data collection under NFPA 921. See NFPA 921 § 4.3.3; see Travelers, at *4.

This flaw is fatal to Morrill's purported application of the scientific method as each substantive step is dependent upon it. Specifically, he could not properly and adequately "analyze the data" under NFPA 921 § 4.3.4 as it requires analysis of "all data," "develop a hypothesis" under NFPA 921 § 4.3.5 as such hypotheses must be "based on data analysis," and "test the hypothesis" under NFPA 921 § 4.3.6 as it requires each hypothesis be compared against "all known facts." Because Morrill failed to apply the scientific method in reaching his conclusion the cause of the fire is "undetermined," it is unreliable.

The unreliability of Morrill's conclusion is further demonstrated by the fact that he failed to consider certain portions of NFPA 921 which were applicable to the instant case. In essence, Morrill opines that Cincinnati's expert, Mark Sells, could not identify an ignition source within the area of origin and therefore should have found the cause of the fire to be "undetermined." (Depo. of Jeffery Morrill P. 28 L. 8 thru P. 29, L. 20, Report of Jeffery Morrill at P.P. 6-8). This reasoning simply ignores NFPA 921 § 19.2.1.4(B), which provides in relevant part:

> In the instance in which the investigator fails to identify the ignition source, the fire need not always be classified as undetermined (See 18.6.5.1).

NFPA 921 § 19.2.1.4(B). Morrill's reasoning further ignores NFPA 921 § 18.4.4.3 which

similarly provides:

> **18.4.4.3** There are times when there is no physical evidence of the ignition source found at the origin, but where an ignition sequence can logically be inferred using other data. Any determination of fire cause should be based on evidence rather than on the absence of evidence; however, there are limited circumstances when the ignition source cannot be identified, but the ignition sequence can logically be inferred. This inference may be arrived at through the testing of alternate hypotheses involving potential ignition sequences, provided that the conclusion regarding the remaining ignition sequence is consistent with all known facts (*see Basic Methodology chapter*). The following are examples of situations that lend themselves to formulating an ignition scenario when the ignition source is not found during the examination of the fire scene. The list is not exclusive and the fire investigator is cautioned not to hypothesize an ignition sequence without data that logically supports the hypothesis.
>
> **(A)** Diffuse fuel explosions and flash fires.
>
> **(B)** When an ignitable liquid residue (confirmed by laboratory analysis) is found at one or more locations within the fire scene and its presence at that location(s) does not have an innocent explanation. (*See Incendiary Fires chapter*).
>
> **(C)** When there are multiple fires (*See Incendiary Fires chapter*).
>
> **(D)** When trailers are observed. (*See Incendiary Fires chapter*).
>
> **(E)** The fire was observed or recorded at or near the time of inception or before it spread to a secondary fuel.

NFPA 921 § 18.4.4.3.

When questioned regarding NFPA 921 § 18.4.4.3, Jeff Morrill admitted:

Q: (Mr. Chastain) Let me show you section 18.4.4.3 from the 2011 edition of NFPA 921, and I want to talk through that section with you. Are you familiar with that section?

A: Absolutely.

Q: All right. Let's go through it. It says: There are times when there is no physical evidence of the ignition source found at the origin, but where an ignition sequence can logically be inferred using other data. Do you agree with that?

A: Yes.

***

Q: All right. And in going through specifically identified factors A through E, let's look at a couple of those. B is: When an ignitable liquid residue, confirmed by laboratory analysis, is found at one or more locations within the fire scene and its presence at that location does not have an innocent explanation.

Did I read that correctly?

A. You did.

Q. All right. If the GC and mass spec testing that was done by Christine Foran did actually confirm ignitable liquid residue, according to this paragraph of the NFPA guidelines, it did not have to be in the area of origin did it, to be a factor that is proper for Mark Sells to consider in reaching his conclusion?

A. That is correct….

(Depo. of Jeffery Morrill P. 55, L. 24 thru P. 56, L. 9; P. 57, L. 1-23). Moreover, Morrill admitted Mark Sells appropriately considered Christine Foran's results wherein she found two samples taken from the scene were positive for ignitable liquid residue. (Depo. of Jeffery Morrill P. 27, L. 10 thru P. 28, L. 2; EFI Laboratory Report of Christine Foran). In light of the foregoing, Morrill's opinion that the fire had to be ruled "undetermined" as there was no proof of ignitable liquids at the point of origination is clearly inconsistent with NFPA 921 and his own understanding thereof. Indeed, proper consideration of Ms. Foran's findings could have led Morrill to find the fire was incendiary.

Moreover, Morrill dismisses without any true analysis Mark Sells' testimony that he saw unusual fire patterns in the office which shared a wall with the master bedroom which is the agreed place of origin. The below illustrates the proximity of the office to the master bedroom:



BANKS_FULL     12/18/2012    Page: 75

(Exhibit 7 to Deposition of Mark Sells). Specifically, Mark Sells testified:

> Q. All right. What were the other possible reasons for the fire patterns that you've identified as a result of considering that flashover may have occurred?
>
> A. Which fire patterns are you…
>
> Q. Any fire patterns. Let's start with office.
>
> A. Okay. Are you talking about the saddle burn?
>
> Q. What other fire patterns –
>
> A. Well, there's material loss.
>
> Q. Which is?
>
> A. When material is being consumed by the fire.
>
> Q. Okay. And that in and of itself is what you consider a fire pattern?
>
> A. Yes, it is a fire pattern.

