Certified Copy

In the Matter Of:

CINCINNATI INS CO vs. BANKS

4:12-cv-32

**JEFFERY T. MORRILL**

*August 08, 2013*

ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

1      Q.    Do you have your time sheets in that file?

2      A.    I only have the time that I have put into

3   the review of the case and preparation of the report.

4      Q.    Okay.  What other time would there be?

5      A.    I don't know of any.  I don't keep a

6   separate time sheet.  When I initially did this case,

7   it was as I do a case review, and the case review

8   comes with whatever counsel would need as far as a

9   verbal or written report.  And I just charge a flat

10  rate of $500 for that.

11     Q.    Okay.  All right.  Well, let me -- let me

12  see if I can narrow down some questions, then.  Have

13  you been to the property that burned in Manchester?

14     A.    I have not.

15     Q.    Other than reviewing records, have you

16  performed any independent testing that you believe

17  relates in any way directly to this case?

18     A.    No, sir.

19     Q.    Have you spoken with any witnesses on your

20  own that relate in any way to this case?

21     A.    No, sir.

22     Q.    Does this notebook contain all the

23  documentation that you have reviewed?

24     A.    Yes.

25     Q.    In your report, you itemized a listing of

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 4:12-cv-00032-WBC   Document 89-2   Filed 08/30/13   Page 2 of 24   PageID #: 1250

1    documents beginning at page 3 of 22 that you had

2    reviewed.

3         A.    Yes.

4         Q.    Other than those documents, and perhaps

5    since the preparation of this report, have you

6    reviewed anything else?

7         A.    The only thing further that I have

8    reviewed is an affidavit prepared by John Lentini,

9    L-e-n-t-i-n-i, and a deposition taken of Mr. Sells on

10   January 8th of this year.

11        Q.    Have you made any supplemental reports

12   based upon your review of those additional items?

13        A.    I have not.

14        Q.    Have any of the opinions that you gave in

15   your report that we have marked as Exhibit 3 changed

16   in light of your review of Mr. Lentini's report or

17   Mr. Sells deposition?

18        A.    I don't believe so.

19        Q.    All right.  Have you developed any new

20   opinions based upon either the review of

21   Mr. Lentini's report or Mr. Sells deposition?

22        A.    I don't believe so.

23        Q.    All right.  So basically Exhibit 3 is what

24   we've got?

25        A.    Yes, sir.

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 4:12-cv-00032-WBC   Document 89-2   Filed 08/30/13   Page 3 of 24   PageID #: 1251

JEFFERY T. MORRILL
CINCINNATI INS CO vs. BANKS

August 08, 2013
8

1    Q.    All right.  Let's talk about John Lentini

2    for a minute.  You and he used to be in business

3    together; is that correct?

4    A.    We were employed by the same company, yes.

5    Q.    That was Applied?

6    A.    Applied Technical Services in Marietta,

7    Georgia.

8    Q.    When did you leave Applied?

9    A.    February 22nd, 2010.

10    Q.    When did Mr. Lentini leave Applied?

11    A.    September 30, 2006.

12    Q.    Do you know why Mr. Lentini left?

13    A.    He was ready to depart the everyday

14    working for somebody else.  He had purchased his

15    retirement home in the Florida Keys.  His children

16    were all out of the house, grown and gone, and it was

17    time for he and his wife to enjoy the rest of their

18    time down in Florida with him still doing consulting

19    work.  But he wasn't involved in the day-to-day

20    operation of the fire investigation department nor

21    was he going out on a regular basis to do fire scene

22    examinations.

23    Q.    At the time he left, was he still

24    performing the gas chromatography testing for

25    Applied?

Case 4:12-cv-00032-WBC   Document 89-2   Filed 08/30/13   Page 4 of 24   PageID #: 1252

1    in this case, we can say that the fire vented out of

2    certain openings prior to the damper being open or

3    failure of the ceiling.

4         Q.    All right.  You mentioned the -- I think

5    in that answer that you would attempt to determine

6    the level of fire origin, too.  In your opinion, did

7    this fire originate on the main level of the

8    structure?

9         A.    It did.

10        Q.    Okay.

11        A.    There was no evidence of any venting from

12   any of the basement.  And I understand that the newer

13   section that we're referring to at the left end or

14   west end of the house was a three-story structure.

15   The lowest level was basement or below the main level

16   of the original house.  So when the addition was

17   built, the actual second level of the addition is

18   equivalent to the main level of the house.

