UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | |
|---|---|
| CINCINNATI INSURANCE COMPANY, )<br>  )<br>   Plaintiff/Counter-Defendant, )<br>  )<br>v.  )<br>  )<br>LARRY BANKS AND  )<br>WANDA SUE BANKS,  )<br>  )<br>   Defendants/Counter-  )<br>   Plaintiffs.  ) | No. 4:12-CV-32<br>JURY DEMAND |

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION
## IN LIMINE TO EXCLUDE PUTATIVE EXPERT TESTIMONY OF TANYA L. BUTLER

Plaintiff/Counter-Defendant, Cincinnati Insurance Company ("CIC"), files this Brief in support of its Motion in Limine to Exclude the Putative Expert Testimony of Tanya L. Butler.

## FACTS

Tanya Butler graduated from Trevecca Nazarene College in 1984, where she majored in music performance and minored in communications. (Depo. of Tanya Butler at P. 8, L. 7-9 attached as Exhibit 1; Expert Report of Tanya Butler at P. 1 attached as Exhibit 2). Butler worked as a painting contractor for approximately 20 years prior to joining FirstCall in 2005. (Depo. of Tanya Butler at P. 7, L. 11-19). FirstCall is a public adjusting firm which assists insureds in the presentation of claims. (Depo. of Tanya Butler at P. 6, L. 24-25 thru P. 7, L. 1-8). Butler is employed by FirstCall as the Manager of the Personal Property Department and is a licensed public adjuster in Tennessee. (Depo. of Tanya Butler at P. 9, L. 12-14; Expert Report of Tanya Butler at

P. 1). Butler has been involved in approximately 500 personal property claims during this employment. (Expert Report of Tanya Butler at P. 1). FirstCall does not work for insurance companies. (Depo. of Tanya Butler at P. 6, L. 24-25 thru P. 7, L. 1-8).

Butler purports to have expertly aided the Banks to "…fully and accurately capture their personal property loss…" and in her opinion "…the personal property list ultimately prepared by FirstCall and submitted to Cincinnati Insurance Company for payment was in fact accurate <u>to the extent reasonably possible under the circumstances</u>." (Expert Report of Tanya Butler at P. 1; P. 4) (emphasis added). Butler has placed further caveats on the accuracy of her personal property inventory stating she strives to ensure it "…reflects, <u>to the best of the insured's ability</u>, the insured's actual personal property losses." (Expert Report of Tanya Butler at P. 2) (emphasis added). Butler further opined:

> By its very nature, the preparation of a personal property contents list Is not an exact science. To the extent the personal property has been destroyed beyond recognition, the insureds must rely on their personal recollection concerning brand names, ages, etc. As such, in my experience, it is not uncommon for personal property lists to contain innocent mistakes.

(Expert Report of Tanya Butler at P. 2)

In describing her methodology in preparing the personal property list, Butler stated she first transcribed the personal property list which the Banks had created from memory and evaluated the cost, quantity, description, and quality of items on the list. (Expert Report of Tanya Butler at P. 2). Butler further stated:

> We further took the Banks' handwritten list and reviewed it and made our recommendations as to the identity of items on the list, pricing, etc. This was accomplished through research, close analysis of their list, on-site analysis of the viewable damaged contents, a review of pre- and post-loss photographs, and in-depth interviews of the Banks. This process is

designed to make sure that the final submitted list is as accurate as reasonably possible. As to items that were not readily and personally viewable and identifiable due to the massive destruction of the fire, it was necessary to rely largely on the recollection of the Banks with the assistance of pre-loss photographs. This process was accomplished via two or three face-to-face meetings with the Banks to review each area of the personal property claim. An inventory of items viewable on site was also prepared and included in the final submission.

(Expert Report of Tanya Butler at P. 2-3).

Describing her on-site inspection, Butler stated she and another employee of FirstCall, Dee Simpson, went to the Banks' home only once. (Depo. of Tanya Butler at P. 17, L. 13-25, P. 18, L. 24-25; P. 33, L. 10-13). Butler testified she did not create an independent inventory based on her findings at the Banks' home. (Depo. of Tanya Butler at P. 26, L. 12-25 thru P. 27, L. 7). Rather, Butler deposed:

> A: Okay. Well, we had a list that the insureds had prepared. So we took the list on-site. And one of us would hold the list and call out the item, and the other one would look for it and make sure that it was notated.
>
> Those items then were pushed to the side or notated that they had already been addressed. Then we inventoried over and above anything that wasn't on the list.
>
> Q: So you had their list?
>
> A: Correct.

