IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

---

CINCINNATI INSURANCE COMPANY,

    Plaintiff/Counter-Defendant,

v.                                            Case No. 4:12-CV-32
                                                   JURY DEMAND

LARRY BANKS and WANDA SUE BANKS

    Defendants/Counter-Plaintiffs.

---

**-DEFENDANTS/COUNTER-PLAINTIFFS' MOTION IN LIMINE NO. 1-**

**MOTION IN LIMINE TO EXCLUDE TESIMONY AND OPINIONS OF MARK SELLS
& MEMORANDUM IN SUPPORT THEREOF**

---

COME NOW the Defendants/Counter-Plaintiffs, Larry Banks and Wanda Sue Banks, by and through counsel, and move this Court for an Order excluding all opinion testimony of Cincinnati Insurance Company's expert witness, Mark Sells, and in support thereof would show as follows:

## INTRODUCTION

Larry Banks and Sue Banks (the "Banks") sued[1] Cincinnati Insurance Company ("CIC") because of CIC's denial of the Banks' insurance claim after their home suffered a total loss by fire on November 28, 2011. During its investigation of the fire that destroyed the Banks' home, CIC hired, Mark Sells ("Mr. Sells") on the issue of cause and origin. Mr. Sells seeks to offer opinion testimony regarding (a) the cause and origin of the fire, and (b) the contents located at the Banks' home at the time of the fire. This Motion seeks to exclude all opinion testimony of

---

1    CIC filed a Complaint for declaratory judgment against the Banks. The Banks filed a counterclaim.

1

Mr. Sells because his opinions are unreliable and because his testimony will not assist the trier of fact in understanding the evidence or determining a material fact in question.

## STATEMENT OF THE RELEVANT FACTS

A. General Background

CIC has disclosed Mark Sells as an expert concerning the cause and origin of the fire that destroyed the Banks' home. Mr. Sells' expert report is attached as Exhibit "1". Mr. Sells commenced his investigation of the fire on December 1, 2011, and ultimately issued a cause and origin report on February 24, 2012 (the "Sells Initial Report").[2] The Banks' home comprised two distinct parts. There was an older, ranch style structure to the right, and then a three-story, 3,600 square foot addition to the left of the older portion of the home constructed approximately seven years prior to the fire.[3] (*See* Sells Initial Report, p. 3; Sells Depo., p. 67).[4] A brick wall separated the older portion of the home from the newer addition. (Sells Depo., p. 71). During the fire, the three-story addition section of the home was heavily damaged, to the extent that the third story fell into the second, and half of the main (second) floor fell into the basement. (Sells Initial Report, p. 3; Sells Depo., p. 68). In his Initial Report, Sells reported that "the building had burned to completion, destroying most of the fire movement patterns in the left side of the structure." (Sells Initial Report, p. 3).

During his deposition, Mr. Sells acknowledged that NFPA 921 (2011 edition) is a widely-recognized guide for fire investigations, but denied it is a standard. (Sells Depo., pp. 18-19). Even so, Mr. Sells agrees it is a good guide, and acknowledges he follows NFPA 921. (Sells Depo., pp. 20, 25, 194). He also claims to follow the scientific method espoused by NFPA

---

2     Mr. Sells' Initial Report is attached as Exhibit "A" to his Expert Report (attached hereto as Exhibit "1").
3     A diagram of the home identified during Mr. Sells' deposition is attached hereto as Exhibit "2". It was marked as Exhibit 7 to Mr. Sells' deposition, which has been separately filed with the Court.
4     The excerpts of Mr. Sells' deposition cited herein are attached as Exhibit "3".

2

921.[5] (Sells Depo, p. 27). According to Mr. Sells, the scientific method requires the development of multiple hypotheses as to cause and origin, and then each hypothesis must be tested through deductive reasoning. (Sells Depo., p. 34). Sells acknowledges that one of the necessary components of testing a hypothesis is to decide if any other hypotheses could be supported by the same set of facts. (Sells Depo., pp. 34-35). There are four possible classifications for the cause of a fire: (1) accidental, (2) undetermined; (3) incendiary; and (4) natural. (Sells Depo., p. 36). If a hypothesis is incapable of being tested, then the fire must be classified as undetermined. (Sells Depo., p. 35).