Q. Okay.

A. Pointer arrows.

Q. Sorry?

A. Pointer arrows.

Q. Tell me what that is?

A. Wall studs, but you can use any wood material. Whichever side the fire is attacking it from, it's going to make a pointer because it's losing material. If we've got it this way, it's going to lose material and it's going to make pointer arrows and that shows you fire travel.

Q. Did the fire patterns in the office identify the fire going upward or downward?

A. Couldn't make a conclusion. Looks like to me, it went both ways.

Q. Okay. And does the fact that it appeared that it may go both ways, does that have any impact on the way you analyze a scene?

A. Yes.

Q. Or any significance to you?

A. Yes.

Q. Tell me what that significance is.

A. A fire does not burn down. If I've got patterns coming down, tells me I need to look further at the evidence.

(Depo. of Mark Sells P. 199, L. 8 - P. 200, L. 24 attached as Exhibit 6). Morrill opines these unusual burn patterns resulted from a drop down without any further analysis. (Depo. of Jeffery Morrill P. 38, L. 18-25). However, these burn patterns, in conjunction with the ignitable liquid residue found in the same area, certainly constitute data upon which a logical inference can be drawn in determining the ignition source under NFPA 921 § 18.4.4.3. As such, Morrill should have given them credence in his analysis.

Additionally, Morrill's testimony should be excluded because he was not legally competent to render an expert opinion on the cause and origin of a fire in the State of Tennessee. Morrill testified his Tennessee license is expired, but was unclear as to the specific dates of expiration and was also unclear whether he had a license at the time he rendered the opinions in this case, which were between November of 2012, and the present. Specifically, Morrill testified:

> Q. Do you have a Tennessee private investigator's license?
>
> A. Not currently.
>
> Q. Did you have – or when did you have one?
>
> A. 2011 or '12 was the last time that I had a valid Tennessee license. It expired and I'm in the process of reapplying.
>
> Q. At the time you performed your analysis of the Banks case, were you current in your Tennessee licensure?
>
> A. I don't know.
>
> Q. Okay. You may need to look at your records, I don't know. When were you actually retained in this case?
>
> A. November 28th, 2012.

(Depo. of Jeffery Morrill P. 48, L. 8-22).

According to http://verified.tn.gov/Details.aspx, Mr. Morrill's license expired on July 27, 2010, and is in "expired" status. See printout attached as Exhibit 7. Accordingly, Mr. Morrill was not licensed as a private investigator in the State of Tennessee at the time of the Banks' fire, nor was he licensed at any point during his investigation. Obviously, Mr. Morrill recognized that, at some point in the past, he needed to be licensed, but failed to maintain that licensure.

Tennessee Code Annotated Title 62, Chapter 26 provides regulatory and licensure information for private investigators. Specifically, T.C.A. § 62-26-204, which deals with "unlicensed practice," states as follows:

> (a) Except as otherwise provided in this part, it is unlawful for any person to act as an investigations company or a private investigator without first obtaining a license from the commission.

Under T.C.A. § 62-26-202, the following definitions exist:

> (6) 'Investigations Company' means any person who engages in the business or accepts employment to obtain or furnish information with reference to:
>
> * * *
>
> (D) The cause or responsibility for fires, libels, losses, accidents, damages or injuries to persons or to property;
>
> * * *
>
> (10) 'Private investigator' means any person who performs one (1) or more services described in subdivision (6)….

T.C.A. § 62-26-202. Because he lacked a license at the time he was hired and rendered an opinion in this matter, Morrill is in violation of Tennessee law.

Cincinnati recognizes this lack of licensure, in and of itself, may not be determinative of the inability of Morrill to testify. However, when this fact is taken in conjunction with his failure to follow scientific method and pay attention to the very guidelines upon which he criticizes Cincinnati's licensed expert, Morrill's testimony must be considered unreliable. Based on this finding, it must be excluded pursuant to Federal Rule of Evidence 702.

## CONCLUSION

Morrill's testimony should be excluded as it is unreliable under Federal Rule of Evidence 702.

Respectfully submitted,

_s/ Parks T. Chastain_
**PARKS T. CHASTAIN**
Registration No. 13744
**E. JASON FERRELL**
Registration No. 24425
Attorneys for Plaintiff, Cincinnati Insurance Company

**BREWER, KRAUSE, BROOKS, CHASTAIN & BURROW, PLLC**
P. O. Box 23890
Nashville, TN 37202-3890
(615) 256-8787

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of August, 2013, a true and correct copy of the foregoing Memorandum in Support of Daubert Challenge as to Expert Witness, Jeffery Morrill, was filed electronically. Notice of this filing will be sent by operation of the court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U. S. Mail. Parties may access this file through the court's electronic filing system.

J. Brandon McWherter, Esquire
Jonathan L. Bobbitt, Esquire
Clinton H. Scott, Esquire
Gilbert Russell McWherter, PLC
101 North Highland Avenue
Jackson, TN 38301

_s/ Parks T. Chastain_
**PARKS T. CHASTAIN**

PTC:dmt