19        Q.    All right.  Do you have an opinion as to

20   the source of ignition within your area of origin?

21        A.    No, sir.

22        Q.    In discussing the level of destruction at

23   some point in your report, specifically on page 6 of

24   22, you comment upon the fact that the master bedroom

25   floor had been mostly consumed and had collapsed into



1       A.      Certainly not.  I probably would have done

2   much the same thing.

3       Q.      Did you read in his deposition the manner

4   in which he layered through the debris?

5       A.      I did.

6       Q.      And what was that?

7       A.      His terminology of hand sifting is

8   certainly incorrect.  The term sifting means you've

9   sifted.  And sifting requires the use of a screen so

10  that you can see the minutia of items that may be in

11  the debris.  All he did was hand shoveled and

12  hand raked through the debris, which is a common

13  technique that fire investigators use.  And this is

14  often used when you're looking for larger items such

15  as a television set or a clock radio or dryer.  If

16  you're looking for something larger or looking for

17  electrical wiring, these type of things, that's

18  perfectly acceptable system to use for going through

19  the debris.

20          If you're looking for anything smaller

21  than what you can rake or shovel, for instance, you

22  will never find or rarely find a single lithium ion

23  battery with a rake and a shovel.  You will almost

24  always need to use a screen.  So if we're looking for

25  something the size of a double A battery, then hand

JEFFERY T. MORRILL
CINCINNATI INS CO vs. BANKS

August 08, 2013

19

1    shoveling and raking are not an appropriate

2    methodology for going through that debris.

3        Q.    And have you performed any sifting of

4    debris?

5        A.    Have I?

6        Q.    Yes.

7        A.    On this case?

8        Q.    Yes.

9        A.    Oh, certainly not.

10       Q.    Are you aware of anyone who has actually

11   sifted the debris?

12       A.    I am not.

13       Q.    As you have used the term?

14       A.    That is correct.

15       Q.    Other than Mr. Sells, are you aware of any

16   person who has actually dug through the debris?

17       A.    The only people I know of is what

18   Mr. Sells reported is that there were some debris

19   removal actions done by the fire department, and I

20   believe that's Mr. Woods with the fire department,

21   prior to Mr. Sells arrival.

22       Q.    Do you have an opinion as to the cause of

23   this fire?

24       A.    No, sir.  Other than undetermined.

25       Q.    Have you reviewed the opinions either in

1    fire reports or deposition of Jeremy Woods?

2         A.    No.

3         Q.    What about Russel Robinson with the State?

4         A.    No.

5         Q.    Do you know the opinion as to the cause of

6    the fire that Mr. Woods arrived at?

7         A.    No, sir.

8         Q.    Do you know the opinion that Mr. Robinson

9    arrived at?

10        A.    No.

11        Q.    I think I know the answer to the question,

12   but I've got to ask it for the record anyway.

13   Therefore, do you have any criticism of the

14   methodology that they used in arriving at their

15   conclusions?

16        A.    Without knowing what their conclusions

17   are, I certainly wouldn't be able to opine about

18   their methodology.

19        Q.    Do you know what the sources of ignition

20   were in the area that you have labeled as the likely

21   origin area on Exhibit 4?

22        A.    It would be whatever is part and parcel of

23   the structure and the contents.  So in the case of an

24   electrical fire, it would be anything of the

25   electrical system that would have been energized

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 4:12-cv-00032-WBC   Document 89-2   Filed 08/30/13   Page 8 of 24   PageID #: 1256

1    prior to this fire.  Any of the house wiring, any of

2    the appliances plugged into any of the house wiring.

3    Those are the common articles that one would look at

4    to opine as to whether they may or may not have been

5    involved in the ignition of this fire.

6         Q.    Have you looked at those articles to see

7    if they were involved in the ignition of this fire?

8         A.    I have not.  I have only reviewed the

9    documents that were provided.

10        Q.    I looked through your updated list of

11   testimony this morning and I do not think I saw any

12   cases where you have testified as a witness either

13   for or against Cincinnati; is that accurate?

14        A.    I don't think so.  I don't think any of

15   the Cincinnati cases I ever worked went to deposition

16   or trial.  They may have.

17        Q.    And you obviously have worked for

18   Cincinnati before?

19        A.    That is correct.

20        Q.    And have you ever worked for Cincinnati in

21   the state of Tennessee?