(Depo. of Tanya Butler at P. 19, L. 8-18). Butler testified when an item was found, a check was placed next to the item on the list but she does not know whether that list was maintained in her files. (Depo. of Tanya Butler at P. 20, L. 11-14). Moreover, Butler deposed she failed to make a list of items on the Banks' list which she and Ms. Simpson did not find at the home. (Depo. of Tanya Butler at P. 31, L. 3-11). Butler additionally stated she <u>may</u> have made a notation if she or Ms. Simpson found an item

in the home which was not on the Banks' list. (Depo. of Tanya Butler at P. 26, L. 9-11). Ultimately, Butler was not able to review the inventory list and identify items which she and Ms. Simpson actually found at the house. (Depo. of Tanya Butler at P. 57, L. 19-25 thru P. 58, L. 1-23 ).

Because certain portions of the Banks' home were inaccessible due to fire damage, Butler and Ms. Simpson's survey of personal property was limited. (Depo. of Tanya Butler at P. 27, L. 11-25 thru L. 28, L. 1-3). However, Ms. Banks failed to note how the damage affected their survey and inspection. Id. Specifically, Butler deposed:

> Q: Do you recall what rooms you went into at the Banks' home?
>
> A: Every room that was still intact.
>
> Q: Do you know what the names of those rooms are?
>
> A: Kitchen, utility room, back porch. There was a small – there was a den off of the dining room, a living room, one or two bedrooms down the long hall to the left-hand side and one bathroom possibly.
>
> But most of that was burned. And one room had been scraped.
>
> Q: Did you in any way identify in your report or on the contents inventory FirstCall prepared for the Banks which rooms you went in and looked at items and which rooms you didn't or couldn't go in and look at?
>
> A: I don't recall.

Id.

When an item was found at the home, Butler did not always make an attempt to verify its brand, model number, or other relevant information. Rather, she determined some items simply to be of "like kind and quality." Specifically, she deposed:

> Q. An example of that – I know you're going to stipulate to it, but let me give an example. You find a Zenith TV in the living room, a

room that's not completely destroyed, and it's got the brand name and model number on it. You can accurately assess that it's a Zenith TV with a certain model number and find the value?

A. Correct.

Q. And if it was claimed to be something else, then you could – well, you could change that. You could fix it. If it was claimed to be a Toshiba, you could go back and you could remedy that and fix it by your actual on-site inspection of that particular piece of property, if it was not burned beyond recognition?

A. Correct. Or value it at like kind and quality.

Q. Tell me what you mean by that, or value – I mean, if the thing – let's say it's still available, same brand, same model number. You're talking about valuating it like kind and quality. What do you mean by that?

A. Well, if something is five years old and it's electronic, it's probably not still available in that same form. So you find something that is available present day, like kind and quality.

Q. Well –

A. A 32-inch television, you don't replace a 32-inch television with a 13-inch, you know, boat TV. You replace it with a 32-inch television or something similar in fashion.

Q. Did you say boat TV?

A. Yeah. Like a little one you plug into a cigarette lighter or something. You don't replace a 32-inch television with that.

Q. You wouldn't replace – is it a cathode ray tube TV with a flat screen; right?

A. Not sure what that big word means.

Q. I'm not sure I said it right. The tube TV?

A. Correct or CRT, which is a big –

Q. That's what I mean.

A. Yeah. CRT – now, say that again. Ask the question again.

CT Larry Banks Studio #2 Mem MOL Exp Butler 130723    5
Case 4:12-cv-00032-WBC   Document 91   Filed 08/30/13   Page 5 of 16   PageID #: 1317

Q. I don't know if I can.

A. You wouldn't replace it with that?

Q. Well, it's different, isn't it?

A. It's like kind and quality. A screen is a screen. If CRTs are no longer available, then you price it with the current day what replacement – replacing, giving them a 32-inch screen. Again, with the little cigarette lighter, I'm not going to replace a cigarette lighter TV with a 70-in plasma.