    B. The "Peer-Reviewed" Initial Report.

In his Initial Report, Sells noted that the "meter base [to the home] was not properly grounded," and "[t]here was no driven grounding rod or cable visible." (Sells Initial Report, p. 3 However, Mr. Sells denied he wrote the portion of his report that indicated the meter base was not properly grounded. (Sells Depo., p. 109). He claims his peer reviewer, Metts Hardy, made that change during the peer review process. (Sells Depo., p. 109-110).

Mr. Sells' Initial Report also indicated "no determination could be made as to the quantity or quality of any contents in the left side addition that was destroyed by the fire" (Sells Initial Report, p. 6; Sells Depo., pp. 127-128), but then denied that was his opinion:

> Q. When you say - - tell me if I quote this right - - "no determination could be made as to the quantity or quality of any contents in the left side addition that was destroyed by the fire."
> A. That's not my wording either.
> Q. That was the opinion that you gave to Cincinnati Insurance Company, correct?
> A. No, sir.
> Q. So, I don't understand how this happened. This is your report, right?
> A. Right.

---
5    A copy of the NFPA 921, Guide for Fire and Explosion Investigations, was marked as Exhibit 1 to Mr. Sells' deposition.

3

> Q. But you're saying that's not your opinion?
> A. That's not what I wrote in the report.
> Q. This is the opinion that has been given to me by your lawyers as being the opinion that you're going to offer at trial.
> A. This is not what I wrote.
> Q. Where is the prior draft?
> A. Again, I don't know.
> Q. You don't know if the things in this report are your opinions or not as we sit here today, do you?
> A. Maybe little details like that, no, I don't.
> Q. That's not a little detail, that's a big detail; you would agree with that, wouldn't you?
> A. Yeah.
> Q. Whoever reviewed this, which is Hardy Metts, opined at least that no determination could be made as to the quantity or quality of any contents in the left side addition, correct?
> A. That's correct.

(Sells Depo., pp. 128-29). The following discussion then ensued concerning the process of peer review:

> Q. All right. Peer review. What is peer review?
> A. It's when another person in your field reviews your work.
> Q. And the purpose of it is what?
> A. To try to find any mistakes.
> Q. And if they see some, they?
> A. Correct them.
> Q. And that's what Mr. Metts did here, correct?
> A. Appears so. After he corrected it, it was not sent back to me to review.

(Sells Depo., pp. 129-130).

Despite Mr. Sells' denial that the opinions in his Initial Report were his own, he issued those same written opinions yet again in his Expert Report drafted in November 2012 for this litigation. (Sells Expert Report, p. 4). Mr. Sells testified:

> Q. So, just a few months ago, November 2012, you were still issuing the opinion that you had made no and have made no specific determination as to the quantity and quality of items claimed to have been in the left side of the home, correct?
> A. Correct.

4

(Sells Depo., p. 147).

   C. <u>The Determination of Cause and Origin.</u>

Mr. Sells has opined the origin of the fire was in the master bedroom, which was on the main level (second floor) of the new addition. (Sells Depo., p. 187). Sells could not identify a specific point of origin, but rather his determination of origin was that the fire started in the master bedroom area of the new addition. (Sells Depo., pp. 187-189).