22        A.    I have.

23        Q.    Based upon your -- well, let me ask you

24   this.  I know you've reviewed a fairly limited amount

25   of materials, but based upon what you reviewed, do


ESQUIRE
S O L U T I O N S

800.211.DEPO (3376)
EsquireSolutions.com
Case 4:12-cv-00032-WBC   Document 89-2   Filed 08/30/13   Page 9 of 24   PageID #: 1257

1        A.     No, sir, I do not know her.

2        Q.     Do you have an opinion whether there were

3    any ignitable liquids present in any of the debris

4    samples taken by Mark Sells?

5        A.     I do.

6        Q.     And what is that opinion?

7        A.     That none of the samples had any ignitable

8    liquid residues in them.

9        Q.     And what is that opinion based on?

10       A.     It's based initially on Ms. Foran,

11   F-o-r-a-n, Ms. Foran's report where there were

12   multiple samples taken.  She identified two of nine

13   as being negative.  I'm sorry, two of nine being

14   positive, the other seven being negative.  When

15   that -- when those two positives were reviewed, it

16   was found that those are not in fact positive

17   samples.

18       Q.     And you're talking about Mr. Lentini's

19   review?

20       A.     That is correct.

21       Q.     Did you perform any analysis of the

22   gas chromatography and mass spectrometry testing on

23   your own?

24       A.     I did not.  I'm not a fire debris analyst.

25   I'm familiar with the methodology from working in the

ESQUIRE
S O L U T I O N S

800.211.DEPO (3376)
EsquireSolutions.com
Case 4:12-cv-00032-WBC   Document 89-2   Filed 08/30/13   Page 10 of 24   PageID #: 1258

JEFFERY T. MORRILL
CINCINNATI INS CO vs. BANKS

August 08, 2013
24

1    fire debris laboratory at Applied Technical Services.

2        Q.    But as to the methodology, would you defer

3    to Mr. Lentini on that?

4        A.    Absolutely.

5        Q.    In your report, page 4, the top sentence,

6    you indicate:  This author utilized the guidance set

7    forth in NFPA 921, The Guide For Fire and Explosion

8    Investigations, 2011 edition, for the analysis of

9    this fire.  Is that correct?

10       A.    That is correct.

11       Q.    Is it your view that NFPA 921 is a guide?

12       A.    Absolutely it's a guide.

13       Q.    And do you know what the word standard is?

14       A.    Yes, sir, I do.

15       Q.    NFPA publishes standards also, don't they?

16       A.    Standards, recommended practices and

17   guides.

18       Q.    All right.  So tell me in your opinion

19   what the role of NFPA 921 in directing or with

20   respect to a fire investigation really is.

21       A.    NFPA 921 is the only peer reviewed

22   consensus document that exists in the world in the

23   field of fire investigation.  It's been accepted by

24   the courts as a standard of care, and that's where

25   the word standard comes in very often.  The title on

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 4:12-cv-00032-WBC   Document 89-2   Filed 08/30/13   Page 11 of 24   PageID #: 1259

1    the book certainly is a guide, and it says right in

2    there that you do not have to abide by anything that

3    this document says, however, my experience has been

4    that if you deviate from the guidance set forth in

5    NFPA 921, you will have to explain that.  And

6    certainly, it's a very large document now.  Not every

7    chapter is relevant to every fire scene so,

8    therefore, you do not need to utilize every paragraph

9    of the entire document.

10        Q.    Your resume indicated that you were a

11   member of the NFPA 921 committee; is that correct?

12        A.    That is correct and I still am.

13        Q.    With respect to the 2011 edition, were you

14   a full member or were you -- what's the word?

15        A.    Alternate.

16        Q.    Alternate for Mr. Lentini?

17        A.    I have always been Mr. Lentini's

18   alternate.

19        Q.    And what does it mean to be an alternate?

20        A.    I provide the same services that he would

21   provide if he is not there as far as voting.  That's

22   the only place where an alternate is silent is if the

23   sitting committee member is there present at a

24   meeting and a vote is taken, the alternate doesn't

25   get a vote.  As far as the conversations, as far as



800.211.DEPO (3376)
EsquireSolutions.com
Case 4:12-cv-00032-WBC   Document 89-2   Filed 08/30/13   Page 12 of 24   PageID #: 1260

1    Q.   All right.  3, collect data.  Do you agree

2    that he did collect data?

3    A.   He did collect data.

4    Q.   And let me ask you something about some of

5    the data he collected.  Is the result of the

6    gas chromatography and mass spec testing some of the

7    data that he collected?