Q. Sure. I understand.

A. But like kind and quality.

Q. Of course, they don't have the black-and-white TVs anymore.

A. They still had a TV.

Q. Sure.

A. Still had something to view on.

Q. How do you make a determination which particular TV you use to assess the like kind and quality for the purpose of preparing your –

A. Branding.

Q. Try to use the same brand?

A. Of like kind and quality.

Q. If the brand is available, you try to use the same?

A. Of course.

Q. I don't know if they even make Zenith TVs anymore.

A. I don't know. Maybe.

Deposition of Tanya Butler, P. 36, L. 21 – P. 39, L. 20.

When questioned regarding price verification, Butler contradicted herself to whether every item's price was verified. Where an item's price was in fact verified via a retailer or its website, no proof was obtained or provided from that retailer. Rather, for some of those items but not others, Butler noted in parenthesis the name of the retailer or its website from which she allegedly verified price. Specifically, Butler testified:

> Q. So there's – some items have comments on them. Some items have question marks. Others don't have anything What's the different reasons for that, if you know?
>
> A. Uniqueness or price or verification. Typically verify anything over a hundred dollars.
>
> Q. If you verify it's a different price, do you change the price? Is this where you do that?
>
> A. If we can't find a verification, then we work with the insured to find out where they purchased it or where – how can we find that kind of pricing.
>
> Q. There are some items that are shaded there. I guess they're highlighted, maybe. This is a printout, so it's hard to tell. Is that what corresponds to the notes that you made there? Hold that up for the camera so we can see what we're talking about.
>
> A. (Witness complies)
>
> Q. There are some items shaded here in the middle column, ERC each. Look at that again. Is that how – so these items that are highlighted, you had some question about or needed to verify something. Is that how that worked?
>
> A. Actually, this in column ERC each, that shading is annotation because the number is above a hundred dollars.
>
> Q. So it's something you want to verify?
>
> A. Correct. But we may not have to verify every single thing.
>
> Q. Gotcha.
>
> A. It's just a notation so it jumps out to us.

Q. So if it's less than a hundred dollars, you don't usually verify unless it's unique?

A. No. We verify it.

Q. Well, you said you verify things that are a hundred dollars usually. What –

A. When I say 'verify,' but virtue of a web site or a specific store, that type of thing.

Q. How you verify –

A. I don't verify Q-tips at $4.39 at Wal-Mart.

Q. I understand that.

A. So that's a notation for us because that's a typical industry standard. If it's a hundred dollars or more, I'm not going to say a pack of gum, a hundred dollars.

Q. Sure. But this desk pen, Office Depot, $59.95 –

A. We would verify is that a reasonable amount for desk pen at Office Depot.

Q. Just in your mind, or do you go to Office Depot?

A. Office Depot.

Q. Okay. That's what I'm getting at.

A. Yes.

Q. Because you said a hundred dollars. And if it was less than a hundred dollars, I wasn't sure if you were doing that or not?

A. No, sir. We verify the entire inventory. We verify based on a specific web site for most items that are over a hundred dollars. There may be an antique that we have to verify. You can't just say the antique is worth $35,000.

Q. Absolutely.

A. I have to verify that somehow. This is notated with Office Depot. We've gone and looked and determined that indeed this type of lamp, Realspace at Office Depot, is approximately $39.95.

Q. So you actually went to visit the Office Depot? Is that what I'm understanding? I just want to make sure I understand what you guys did. Maybe I just don't understand exactly what you're saying. Is that something would you say that price looks right and go on or is that something you verified either online or an in-person visit to the store? That's what I'm getting at.

A. Desk pen, Office Depot, we would verify that pricing online.

Q. Okay.

A. And then the insured looks at it again to make sure that those prices were comparable for what they had.

Q. Sure. But how is that different than the items you look at over a hundred dollars?

A. I didn't make that determination.

Q. Maybe you didn't. That's what I understood. I may have misunderstood what you were telling me. You said something over a hundred dollars, and then you said something less than that. I'm trying to figure that part out. Is there any difference as to whether or not – obviously, Q-tips, you're not going to do that. But if there's something that's 40 of $50, do you verify that at its source?