As to the cause of the fire, Mr. Sells readily admits he could not rule out electrical fault as a cause of the fire. (Sells Initial Report, p. 6) ("[T]here is too much damage to make an engineering determination for fire causation."). An electrical engineer, Matt Forbes, accompanied Mr. Sells during his fire investigation to study the electrical system. Neither Forbes[6] nor Sells could rule out electrical fault as a cause of the fire. (Sells Initial Report, p. 6; Sells Depo., pp. 227-228, 240). In fact, Sells has not even made any conclusions as to what heat producing devices were within the area of origin. (Sells Depo., p. 228). Sells also admits he could not rule out negligence as a cause of the fire. (Sells Depo., p. 227). Mr. Sells testified:

> Q. All right. What was the - - what were the potential ignition causes in the area of origin; meaning, what were the various hypotheses that you considered as the causative agent that started the fire?
> A. The hypothesis I considered, possibly electrical.
> Q. Okay. Were you able to rule out electrical?
> A. No, I wasn't.
> Q. Okay. What else?
> A. Could have been any kind of negligence involved. Human involvement. Those were the three that I thought.
> Q. Okay. And how did you rule out negligence?
> A. I couldn't.

---

6   Sells inserted the opinion of the electrical engineer, Matt Forbes, into his Initial Report. (Sells Initial Report, p. 6). Forbes' written opinion is contained in 5 paragraphs. There is a sixth paragraph (just above the next section, "<u>Investigation</u>," but the opinions in that paragraph are Sells', not Forbes. A normal reading of the Initial Report would cause the reader to conclude that Forbes also was of the opinion that the fire was incendiary, but Sells admits that was not Forbes' opinion. (Sells Depo., pp. 240-241). In fact, the opposite is true – Forbes could not rule out electrical fault as a cause of the fire. (Sells Depo., p. 240).

5

> Q. All right. So, negligence is a possible cause.
> A. It was a hypothesis; it's not my opinion.
> Q. Okay. Can you rule it out sitting here today?
> A. No.
> Q. All right. And you can't rule out electrical sitting here today.?
> A. No. . . .

(Sells Depo., pp. 226-228).

Although he could not rule out electrical fault or negligence as the cause of the fire, Mr. Sells classified the fire as incendiary, meaning human involvement brought ignition and fuel together. (Sells Initial Report, p. 7). According to Sells, there were only two factors that led him to that conclusion: (a) an alleged positive sample for an accelerant in the office (which was not the area of origin of the fire); and (b) his perceived lack of contents in the home. (Sells Depo., pp. 203).

      a. <u>The Debris Samples.</u>

Sells took nine debris samples for laboratory testing for accelerants. (Sells Initial Report, p. 5). There were two positive samples, both of which were in the office of the older portion of the home, separated by a brick wall from the area of origin identified by Sells (the master bedroom area on the main level/second floor of the new addition). (Sells Depo., pp. 71, 140-141). Sells meticulously took samples in the area of origin, and all of those samples came back negative. (Sells Depo., pp. 140, 222, 233). He also took a sample in the doorway leading from the older section of the home to the new addition, and it came back negative as well. (Sells Depo., p. 140). During his deposition, Sells conceded that the only positive samples were outside of the area of origin where he opined the fire started, and that the only known combustibles in the area of origin were building materials and furnishings. (Sells Depo., pp. 221-224). Despite that fact, Mr. Sells holds fast to his conclusion that the fire started in the master

6

bedroom of the home, and that the cause of the fire was the ignition of ignitable liquid vapors. (Sells Depo., p. 246). Sells acknowledges there is no evidence of accelerants in the area of origin. (Sells Depo., p. 246). The following excerpts summarize Sells' opinion regarding the cause of the fire:

> Q. What evidence of pouring do you have, other than the one positive or the two positive samples in the office?
> A. It's my theory.
> Q. But there's no evidence outside of your theory?
> A. In my experience and training and education, when somebody does this, they pour a line to the closest exit and out. No, if I would have had samples going this way, I could have come up with another exit and a theory. That's why hypothesis works for me.
> Q. Let me ask it again. What is the evidence that you have that there was any ignitable liquid poured outside of the office anywhere?
> A. There is none, it burnt away.
> Q. Okay. If it was ever there, it's gone. And so because you found a positive sample in the office, you have a theory that it was poured all the way out the back door; there's no evidence of that, but that's your theory?
> A. Correct.

(Sells Depo., p. 258).