8    A.   It would be data that was generated based

9    upon material items he collected.  It becomes data.

10   Q.   Okay.  As a fire investigator in Mr. Sells

11   position, do you see any reason that he should not

12   have considered the report from Christine Foran in

13   assessing the overall data and arriving at his

14   conclusions as to the fire?

15   A.   I have no problem with him accepting the

16   fact that his chemist says that he took two positive

17   samples out of the Banks' residence.  What I take

18   exception with, of course, is him making the leap

19   that where he got these reported positive samples

20   means that there were or was the presence of

21   ignitable liquids in other areas of the house.

22   Q.   I understand.  And we're going to get to

23   that.  But just the mere fact that he took her word

24   for it, based upon what appeared to be her testing

25   that those were positive, that's not a criticism that

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 4:12-cv-00032-WBC   Document 89-2   Filed 08/30/13   Page 13 of 24   PageID #: 1261

JEFFERY T. MORRILL
CINCINNATI INS CO vs. BANKS

August 08, 2013
28

1    you have?

2         A.    No.

3         Q.    Okay.   Number 4, analyze the data.   Here

4    you have an italicized version or a partial paragraph

5    so I presume you have some criticism of Mr. Sells

6    analysis of the data?

7         A.    That is correct.

8         Q.    Tell me what your criticism is as to his

9    analysis of the data.

10        A.    All fire investigators analyze the data in

11   light of their own training, education, knowledge and

12   experience.   Each fire investigator will look at the

13   data collected from a fire scene perhaps differently.

14   Mr. Sells identified an area of origin as the area of

15   the master bedroom on the main level of the addition.

16   From there, he collected some samples.   The samples

17   that he collected from his opined area of origin were

18   negative for the presence of ignitable liquids.   He

19   goes to another area of the house, which he does not

20   include as part of his area of origin.   He sees what

21   he opines as being holes in the floor that could only

22   be done by the presence of ignitable liquids.   Even

23   though there are no walls in this area and there's no

24   roof, there's no ceiling, none of this part of the

25   structure exists.   So he's only looking down at holes

1    in the floor and says, these must be due to an

2    ignitable liquid.  And when he gets his report back

3    from the chemist, it says, yes, there's ignitable

4    liquid residues there, he has an aha.  And so in his

5    opinion, because he either lacks training, education,

6    knowledge or experience, or a combination thereof, he

7    can't see any other way that these holes could appear

8    in the floor without the use of an ignitable liquid,

9    which means to me that he's never investigated a fire

10   of a structure that was a lightning strike into a

11   roof and by the time the fire department gets there

12   and puts it out, all that's remaining is a basement.

13   So obviously, even a lightning strike to a roof where

14   the origin of the fire is up very high can result in

15   the total destruction of a house.  So obviously, at

16   some point in time that fire will burn down.  May be

17   due to radiant heat, it may be due to a flashover

18   situation occurring, whatever it is, you can get fire

19   damage on floors without there being an ignitable

20   liquid there.

21        Q.    How are you using the term flashover?

22        A.    Flashover is a phenomenon that occurs when

23   the heat flux in a room becomes intense enough to

24   basically ignite all of the combustibles in that

25   room.



1    see any evidence of an electrical ignition to the

2    fire?

3        A.    No, sir, but I did not inspect or examine

4    any of the electrical components.  There's a one-page

5    document from the electrical engineer that Mr. Sells

6    had at the fire scene who said that the damage was

7    too extensive for him to identify anything as

8    potential cause or eliminate any of it as potential

9    cause for the fire.

10       Q.    Do you believe that Mr. Sells made an

11   attempt to properly analyze the data?

12       A.    I believe he made an attempt to.  Again,

13   in light of his training, education, knowledge and

14   experience.  He did in fact employ the services of an

15   electrical engineer within his company to assist him

16   in understanding the potential electrical failures or

17   faults within his area of origin.

18       Q.    You've mentioned lightning strike and I

19   think I've asked you this, but is it your opinion

20   that a lightning strike caused this fire?

21       A.    No, sir, I have no data to support a

22   lightning strike.