A. We go through every single line. We verify every single line.

Q. I know.

A. A hundred dollars or more – I think this is the third time I'm saying it.

Q. I'm trying to understand if you – you say you verify it. I get that. You said there's some difference between a hundred dollars and not a hundred dollars. What's that difference in terms of verification of a personal property item?

A. Okay. We take the inventory in. We look at it. Sometimes we have prices. Sometimes we don't. We search for the closest like kind and quality according to what the insureds have shared with us or we've seen on-site based on their buying habits. We price the

item. If it's $5.95, it's $5.95. If it's a chest of drawers and it's $595, you will most likely see it on our inventories at $595 and in parentheses, AshleyFurniture.com. We verify every price. $100 is a typical industry standard, insurance industry. For a verification of – well, I'm just not going to take you bought a pack of gum for a hundred dollars. So I have to verify that.

Q. I understand.

A. So we verify every single price. I don't put a web site down for $4.39 Q-tips.

Q. That's the difference, then. You put a web site down when it's over –

A. Most of the time.

Q. Okay. That's what I'm trying to understand. That's what it is that you're trying to tell me. You verify everything through an online source or some other source; is that correct?

A. Correct.

Q. And the items that are over a hundred dollars –

A: Most of the time.

Q: --most of them, you have a source for that?

A: Yes.

Deposition of Tanya Butler, P. 50, L. 25 – P. 56, L. 17.

## LAW & ARGUMENT

The Court should exclude Butler's testimony because the opinions she espouses in her report testimony are not the product of reliable principals methods and she lacks expert knowledge, skill, and experience. Specifically, Rule 702 of the Federal Rules of Evidence provides the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Civ. Pro 702. The proponent of evidence under Rule 702 bears to burden of establishing its admissibility. Daubert v. Merrill Dow Pharmaceuticals, 509 U.S. 579, 593 (1993). The United States Court of Appeals for the Sixth Circuit has explained:

> This rule, as amended in 2000, reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho.* Fed.R.Evid. 702 advisory committee's notes, 2000 amend. ("In *Daubert* the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in *Kumho* clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science.").

In re Scrap Metal Antitrust Litig., 527 F.3d 517, 528 (6th Cir. 2008).

In Daubert, the Court held the reliability analysis focuses on whether the reasoning or methodology underlying the testimony is valid. Daubert, at 590. In order to aid trial courts in their determinations of reliability, the Daubert Court set forth four non-exclusive factors which the courts may consider: (1) whether the expert's theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or technique is generally accepted in the relevant scientific

community.  Id. at 593–94; Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999).

Here, Butler's methodology has not been tested, subjected to peer review, or published.  Additionally, there is no indication that Butler's methodology in preparing personal property inventories following fire losses is used by others in her field.  In fact, she did not even prepare a personal property inventory.

Analysis of Butler's methodology demonstrates a complete lack of standards.  Butler took a list prepared by the Banks with her to the property despite her own admission such lists frequently contain mistakes.  When items were found, Butler or her employee placed a check mark next to the item on this list but did not take steps to ensure the list was as accurate as possible by noting the brand, age, model number or other relevant information.  Rather, if she deemed the found item to be of "like kind and quality," the item simply was marked off.  Moreover, no list or notation was made of items on the list which were not found at the property, items found at the property which were not on the list, or the rooms which were searched.  Even if such notes were taken, Butler would likely not be able to provide any relevant information as she does not know the whereabouts of the original list.  As a result of this lack of standards in her process, Butler was not able to review her inventory list, which she purports to be as accurate as possible, and positively state which items were found at the house.

This lack of standards carried over to Butler's purported price verification method.  In her testimony, Butler contradicted herself, testifying "we may not have to verify every single thing," "I don't verify Q-tips at $4.39 at Wal-Mart," but also, "We verify the entire inventory," "…we verify every single price.  I don't put a web site down for $4.39 Q-tips."