> Q. All right. And so I'm still trying to understand what you're basing your opinion on that the fire traveled from the new addition to the older part by way of ignitable fluid?
> A. That's my opinion.
> Q. That there was one sample taken in the office, and your opinion is what?
> A. There were two samples taken in the office.
> Q. Okay, two samples taken in the office?
> A. Yes, sir.
> Q. What does that have to do with the fire traveling from the old part - - excuse me. From the new part to the old part?
> A. The floors were poured with ignitable liquid and that's how it would have traveled.
> Q. Did you test - - did you take a sample in the doorway into the addition?
> A. Yes.
> Q. And what did that reveal?

7

        A.    It was negative.
        Q.    Okay. Did you take samples in the newer part of the house?
        A.    Newer part?
        Q.    The addition.
        A.    The addition, yes, sir.
        Q.    And how did those come out?
        A.    Negative.
        Q.    The only positive sample you got was one particular area in the office?
        A.    One room, yes.

. . .

        Q.    There were no positive samples in the area of origin that you identified, correct?
        A.    Right.

(Sells Depo., pp. 139-141, 222).

    b.  <u>Sells' Opinions Concerning the Contents in the Home at the Time of the Fire.</u>

Mr. Sells readily admits that he did not take a contents inventory, and that "no determination could be made as to the quantity or quality of any contents in the left side addition that was destroyed by the fire." (Sells Initial Report, p. 6; Sells Expert Report, p. 4; Sells Depo., pp. 127-128, 135, 147). Despite those concessions, Sells offers the opinion that evidence indicated contents had been removed. (Sells Depo., p. 130). Even so, he admits it is necessary to know what contents were normally in the home before reaching a determination of whether contents were removed prior to the fire. (Sells Depo., p. 130). Even though Sells agreed the Banks' knowledge of the contents of their home was critical information he needed, he failed to interview Mr. and Mrs. Banks. (Sells Depo., pp. 130-131). When asked in his deposition why he did not interview the Banks, Sells stated that CIC instructed him to not talk to Mr. or Mrs. Banks. (Sells Depo., pp. 130-131).

During Mr. Sells' deposition, it became apparent that Sells had no opinion as to whether

8

or not any items of personal property claimed by the Banks were present at the time of the fire, but rather his opinion was limited to whether certain items would have survived the fire. (Sells Depo., pp. 151-156).

> Q. There are two lists in your report?
> A. Yes, sir.
> Q. Based on what you've told me today, it's my understanding what you've done is compared the lists and made a list of items that you believe should have survived the fire and that evidence should have existed of those particular items?
> A. Correct.
> Q. That's what those lists are?
> A. Correct.
> Q. And nothing more?
> A. Correct.

(Sells Depo., p. 247).

As to the issue of what contents should have survived the fire, Mr. Sells blindly offered opinions that certain items would have survived the fire without even knowing what the items were. For example, Mr. Sells offers the opinion that a rattan chair would have survived the fire when he does not even know what a rattan chair is or of what it is composed. (Sells Depo., pp. 176-177). Moreover, Mr. Sells has no training, experience, or education that he was qualified to offer such opinions. Mr. Sells does not know and did not consider the pyrolysis[7] temperature of each item on the contents list, and he performed no tests to determine how long it would take at a particular temperature for any certain item to reach pyrolysis. (Sells Depo., pp. 247-248). Additionally, Sells formulated no opinion as to the temperature of the fire, and performed no tests on exemplar items of contents to determine the temperature at which those items become unrecognizable. (Sells Depo., p. 248).

The ridiculousness of Sells' opinions concerning contents was exemplified during his

---

[7] Pyrolysis is defined as "a process in which material is decomposed, or broken down, into simpler molecular compounds by the effects of heat along; pyrolysis often precedes combustion. National Fire Protection Agency, NFPA 921, *Guide for Fire & Explosion Investigations*, 3.3.134 (11th Ed. 2011).

9

deposition when discussing cotton balls and similar items. Mr. Sells admitted that cotton balls, ace bandages, band-aids, etc. leave no evidence after a fire. (Sells Depo., p. 248). Despite that admission, Sells opined in his expert report that evidence of such items should have existed after the fire, even when he had no idea where the items were located within the home before the fire and had never asked the Banks. (Sells Depo., pp. 249-251).