23       Q.    All right.  Point number 5 on page 22

24   deals with developing a hypothesis.  And then point

25   number 6 is testing the hypothesis, and then it



JEFFERY T. MORRILL
CINCINNATI INS CO vs. BANKS

August 08, 2013

38

1  ignitable liquid.  However, a linoleum floor, you

2  will -- in my experience, never gotten a positive

3  sample off a linoleum floor.  And we have actually

4  done some laboratory tests where we have taken fresh

5  linoleum right off the rack at Home Depot, taken a

6  sample of it, run it through the GC to get a

7  baseline, poured gasoline on it, kerosene, diesel

8  fuel, burned it, put it in the can, and nothing comes

9  back.  It comes back with the same -- so the matrix

10  of whatever that linoleum is simply doesn't retain

11  any of the ignitable liquids.  However, hardwood

12  floorings and carpet, things like that do.

13       Q.    What is a saddle burn?

14       A.    Saddle burn is the appearance of a burn

15  that goes from the surface of the floor down, usually

16  in a curved manner such as what a horse saddle would

17  look like.

18       Q.    Do you believe that the photographs that

19  Mr. Sells took of the office area depicts saddle

20  burning?

21       A.    I believe they do, yes.

22       Q.    And I think you told me it's your opinion

23  that was from drop down?

24       A.    From fall-down, yes, sir.

25       Q.    Fall-down.

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 4:12-cv-00032-WBC   Document 89-2   Filed 08/30/13   Page 17 of 24   PageID #: 1265

1    possibly have been anything other than a human act to

2    have caused that fire.

3        Q.    Do you agree that the NFPA 921 permits the

4    use of witness information to determine the cause of

5    a fire when the ignition source is undetermined?

6        A.    It is data that can be utilized, but

7    typically witnesses are not generally used for the

8    cause of the fire.

9        Q.    Does the NFPA permit the use of just

10   general principles of fire dynamics in determining

11   the cause and origin of the fire when the ignition

12   source cannot be identified?

13       A.    Absolutely.  That's part of the data

14   collection and data analysis is fire dynamics.

15       Q.    If you would, turn to page 6 of -- you may

16   already be there.  The second opinion that you have

17   is that the fire cause could not be shown to be

18   intentionally set as opined by Investigator Sells;

19   correct?

20       A.    That is correct.

21       Q.    And I think we've talked about that.  It's

22   your opinion that the cause of the fire should have

23   been listed as undetermined?

24       A.    Absolutely correct.

25       Q.    All right.  And have you told me in

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 4:12-cv-00032-WBC   Document 89-2   Filed 08/30/13   Page 18 of 24   PageID #: 1266

1    discussing the two criticisms of Mr. Sells' analysis

2    and his testing of the hypothesis, basically the

3    reasons why you think that the fire should have been

4    determined to be undetermined?

5         A.    I believe so.

6         Q.    All right.  Under that, you have some

7    other highlighted areas and I want to ask you about

8    those.  The first one says potential heat/ignition

9    sources identified within the area of origin include

10   introduction of open flame.

11              What is your point regarding that?

12        A.    That's Mr. Sells wording that the

13   potential heat/ignition sources within the area of

14   origin include introduction of an open flame.  Well,

15   of course, they do.  That is something that is

16   possible in any fire.  However, he didn't list that

17   the unidentified electrical devices or electrical

18   wiring are also, you know, included in his area of

19   origin as potential heat ignition sources.  In other

20   words, the only thing he identified as a potential

21   for this fire is an open flame.

22        Q.    If an ignitable liquid is used in a fire,

23   do you agree there has to be an open flame to ignite

24   the vapors from the ignitable liquid?

25        A.    Not necessarily an open flame, but an arc,



1      Q.    In your opinion, did the room identified

2  as the office experience flashover?

3      A.    Absolutely.

4      Q.    In order for the office to flashover, the

5  roof had to remain intact at least at that point in

6  the fire; correct?

7      A.    That is correct.

8      Q.    Turn over to the next page, page 8 of 22.

9  And I think this is opinion number 3, and we've

10  talked about this some.  The fire should be

11  classified as undetermined; is that correct?

12      A.    Correct.

13      Q.    I'll come back to that.

14      In the bottom of that, the bottom of that

15  page, you make a comment that it is possible that the

16  actual cause of the fire could have been found in the

17  debris of the master bedroom area had a different

18  method of debris removal been used.  Do you see that?

19      A.    Yes, sir.

20      Q.    What other method of debris removal do you

21  believe should have been used?

22      A.    It certainly could have been cleared by

23  hand and sifted.  It's not an operation that's

24  unfamiliar to most fire investigators.  It's long and

25  tedious and requires a lot of manual labor, but you

1    will find the minutia of everything that's in that

2    fire scene.