This contradiction in her testimony makes clear Butler does not have an exacting standard in place to ascertain pricing information. Moreover, where an item's price was in fact verified via a retailer or its website, no proof was obtained or provided from that retailer. Rather, for some of those items but not others, Butler noted in parenthesis the name of the retailer or its website from which she allegedly verified price. This, of course, is no proof at all as prices change and companies go out of business.

Admittedly, there is no specific rate of error known. However, by Butler's own estimation, her list is not completely accurate as her methodology is dependent upon the faulty memory of the insureds. This issue is exacerbated by the fact Butler failed to create her own list but rather worked off of the one provided to her by the Banks. Of course, this methodology is particularly problematic in this case as the Banks are alleged to have burned their house for financial gain. As such, Cincinnati avers Butler's methodology likely has a high rate of error. Accordingly, none of the <u>Daubert</u> factors are met.

Of course, the <u>Daubert</u> factors, while often very helpful, are not applicable to every case. Indeed, the Advisory Committee Comment to Federal Rule of Evidence 702 provides:

> Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise. The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded.

Fed.R.Evid. 702 advisory committee's note (2000 amendment).

Here, Butler's testimony regarding the loss is speculative, ill-reasoned, and not properly grounded. Again, she worked off a list prepared by the insureds despite her own belief such information is often faulty. This list accompanied her to the property where she marked off items which were found but failed to take notes as to those items' correct brand, age, model numbers, or other relevant information. Additionally, Butler failed to make notations as to what rooms were searched and what items were not found. Even a lay person would conclude these simple steps would have ensured a more accurate inventory list which would enable one to understand what was found at the home and what was not. Indeed, as a result of this failure, even Butler could not state what she found at the property and what she did not find.

Additionally, in assessing whether products were of "like kind and quality," Butler made assumptions. For instance, when asked whether she would deem a tube television to be of like kind and quality to a flat screen television, Butler testified "A screen is a screen." Clearly, common sense dictates this statement is not accurate. Moreover, it is unclear whether Butler in fact verified the price of every item on the list as her testimony on this subject is contradictory. Where an item's price was in fact verified via a retailer or its website, no proof was obtained or provided from that retailer. Rather, the only proof provided is Butler's own parenthetical notes. Again, even a layperson would conclude these notes do not constitute proof as prices change and companies go out of business.

The foregoing failures likely arise out of Butler's lack of education and training in creating personal property inventory lists for insureds following fires and similar losses. Again, Butler was a music major in college who worked as a painting contractor for the

majority of her career.  She only entered the field of public adjusting in 2005.  While Butler has been involved in approximately 500 personal property claims since that time, this experience clearly has not enabled her to develop a clear standard or methodology which was reliably applied to the facts of this case.  See Fed.R.Evid. 702 advisory committee's note (2000 amendment) (stating "If the witness is relying solely or primarily on experience, then the witness must explain … how that experience is reliably applied to the facts.")  Therefore, Butler is not competent to provide expert testimony in this case.

## CONCLUSION

Because Butler's purported expert testimony is not based on a sound methodology, it must be excluded under Federal Rule of Evidence 702.

Respectfully submitted,

_s/ Parks T. Chastain_
**PARKS T. CHASTAIN**
Registration No. 13744
**E. JASON FERRELL**
Registration No. 24425
Attorneys for Plaintiff, Cincinnati Insurance Company


**BREWER, KRAUSE, BROOKS, CHASTAIN & BURROW, PLLC**
P. O. Box 23890
Nashville, TN   37202-3890
(615) 256-8787

## CERTIFICATE OF SERVICE

      I hereby certify that on this 30th day of August, 2013, a true and correct copy of the foregoing, Brief In Support Of Defendant's Motion In Limine To Exclude Putative Expert Testimony Of Tanya L. Butler, was filed electronically. Notice of this filing will be sent by operation of the court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U. S. Mail. Parties may access this file through the court's electronic filing system.

J. Brandon McWherter, Esquire
Jonathan L. Bobbitt, Esquire
Clinton H. Scott, Esquire
Gilbert Russell McWherter, PLC
101 North Highland Avenue
Jackson, TN 38301

                                                                          _s/ Parks T. Chastain_
                                                                          **PARKS T. CHASTAIN**

PTC:MAC:dmt