## LAW

### A. Expert Testimony under Rule 702 of the Federal Rules of Evidence.

Fed. R. Evid. 702 delineates the standard to be applied in determining whether expert testimony is admissible:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2012). The admissibility of expert testimony should be subjected to a two-part test. The first inquiry for a court's consideration is whether the reasoning or methodology underlying the expert's testimony is scientifically valid (reliability), and the second inquiry is whether that reasoning or methodology could be properly applied to the facts at issue to aid the trier of fact (relevance). *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

The reliability of the proffered expert testimony must involve an initial determination that the witness seeking to render the opinion is qualified to render an expert opinion in the designated area. Also, in the reliability analysis, a court must decide whether the proffered

testimony is based on scientific, technical, or other specialized information. *Smelser v. Norfolk Southern Railway Co.*, 105 F.3d 299, 303 (6th Cir. 1997). A court must carefully asses the methodology, reasoning, or technique employed by the expert to determine whether the expert's opinion is based on scientifically valid principles under Fed. R. Evid. 702. *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000); *Smelser*, 105 F.3d at 303. "*Daubert* teaches that expert opinion testimony qualifies . . . under Rule 702 only if its derived by the scientific method and is capable of validation." *Smelser*, 105 F.3d at 304. In *Daubert*, the Supreme Court identified several factors to assist courts in evaluating whether a scientific theory or methodology constitutes reliable scientific knowledge. These include:

(1) whether the expert's theory or technique can be and has been tested;
(2) whether the expert's theory or technique has been subjected to peer review and publication;
(3) whether the expert's theory or technique has a known rate of potential error; and
(4) whether the expert's theory or technique has been generally accepted within a relevant scientific community.

*Daubert*, 509 U.S. at 593-94. However, the analysis of reliability is flexible, and its indicators may vary from discipline to discipline. *Id.* at 593.

"For purposes of Rule 702, 'evidentiary reliability' means, essentially, 'trustworthiness;' i.e., 'in a case involving scientific evidence, *evidentiary reliability* will be based on *scientific validity.*" *Id.*; *American & Foreign Ins. Co. v. General Electric Co.*, 45 F.3d 135 (6th Cir. 1995). As the *Daubert* court noted, "the adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Id.* "An expert opinion that is based on scientifically valid principles will satisfy Fed. R. Evid. 702; an expert's subjective belief or unsupported speculation will not." *Smelser v. Norfolk So. RR Co.*, 105 F.3d 299, 303 (6th Cir. 1997), *abrogated on other grounds by*

11

*Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500 (6th Cir. 1998) (quoting *Daubert* (on remand), 43 F.3d at 1316). Thus, the Court should focus on the expert's methodology rather than the expert's conclusions, but the conclusions must be connected to the existing data by more than the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."). Finally, testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the jury. *McGowan v. Cooper Indus., Inc.* 863 F.2d 1266, 1273 (6th Cir. 1987).

**B.     Exemplar Sixth Circuit Cases in Which Cause and Origin Experts Were Excluded.**

Courts within the Sixth Circuit have excluded proposed fire cause and origin witnesses numerous times, as follows:

- *Barton Brands, LTD v. O'Brien & Gere, Inc. of N. Am.*, 2009 U.S. Dist LEXIS 52887 (W.D. Ky. June 22, 2009) (excluding proposed cause and origin experts). "Identifying only one possible cause and failing to investigate other possible causes is not a particularly reliable methodology." *Id.* at *13.