3        Q.    And I take it from your prior answers that

4    you do not know if the sifting of that debris would

5    have shown anything about the cause of the fire, you

6    just think it could have been done better?

7        A.    Absolutely.

8        Q.    Do you have a Tennessee private

9    investigator's license?

10       A.    Not currently.

11       Q.    Did you have -- or when did you have one?

12       A.    2011 or '12 was the last time that I had a

13   valid Tennessee license.  It expired and I'm in the

14   process of reapplying.

15       Q.    At the time you performed your analysis of

16   the Banks case, were you current in your Tennessee

17   licensure?

18       A.    I don't know.

19       Q.    Okay.  You may need to look at your

20   records, I don't know.  When were you actually

21   retained in this case?

22       A.    November 28th, 2012.

23       Q.    All right.

24       A.    That comes from page 3 of my report.

25       Q.    All right.  Have you and Mr. Lentini had

JEFFERY T. MORRILL
CINCINNATI INS CO vs. BANKS

August 08, 2013
55

1 time of the Banks fire?

2       A.    No, sir.

3       Q.    I know at some point in the past you have

4 done a lot of work on vehicle fires.  What is your

5 current breakdown of automobile fires versus house

6 fires?

7       A.    Probably 50/50.

8       Q.    And has it been that way for some period

9 of time?

10      A.    Typically.  One month I may look at 10

11 cars and 3 houses and the next month I look at 15

12 houses and 2 cars.

13      Q.    Right.  Does gas burn at a higher

14 temperature than wood?

15      A.    No.  And I assume -- I'm sorry.  I assume

16 that you meant gasoline?

17      Q.    Yes.

18      A.    And not a natural gas or a propane gas.

19      Q.    Right.  And I don't mean ignition

20 temperature, either, I mean flame temperature?

21      A.    Actual open flame temperature of almost

22 any product is in the 14 to 1,600 degree Fahrenheit

23 range.

24      Q.    Let me show you section 18.4.4.3 from the

25 2011 edition of NFPA 921, and I want to talk through

ESQUIRE
S O L U T I O N S

800.211.DEPO (3376)
EsquireSolutions.com
Case 4:12-cv-00032-WBC   Document 89-2   Filed 08/30/13   Page 22 of 24   PageID #: 1270

1     that section with you. Are you familiar with that

2     section?

3         A.     Absolutely.

4         Q.     All right. Let's go through it. It says:

5     There are times when there is no physical evidence of

6     the ignition source found at the origin, but where an

7     ignition sequence can logically be inferred using

8     other data. Do you agree with that?

9         A.     Yes.

10        Q.     And I take it that from what we've talked

11    about, your opinion is that Mr. Sells' conclusions

12    don't represent a logical inference based upon the

13    evidence that he observed?

14        A.     That is correct.

15        Q.     All right.

16        A.     Or the data that he collected.

17        Q.     Correct. On in that primary paragraph, it

18    says: The following are examples of situations that

19    lend themselves to formulating an ignition scenario

20    when the ignition source is not found during the

21    examination of the fire scene. The list is not

22    exclusive and the fire investigator is cautioned not

23    to hypothesize an ignition sequence without data that

24    logically supports the hypothesis.

25           Did I read that correctly?

1    A.    Yes, sir.

2    Q.    All right.  And in going through

3  specifically identified factors A through E, let's

4  look at a couple of those.  B is:  When an ignitable

5  liquid residue, confirmed by laboratory analysis, is

6  found at one or more locations within the fire scene

7  and its presence at that location does not have an

8  innocent explanation.

9          Did I read that correctly?

10   A.    You did.

11   Q.    All right.  If the GC and mass spec

12  testing that was done by Christine Foran did actually

13  confirm ignitable liquid residue, according to this

14  paragraph of the NFPA guidelines, it did not have to

15  be in the area of origin, did it, to be a factor that

16  is proper for Mark Sells to consider in reaching his

17  conclusion?

18   A.    That is correct, when you read that one

19  paragraph.  But it also says see incendiary fire

20  chapter.

21   Q.    Correct.

22   A.    Which will run you through an entire list

23  of incendiary fire characteristics.

24   Q.    Subheading C there also references

25  incendiary fires chapter, but it talks about there


ESQUIRE
S O L U T I O N S

800.211.DEPO (3376)
EsquireSolutions.com
Case 4:12-cv-00032-WBC   Document 89-2   Filed 08/30/13   Page 24 of 24   PageID #: 1272