- *Pride v. The BIC Corp.*, 54 F. Supp.2d 757, 762 (E.D. Tenn. 1998) (excluding proposed expert testimony regarding alleged defect in lighter). "Quite simply he did no tests to back up his opinions and his opinions are not supported by any scientific methodology. . . . [A]ssumptions do not satisfy the reliability requirements of *Daubert*." *Id.* The expert's "opinion appears to be based on the conclusion that the lighter was the only source of ignition in the area and therefore that a defect in the lighter must have caused the fire. This conclusion does not fit

12

the facts of the case because it ignores other possible scenarios . . . ." *Id.* "The jury would not be aided by the unverified speculations of the plaintiff's experts." *Id.*

- *American & Foreign Ins. Co. v. General Electric Co.*, 45 F.3d 135, 139 (6th Cir. 1995) (excluding speculative opinion testimony of electrical engineer regarding cause of fire)

- *Meemic Ins. Co. v. Hewlett-Packard Co.*, 717 F. Supp.2d 752 (E.D. Mich. 2010) (excluding expert's proposed fire cause and origin testimony on basis that opinion was unreliable and would not assist the trier of fact in understanding or determining a material fact in question).

- *Knotts v. Black & Decker, Inc.*, 204 F. Supp.2d 1029 (N.D. Ohio 2002) (excluding expert's proposed fire cause and origin testimony on basis that opinion was speculative and unreliable)

- *Lockridge v. Lawrence*, 2005 U.S. Dist. LEXIS 47962 (M.D. Tenn. March 16 2005) (excluding plaintiff's expert's proposed testimony regarding cause of fire).

- *Indiana Ins. Co. v. General Electric Co.*, 326 F. Supp.2d 844 (N.D. Ohio 2004) (excluding testimony of cause and origin expert and engineer regarding cause and origin of fire)

## **ARGUMENT**

This Court should exclude all opinion testimony of Mark Sells because his opinions are unreliable and because his testimony will not aid the trier of fact.

13

### A. <u>Sells' Opinions Are Unreliable.</u>

Sells' opinions are based on nothing but his subjective belief and unsupported speculation. He offers two primary opinions: (1) that the fire was incendiary by way of intentional ignition of an ignitable liquid; and (2) that the contents claimed by the Banks were not in the home at the time of the fire and not in the quantities claimed. Sells' opinions are untested, and did not withstand his own company's peer review process. His opinions also have an incredibly high rate of potential error, and his methodology is counter to techniques generally accepted within the fire investigation community. An expert's conclusions must be connected to data by more than the *ipse dixit* of the expert, and Mr. Sells' opinions are just that - - untested, unreliable, and imaginative speculation that is wholly devoid of factual and scientific support.

   1. <u>Sells Opinion Regarding the Cause of the Fire is Unreliable.</u>

Mr. Sells has opined that the fire started in the master bedroom area on the main level (second floor) of the three-story addition to the Banks' home. He also opines that the cause of the fire included human involvement, specifically the intentional ignition of ignitable liquids. His opinion as to causation is unreliable and must be excluded for several reasons.

First and foremost, Mr. Sells admits he cannot rule out an electrical fault as a cause of the fire, and also acknowledges he cannot rule out negligence as a cause of the fire. (Sells Depo., pp. 227-228, 240). Although his theory that the fire was intentionally set is only one of at least three potential causes of the fire that could not be eliminated (electrical, negligence, and incendiary), Mr. Sells nonetheless opined the fire was intentionally set. This type of approach and unsupported speculation is not allowed by the scientific method that Sells purports to follow. According to Sells, the scientific method requires the development of multiple hypotheses as to cause and origin, and then testing of each hypothesis through deductive reasoning. (Sells Depo.,

pp. 27, 34). If any hypothesis could be supported by the same set of facts or is incapable of being tested, then the fire must be classified as "undetermined." (Sells Depo., pp. 34-35). Here, Sells cannot rule out electrical or negligence as a cause of the fire, much less prove the fire was incendiary. He admits there are multiple potential causes of the fire, and his conclusion that the fire was incendiary is ludicrous in light of his own admissions concerning other possible causes of the fire. His opinion regarding cause failed to account for other equally probably causes, and is unreliable on its face.

Second, Mr. Sells' opinions regarding the cause of the fire did not withstand peer review. In his Initial Report, Sells noted that the "meter base was not properly grounded," and "[t]here was no driven grounding rod or cable visible." Sells denied this was his opinion, and claims his boss and peer reviewer, Metts Hardy, made that change to his report. Regardless of whether Sells agrees with the change, it is yet another possible cause of the fire that Sells' own peer reviewer knew could not be ruled out as a cause of the fire. The changes to his report during the peer review process cause further doubt as to the reliability of Sells' opinions because Sells himself has admitted he does not know if the opinions in his report are really his opinions or not. (Sells Depo., pp. 128-129).

Third, Mr. Sells' opinion regarding the cause of the fire are wholly unsupported by the facts of the case, but rather are based on his own *ipse dixit* (because he says so). Sells claims that the fire originated in the master bedroom, and that the fire was caused by human involvement bringing fuel and ignition together. He theorizes that an unknown person set an ignitable liquid afire in the master bedroom, but his opinion is just that – an unsupported theory. Sells concedes there was no evidence of human involvement or that the fire was intentionally set except for a positive debris sample test in the office, which was separated from the master bedroom area of

15

origin by a brick wall. (Sells Depo., pp. 71, 139-141, 222, 246, 258). All of the debris samples taken in the area of origin came back negative, and there was no physical or scientific evidence at all of an intentionally set fire in that area. (Sells Depo., pp. 139-141, 222, 233, 246, 258). Sells even admits he has no evidence, but rather it is just his theory. (Sells Depo., p. 258).

In summary, Sells failed to compare his incendiary cause hypothesis to known facts, and his opinion fails to withstand even a mildly critical examination. *Daubert* and Rule 702 require a more demanding approach to scientific evidence than just unsupported theories. Sells' opinion regarding causation failed to account for other possible causes that he readily admits he cannot rule out. Just looking at percentages alone, he has only a one in three chance of being correct because he admits there are three potential causes of the fire (electrical, negligence, and incendiary). Accordingly, the rate of potential error is great. Sells' failure to test his causation hypotheses or to validate his hypotheses by reference to generally accepted scientific principles as applied to the facts renders his testimony on the cause of the fire unreliable and therefore inadmissible. "Identifying only one possible cause and failing to investigate other possible causes is not a particularly reliable methodology." *Barton Brands, LTD v. O'Brien & Gere, Inc. of N. Am.*, 2009 U.S. Dist. LEXIS 52887, *13 (W.D. Ky. June 22, 2009). Sells' opinion testimony as to the cause of the fire should be excluded.

2. <u>Sells' Opinions regarding the Contents in the Home are Unreliable.</u>

Sells also seeks to offer an opinion regarding the contents in the home at the time of the fire, and an opinion concerning which items of personal property claimed by the Banks would have survived the fire so they could be identified. This opinion testimony should also be excluded because it is unreliable.

Sells' opinions concerning the contents of the home are unreliable because he has

16

admitted: (1) he performed no contents inventory; (2) both of his written reports indicate that no determination could be made as to the quality or quantity of any contents in the left side addition that was destroyed by the fire; and (3) he is not qualified to give opinions on what items would have survived the fire. Sells further concedes it is necessary to know what contents were normally in the home before he can reach a determination of whether contents were removed prior to the fire. (Sells Depo., p. 130). Even so, he did not interview the Banks because CIC told him not to do so. (Sells Depo., pp. 130-131).

As set out in the "Facts" section above, Mr. Sells has no training, education, or experience that qualify him to render an opinion as to what items of personal property would have survived the fire. He does not know of the pyrolysis temperature of each item on the contents list, and performed no tests to determine how long it would take at a particular temperature for a certain item to reach pyrolysis. (Sells Depo., pp. 247-248). He formulated no opinions regarding the temperature reached in the fire, and performed no tests on exemplar items to determine the temperature at which those items become unrecognizable. (Sells Depo., p. 248). Again, he simply testifies without factual support that he did not believe the contents list submitted by the Banks was consistent with what was found in the home after the fire.

Sells testimony concerning the contents is unreliable because his theories have not been tested, have an incredible rate of potential error (consider the cotton ball example as set forth in the "Facts" section above), and there is no scientific basis for his opinions. Further, his own peer review process resulted in a change in his report that "no determination could be made as to the quantity or quality of any contents in the left side addition." (Sells Depo., pp. 128-129). Although Sells denied that was his opinion and suggested it was a change made to his Initial Report during the peer review process without his knowledge, the same opinion surfaced again

17

in his Expert Report tendered during this litigation. (Sells Depo., p. 147). In summary, Sells is unqualified, his opinions are purely speculative and contrary to the facts, and his opinions concerning the Banks' contents are unreliable and should therefore be excluded.

**B. Sells' Opinions are Irrelevant and Will Not Assist the Trier of Fact.**

In addition to determining that proffered expert testimony is reliable, it must also determine the relevancy of the proposed testimony. Expert testimony is relevant only when it will assist the trier of fact in understanding the evidence or determining a material fact in evidence. *Daubert*, 509 U.S. at 592-93. The party offering expert testimony must prove its admissibility by a preponderance of the evidence. *Id.* at 592 n.10. "If everyone knows [a particular fact], then we do not need an expert because the testimony will not assist the trier of fact to understand the evidence or to determine a fact at issue." *Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994).

In this case, Sells' proposed opinion regarding the cause of the fire invades the province of the jury, and is based on personal conjecture and speculation, not valid scientific principles. He admits there are multiple potential causes of the fire that could not be ruled out, and he has no scientific basis for his opinion that the fire was intentionally set except for his *ipse dixit*. Further, his causation opinion is not supported by any methodology, but rather is nothing more than his imaginative "theory" that does not fit the facts of the case because it ignores other possible scenarios. *See Pride v. The BIC Corp.*, 54 F. Supp.2d at 762. Such imaginative and unverifiable testimony will confuse and mislead, rather than assist, the trier of fact.

Concerning the Banks' contents, Sells' opinions also will not assist the trier of fact. Sells has no specialized knowledge and did no tests to determine which contents should have survived the fire. Similarly, he never spoke with the Banks regarding the contents, and agrees that one

18

person's "normal" may be different than another's. Sells offers no expertise whatsoever, and the jury will not be assisted by his unscientific and unverifiable theories, which he acknowledges may be wrong. Accordingly, Sells' expert opinions are irrelevant, and should be excluded.

## **CONCLUSION**

In summary, the Banks request that the Court exclude all opinion testimony of Mark Sells, including but not limited to the following:

A. That Sells not be allowed to offer testimony or other evidence concerning the cause of the fire;

B. That Sells not be allowed to offer testimony or other evidence regarding the contents in the house before the fire, after the fire, or at the time of the fire;

C. That Sells not be allowed to offer testimony or other evidence regarding "normal" contents in a home;

D. That Sells not be allowed to offer testimony or other evidence regarding the contents that should have survived the fire; and

E. For the reasons as identified in the Banks' Motion to Exclude Testimony and Opinions of Christine Foran (the contents of which are incorporated herein by reference), that Sells not be allowed to offer testimony or other evidence concerning the debris samples that purportedly tested positive for medium to heavy petroleum distillates.

Respectfully submitted,

GILBERT RUSSELL McWHERTER PLC


/s J. Brandon McWherter
J. BRANDON McWHERTER #21600
CLINTON H. SCOTT #23008
*Attorney for Larry and Sue Banks*
101 North Highland
Jackson, Tennessee 38301
Telephone: (731) 664-1340
Facsimile: (731) 664-1540
bmcwherter@gilbertfirm.com
cscott@gilbertfirm.com


**CERTIFICATE OF SERVICE**

I, the undersigned, do hereby certify that a true and exact copy of this Motion has been mailed electronically via the Court's electronic filing system, to all counsel of record on this the 30th day of August, 2013:

Parks T. Chastain
E. Jason Ferrell
Brewer, Krause, Brooks,
Chastain & Burrow, PLLC
P. O. Box 23890
Nashville, TN 37202-3890
pchastain@bkblaw.com
jferrell@bkblaw.com


s/ J. Brandon McWherter