# In The Matter Of:

*CINCINNATI INSURANCE  vs.*
*LARRY BANKS*

---

*MARK SELLS*
*January 8, 2013*

---

*Alpha Reporting Corporation*
*236 Adams Avenue*
*Memphis, TN 38103*
*901-523-8974*



Original File Mark Sells Deposition.txt
Min-U-Script® with Word Index

```
        IN THE UNITED STATES DISTRICT COURT
         FOR EASTERN DISTRICT OF TENNESSEE
                WINCHESTER DIVISION


-----------------------------------------------

CINCINNATI INSURANCE    )
COMPANY,                )
                        )
                        )
Plaintiff,              )
Counter-Defendant       )
                        )
                        )CASE NO. 4:12-CV-32
v.                      )
                        )
LARRY BANKS AND         )
WANDA SUE BANKS,        )
                        )
                        )
Defendant,              )
Counter-Plaintiffs      )
                        )
                        )
                        )


-----------------------------------------------

 The Deposition of:  MARK SELLS
                     JANUARY 8, 2013
```

The Deposition of MARK SELLS,
was taken by agreement, at Brewer, Krause,
Brooks, Chastain & Burrow, 611 Commerce Street,
in Nashville Tennessee on January 8, 2012, pursuant
to the provisions of the Tennessee Rules of Civil
Procedure.

All formalities as to notice,
caption, certificate, reading and signing
of the deposition are not waived.  All
objections, except as to the form of the
questions, are reserved to the hearing.


APPEARANCES:

For the Plaintiff:      PARKS T. CHASTAIN, ESQ.
                        BREWER, KRAUSE, BROOKS
                        CHASTAIN & BURROW
                        611 Commerce Street
                        Suite 2600
                        Nashville, Tennessee
                                       37202


For the Defendant:      J. BRANDON MCWHERTER, ESQ.
                        GILBERT, RUSSELL &
                        MCWHERTER
                        101 North Highland
                        Jackson, Tennessee
                                       38301


**Alpha Reporting Corporation**

INDEX                                          PAGE

EXAMINATION BY    .......................         7
MR. MCWHERTER:

EXAMINATION BY    .......................        248
MR. CHASTAIN:

--------------------------------------------------

EXHIBITS

Exhibit No. 1      NFPA 921 Guide                 25

Exhibit No. 2      EFI Report                     38

Exhibit No. 3      Photos on CD                   39

Exhibit No. 4      EFI Report with                47
                   Pictures

Exhibit No. 5      Jeff Morrill Report            50
                   with Notes from
                   Mark Sells

Exhibit No. 6      Photos taken by                51
                   First Call Responders

Exhibit No. 7      Diagram of Banks'              75
                   Home (3 Pages)

Exhibit No. 8      Photo of Excavator             86

**Alpha Reporting Corporation**

<table>
<tr><td colspan="3" align="center">EXHIBITS</td><td>PAGE</td></tr>
</table>

| | | | |
|---|---|---|---|
| Exhibit No. 9 | Photo of Dresser | | 87 |
| Exhibit No. 10 | Photo of Home Outside | | 89 |
| Exhibit No. 11 | Photo of Area Standing on Block Wall | | 90 |
| Exhibit No. 12 | Photo of Container With Jewelry | | 90 |
| Exhibit No. 13 | Photo of Bathtub | | 92 |
| Exhibit No. 14 | Photo of Floor in Dressing Area with Dresser | | 95 |
| Exhibit No. 15 | Photo of Floor in Dressing Area with Dresser | | 97 |
| Exhibit No. 16 | Photo of Floor in Dressing Area with Dresser | | 97 |
| Exhibit No. 17 | Photo of Floor in Dressing Area with Dresser | | 101 |
| Exhibit No. 18 | Photo of Excavator at Work | | 102 |
| Exhibit No. 19 | Photos of Rug and Flooring (7 Photos) | | 117 |
| Exhibit No. 20 | Photo of Springs | | 118 |

**Alpha Reporting Corporation**

|                        | EXHIBITS                          | PAGE |
|------------------------|-----------------------------------|------|
| Exhibit No. 21         | Photo of Excavator and Debris     | 120  |
| Exhibit No. 22         | Photo of Electrical Equipment     | 123  |
| Exhibit No. 23         | Photo of Mattress Springs         | 123  |
| Exhibit No. 24         | Photo of Sleeper-Sofa Springs     | 124  |
| Exhibit No. 25         | Photo of Heat Exchanger           | 124  |
| Exhibit No. 26         | Photo of Washer Dryer             | 125  |
| Exhibit No. 27         | Photo of Furniture Ruminants      | 125  |
| Exhibit No. 28         | Photo of Satellite or Cable Box   | 125  |
| Exhibit No. 29         | Photo of TV                       | 126  |
| Exhibit No. 30 Collective | Photos of Dehumidifier         | 126  |
| Exhibit No. 31         | Photo Various Furniture Springs   | 126  |
| Exhibit No. 32         | Firetrack Report                  | 142  |

**Alpha Reporting Corporation**

|                | EXHIBIT                      | PAGE |
|----------------|------------------------------|------|
| Exhibit No. 33 | Photo                        | 162  |
| Exhibit No. 34 | Photo                        | 163  |
| Exhibit No. 35 | Photo                        | 166  |
| Exhibit No. 36 | Photo                        | 166  |
| Exhibit No. 37 | Photo                        | 170  |
| Exhibit No. 38 | Photo                        | 171  |
| Exhibit No. 39 | Photo                        | 172  |
| Exhibit No. 40 | Photo                        | 174  |
| Exhibit No. 41 | Photo                        | 176  |
| Exhibit No. 42 | Photo of Debris              | 178  |
| Exhibit No. 43 | Photo of Adding Machine      | 178  |
| Exhibit No. 44 | Photo                        | 204  |
| Exhibit No. 45 | Photo Sample 1 Close-up      | 207  |
| Exhibit No. 46 | Photo Sample 2 Close-up      | 208  |
| Exhibit No. 47 | Photo Sample 3               | 209  |
| Exhibit No. 48 | Photo Top of Can             | 209  |
| Exhibit No. 49 | Drawing                      | 258  |

1   receive any promotions or title changes during the

2   period you were there?

3       A.   No.

4       Q.   And in September 2012, you opened up your

5   own business called Firetrak?

6       A.   Yes.

7       Q.   The Banks' fire was on November 28, 2011;

8   how many fire investigations had you performed

9   prior to that date?

10      A.   Total?

11      Q.   Yes, roughly.

12      A.   I'd say 1500 plus.

13      Q.   Is the IAAI a recognized organization in

14  your industry?  Do they -- do they print training

15  materials for people?

16      A.   Yes.

17      Q.   Do they conduct seminars?

18      A.   Yes.

19      Q.   And training classes?

20      A.   Yes.

21      Q.   And the NAFI does the same thing, correct?

22      A.   Yes.

23      Q.   Have they adopted any standards for the

24  methodology of fire investigation, either of those

25  entities?

1        A.    No.

2        Q.    Okay.  Are you familiar with any standards

3    concerning the methodology for fire investigation?

4        A.    No.

5        Q.    All right.  Are you familiar with NFPA

6    921?

7        A.    Yes.

8        Q.    And what is that?

9        A.    That's a guide for fire investigators.

10        Q.    Has the IAAI adopted it as a standard?

11        A.    No.

12        Q.    Is it your testimony under oath today that

13    the IAAI did not adopt the NFPA 921 as the standard

14    prior to the Banks' fire?

15        A.    No.

16        Q.    Did not happen?

17        A.    No.

18        Q.    All right.  What about the NAFI, have they

19    adopted the NFPA 921 as a standard?

20        A.    No.

21        Q.    So, same question.  It's your testimony

22    under oath that the NAFI had not adopted NFPA 921

23    prior to the Banks' fire as the standard for fire

24    investigation?

25        A.    No.

1          Q.    What is a guide?

2          A.    It's a -- suggestions, maybe kind of a

3    guideline to guide you through an incident.

4          Q.    Do you follow it?

5          A.    Yes.

6          Q.    Do you recognize it as an authoritative

7    reference that you follow during the course of your

8    fire investigations?

9          A.    No.

10         Q.    You do not?

11         A.    No.

12         Q.    You follow it, but you do not find it to

13    be authoritative?

14         A.    No.

15         Q.    Is that correct?

16         A.    That's correct, I do not.

17         Q.    All right.  Is there any other document or

18    treatise that you note to be more authoritative

19    than the NFPA 921?

20         A.    No.

21         Q.    If the NAFI and the IAAI had adopted NFPA

22    921 as the standard, would that change your opinion

23    as to the authoritativeness of the document?

24         A.    Could you rephrase the question?

25         Q.    Yes.  If you're wrong and NAFI and the

1    A.   Yes.

2    Q.   Have you ever suffered a fire loss?

3    A.   No.

4    Q.   Are you familiar with the most recent

5  amendment to the NFPA 921?

6    A.   Which amendment would you be referring to?

7    Q.   2011 Edition.

8    A.   I am familiar with it.

9    Q.   Okay.  And is that the one that you

10 follow?

11   A.   Yeah.

12   Q.   Okay.  I printed off -- I bought a copy

13 and printed a copy off, so why don't you just take

14 a look at that and see if you recognize that to be

15 a true and correct copy of the 2011 Edition of the

16 NFPA 921.  I represent to you, I've got a book

17 here.  So, if you want to confirm, here's the

18 book.  But I believe that to be -- can you flip

19 through it and tell me if you think it is?

20   A.   (Witness complies.)

21        It appears to be so.

22   Q.   Okay.

23             MR. MCWHERTER:  Let's mark that as

24     Exhibit Number 1.

25             (WHEREUPON, the previously

1     A.    Yes.

2     Q.    Would you agree that it requires a lack of

3     expectation bias?

4     A.    Yes.

5     Q.    Do you know what that is?

6     A.    Yes.

7     Q.    What is the methodology that you use to

8     conduct a fire investigation?

9     A.    Okay.  Well, there's seven steps.  First,

10    you're going to have to recognize the need for an

11    investigation; you're going to have to define a

12    problem; you got to collect data, and then you have

13    to analyze the data, form an hypothesis, test that

14    hypothesis; and at the end of the investigation,

15    you come up with a final hypothesis.

16    Q.    And you are referring to the scientific

17    methods of the NFPA 921?

18    A.    Yes.

19    Q.    What is the first -- do you have to

20    conduct that same methodology separately from both

21    origin and cause?

22    A.    No.

23    Q.    So, there is one process?

24    A.    Right.  Normally.

25    Q.    Okay.  All right.  Do you try to determine

1   scenario that could have possibly caused the fire.

2       Q.    And do you develop multiple hypotheses?

3       A.    Yes.

4       Q.    And then what's next?

5       A.    Well, you have to test the hypothesis.

6       Q.    And testing the hypothesis is done through

7   what's called deductive reasoning, correct?

8       A.    Deductive reasoning, yes, sir.

9       Q.    And tell me about that.

10      A.    It's just in a nutshell, just saying that

11  your hypothesis could actually work and does make

12  sense; and basically does it make sense?  Would it

13  have actually caused the fire?

14      Q.    And there are methods by which the

15  hypothesis can be scientifically tested, correct?

16      A.    Sure.

17      Q.    And those might be laboratory testing?

18      A.    Laboratory results.

19      Q.    Fire modeling?

20      A.    Right.

21      Q.    Anything else?

22      A.    That's all that comes to my mind right

23  now.

24      Q.    And one of the necessary components of

25  testing the hypothesis is to decide if there is any

1   other hypothesis that could be supported by the

2   same set of facts?

3        A.    Right.

4        Q.    And if more than one hypothesis can be

5   supported by the same set of facts, then in some

6   occasions, at least, then the fire might have to be

7   labeled as undetermined, at least the cause?

8        A.    I don't think, not at this point that

9   we're at.

10       Q.    All right.

11       A.    No.

12       Q.    Okay.  What if a hypothesis is incapable

13  of being tested, what do you do?

14       A.    If it's impossible of being tested?

15       Q.    Yes.

16       A.    I couldn't imagine why it would be

17  impossible, but I guess the answer to that would

18  have to be undetermined if it's impossible to test.

19       Q.    Okay.  And what's the next step?

20       A.    Was we at test the hypothesis?

21       Q.    Yes.

22       A.    Okay.  The next step would be come to a

23  final hypothesis.

24       Q.    And a final hypothesis is your opinion?

25       A.    Is your opinion on what's caused the fire;

1    where it originated.

2        Q.    And are there categories for the cause of

3    the fire?

4        A.    Categories?  You mean classifications?

5        Q.    Classifications.

6        A.    Sure.

7        Q.    And those are what?

8        A.    You've got accidental, undetermined, and

9    incendiary.

10       Q.    And natural?

11       A.    Natural, yes.

12       Q.    And then there's those four --

13       A.    There's those four, yes.

14       Q.    -- correct?  Okay.  What causes fire?

15       A.    It's a rapid oxidation.

16       Q.    Okay.  What principles have to come into

17   play in order for a fire to occur?  Let me just

18   help you:  You've got to have fuel?

19       A.    You've got to have fuel, oxygen.

20       Q.    And?

21       A.    Uninhibited chain reaction.

22       Q.    And?

23       A.    Fuel, oxygen and heat.

24       Q.    Ignition source, right?

25       A.    Right.

1          Q.    If you knew that there were ignitable

2    liquids in the home prior to the fire in the

3    ordinary course, whatever they might be, could that

4    change your opinion?

5          A.    No.

6          Q.    Would not change your opinion?

7          A.    No, it would not.

8          Q.    Okay.  No matter their location?

9          A.    No.

10         Q.    And the reason for your refusal to change

11   your opinion is what?

12                      MR. CHASTAIN:  Objection to form.

13                      MR. MCWHERTER:  Go ahead.

14                      MR. CHASTAIN:  You can go ahead

15        and answer.

16                      THE WITNESS:  There's other

17        factors.

18   BY MR. MCWHERTER:

19         Q.    Anything else you've learned from the

20   Banks that day?

21         A.    No.

22         Q.    What about -- what was your second

23   conversation with the Banks?

24         A.    It was a real quick one.  Mr. Banks pulled

25   up and he was very upset that he couldn't get his

1   damage was the?

2       A.    Exterior.

3       Q.    And the older one-story portion of the

4   home, correct?

5       A.    Correct.

6       Q.    Describe, if you would, the nature of the

7   house because it's rather unique, you would agree?

8       A.    Yes.

9       Q.    Tell -- tell us about the house itself

10  pre-fire.  What was the condition of it, what was

11  the structure type, and so forth?

12      A.    It's a wood frame construction.  The

13  original part of the house has a crawl space; and

14  to the left, there's been a three-story addition, I

15  believe.  It's somewhere around seven years old.

16  Huge addition, three-story addition, basement; a

17  main level, and then an upper-level.  I believe the

18  addition itself was 3600 square feet, somewhere

19  around there.  Very nice, very nice home.

20      Q.    And the addition joined the older ranch

21  portion of the house, correct?

22      A.    Correct.

23      Q.    And the ranch portion of the house was

24  level, in terms of elevation, with the middle story

25  of the addition?

1      A.    Correct.

2      Q.    And the basement was underground only as

3   it related to the side that was adjoining the

4   existing structure?

5      A.    Yes, facing the front of the house.  The

6   basement wall to the right was underground.

7      Q.    Okay.  And what was the condition of the

8   house post-fire, generally?

9      A.    Heavy fire damage.

10     Q.    And the -- on the new structure, the third

11  story fell into the second story, correct?

12     A.    Yes.

13     Q.    Had the second story fallen into the

14  first?

15     A.    About half of it, about half of the second

16  floor had collapsed down.

17     Q.    And what was in the -- what rooms were in

18  the new addition to the home?

19     A.    There was the basement, and there was the

20  master bedroom area, dressing room and a bathroom;

21  and the upstairs contained the library and media

22  room.

23     Q.    How many rooms were in the basement?

24     A.    Two.

25     Q.    Okay.  One in the front, one in the back,

1    portion, there is the master bedroom and a laundry

2    and a master bath, and there's one big room

3    categorized as walk-in closet; do you know if

4    that's accurate?

5        A.   To my knowledge, it is.

6        Q.   Okay.  You don't know any different, if

7    that's wrong?

8        A.   No.

9        Q.   Okay.  And then looking at the old section

10   of the house, you see where it says Bed 2 and

11   office?

12       A.   Yes, sir.

13       Q.   That's in the old section of the house,

14   correct?

15       A.   Yes, sir.

16       Q.   And between that and the new section is a

17   brick wall?

18       A.   Yes, sir.

19       Q.   Which is the old exterior wall, correct?

20       A.   Yes.

21       Q.   And where it's labeled "office", you have,

22   at times, referred to that as Bedroom 1?

23       A.   At first, when I first began my

24   investigation, I did not know that was an office at

25   the time.  It was later brought up that this was

1      A.    Yes.

2      Q.    Take a look at your report, if you would,

3  Page 3.  See the paragraph that starts electric

4  service?

5      A.    Yes, sir.

6      Q.    Third sentence:  The meter base was not

7  properly grounded.  There was no driven grounding

8  rod or cable visible.  What does that tell you?

9      A.    I didn't put that in this report.

10     Q.    Well, you signed it?

11     A.    I did not put that in this report.

12     Q.    What does that mean?

13     A.    That would have meant that the meter base

14 wasn't grounded.

15     Q.    Which means what?

16     A.    It just means that the meter base wasn't

17 grounded.

18     Q.    Which can result in what?

19     A.    Something or nothing.

20     Q.    Okay.

21     A.    But I did not put this in the report.

22     Q.    You drafted the report, correct?

23     A.    I did, but I didn't review it and make

24 corrections to it.

25     Q.    And you signed this report, correct?

1      A.   It was signed -- as you can see it was
2  electronically signed.  It's signed when I turned
3  my report in.
4      Q.   Who would have made changes to your
5  report?
6      A.   It would have been the reviewer, Metts
7  Hardy.
8      Q.   And were there prior drafts of this
9  report?
10      A.   Digitalized, yes.
11      Q.   And are the older drafts kept?
12      A.   I have no idea.
13      Q.   You have no knowledge of what changes were
14  made or not made if you don't have the older draft,
15  right?
16      A.   I don't.
17      Q.   Okay.  Look at the next paragraph.  The
18  building had burned to completion.  Destroying most
19  of the fire movement patterns in the left side of
20  the structure.
21      A.   What page are we on again?
22      Q.   Page 3.
23      A.   Okay.
24      Q.   You wrote that the fire movement patterns
25  on the left side of the structure had been

1  quality of the contents in the three-story

2  addition, correct?

3      A.   To the quality, especially.  But to the

4  quantity, there was a lot less than appeared to be

5  normal.

6      Q.   Have you opined -- have you given the

7  opinion that you could not determine the quantity

8  of contents in the three-story addition?

9      A.   Yes.

10     Q.   Is that your opinion?

11     A.   Yes.  I couldn't do it, not 100 percent.

12     Q.   Well, within any reasonable degree of

13  certainty?

14     A.   Yes, with reasonable degree I can.

15     Q.   You can.  Okay.  Look at your report,

16  Exhibit 4.

17     A.   Yeah, I know what it said.

18     Q.   All right.  I just want to know why your

19  opinion changed?

20     A.   Because this is based off of 100 percent

21  fact.

22     Q.   Everything in here is 100 percent fact?

23     A.   Well, based off of it.

24     Q.   Your opinion as to origin and cause is 100

25  percent fact and true.

1        A.    My opinion.

2        Q.    Well, I don't doubt that you 100 percent

3    agree with it.

4        A.    Yeah, that's what I'm saying.

5        Q.    But all opinions are subject to being

6    wrong, true?

7        A.    Right.

8        Q.    So, when you say here in your -- Page 4,

9    third paragraph.  When you say--tell me if I quote

10   this right--"no determination could be made as to

11   the quantity or quality of any contents in the left

12   side addition that was destroyed by the fire."

13       A.    That's not my wording either.

14       Q.    That was the opinion that you gave to

15   Cincinnati Insurance Company, correct?

16       A.    No, sir.

17       Q.    So, I don't understand how this happened.

18   This is your report, right?

19       A.    Right.

20       Q.    But you're saying that's not your opinion?

21       A.    That's not what I wrote in the report.

22       Q.    This is the opinion that has been given to

23   me by your lawyers as being the opinion that you're

24   going to offer at trial.

25       A.    This is not what I wrote.

1      Q.    Where is the prior draft?

2      A.    Again, I don't know.

3      Q.    You don't know if the things in this

4  report are your opinions or not as we sit here

5  today, do you?

6      A.    Maybe little details like that, no, I

7  don't.

8      Q.    That's not a little detail, that's a big

9  detail; you would agree with that, wouldn't you?

10     A.    Yeah.

11     Q.    Whoever reviewed this, which is Hardy

12 Metts, opined at least that no determination could

13 be made as to the quantity or quality of any

14 contents in the left side addition, correct?

15     A.    That's correct.

16     Q.    All right.  Peer review.  What is peer

17 review?

18     A.    It's when another person in your field

19 reviews your work.

20     Q.    And the purpose of it is what?

21     A.    To try to find any mistakes.

22     Q.    And if they see some, they?

23     A.    Correct them.

24     Q.    And that's what Mr. Metts did here,

25 correct?

1    A.    Appears so.  After he corrected it, it was
2  not sent back to me to review.
3    Q.    Okay.  Look up at the paragraph above that
4  you said the content remains are not consistent
5  with the occupancy.  Evidence indicated some of the
6  contents had been removed prior to the time of the
7  loss.  Is that your opinion?
8    A.    Yes.
9    Q.    All right.  Do you -- in order to know if
10 contents had been removed, you had to know what was
11 there before?
12   A.    Correct.
13   Q.    Right.  And what contents do you believe
14 had been removed?
15   A.    Again, I had the virtual tour of the house
16 where it was on the market where it showed loads
17 and loads of contents and they were taken just
18 before this fire.
19   Q.    When?
20   A.    I'm not sure, but just within a couple of
21 months I believe.
22   Q.    All right.  Did you interview the Banks?
23   A.    Again, no.
24   Q.    To ask them about what items may have been
25 removed?

1      A.    Again, no.

2      Q.    Why not?

3      A.    I was instructed not to talk to them.

4      Q.    By whom?

5      A.    Stephen Pierce.

6      Q.    And why would he tell you not to talk to a

7   witness?

8      A.    I didn't ask any questions.

9      Q.    He just told you not to and you followed

10   his instructions?

11      A.    Correct.

12      Q.    And if you could do things the way that

13   you wanted to do them, that would be a critical

14   piece of information you would want?

15      A.    Probably so.

16      Q.    And the reason for that is you want all

17   information available?

18      A.    Well...

19      Q.    Correct?

20      A.    I think I did have it.

21      Q.    Correct?

22      A.    I think I did have it.

23      Q.    Can you answer the question first?

24      A.    I did have it, yes.

25      Q.    You did have what?

1      A.    Not a large amount.

2      Q.    And -- okay.

3      A.    If I would have meant none, I would have

4  wrote none.

5      Q.    How many -- I understand and I appreciate

6  that.  How many does it have to be in order to be

7  lacking?

8      A.    Well, any reasonable person would believe

9  a man with a kitchen like they had would have more

10  than just two little items in a drawer and stuff

11  like that, you would expect a large amount of

12  cooking utensils.

13      Q.    How much silverware did you find?

14      A.    Very minimal.

15      Q.    How much?

16      A.    I didn't take an inventory of this, just

17  very minimal.  It appeared to be lacking.

18      Q.    You had not taken an inventory?

19      A.    No.  I did not take a contents inventory,

20  no.

21      Q.    All right.  You also offered the opinion

22  that items that were on the Banks' contents list

23  were not there, haven't you?

24      A.    Yes.

25      Q.    In order to do that, wouldn't you have to

1      A.    But in the office, it came in through the

2  floor and above.

3      Q.    The office is the remainder of the

4  structure, it's not the addition; correct?

5      A.    We're picking straws, but --

6      Q.    I'm not --

7      A.    -- it's right there.  There's a wall right

8  there that divides them, you're correct there.

9      Q.    All right.  Now, you said you got a

10  positive sample at an area in the office?

11      A.    Correct.

12      Q.    And it was in the middle of the room?

13      A.    Correct.

14      Q.    Was it the middle of the room?

15      A.    From what I could tell, yes.

16      Q.    All right.  What was there pre-fire what

17  was it, do you know?

18      A.    According to what I've discovered in the

19  debris, nothing.

20      Q.    All right.  And so I'm still trying to

21  understand what you're basing your opinion on that

22  the fire traveled from the new addition to the

23  older part by way of ignitable fluid?

24      A.    That's my opinion.

25      Q.    That there was one sample taken in the

1  office, and your opinion is what?

2     A.    There were two samples taken in the

3  office.

4     Q.    Okay.  Two samples taken in the office?

5     A.    Yes, sir.

6     Q.    What does that have to do with the fire

7  traveling from the old part -- excuse me.  From the

8  new part to the old part?

9     A.    The floors were poured with ignitable

10 liquid and that's how it would have traveled.

11    Q.    Did you test -- did you take a sample in

12 the doorway into the addition?

13    A.    Yes.

14    Q.    And what did that reveal?

15    A.    It was negative.

16    Q.    Okay.  Did you take samples in the newer

17 part of the house?

18    A.    Newer part?

19    Q.    The addition.

20    A.    The addition, yes, sir.

21    Q.    And how did those come out?

22    A.    Negative.

23    Q.    The only positive sample you got was one

24 particular area in the office?

25    A.    One room, yes.

1      Q.    In the same area, correct?

2      A.    One was deeper in the office, and the

3  second one would have been more so in the hallway.

4  There's a hallway where you walk through the

5  office, that's where that second one would have

6  been.

7                      VIDEOGRAPHER:  Two minutes.

8                      MR. MCWHERTER:  Well, this may

9          take awhile, so it's a good time.

10                     VIDEOGRAPHER:  Going off the

11         record, Tape Number 2, at approximately

12         13:07.

13                     (Short break in the proceedings.)

14                     VIDEOGRAPHER:  Going back on the

15         record, Tape Number 3, approximately 13:45.

16  BY MR. MCWHERTER:

17     Q.    Okay.  Mr. Sells, we were talking about

18  incendiary fires and ignitable liquid before the

19  break.  We're going to switch gears and come back

20  to that.  Do you have a --

21                     MR. MCWHERTER:  Do we have a clean

22         copy of the expert report?

23                     MR. CHASTAIN:  Here's one right

24         here, Brandon.

25                     MR. MCWHERTER:  Yes.  Thank you.

1        A.    Mike Caldwell.

2        Q.    Okay.  Have you done any independent

3   analysis to check his work?

4        A.    No.

5        Q.    Next paragraph:  While I made no specific

6   determination as to the quantity and quality of the

7   items claimed to have been in the left side of the

8   home, destroyed by the fire, during my initial

9   investigation, I handsifted the area and completely

10  familiar with the evidence that remained in the

11  fire debris.

12          Did I read that correctly?

13       A.    Yes.

14       Q.    So, just a few months ago, November 2012,

15  you were still issuing the opinion that you had

16  made no and have made no specific determination as

17  to the quantity and quality of items claimed to

18  have been in the left side of the home, correct?

19       A.    Correct.

20       Q.    Then you said:  I was asked to look at the

21  -- I think it's a type-o -- list insureds inventory

22  and determine what items would have survived the

23  fire if present in the home at the time of the

24  loss, and of those items which of them left no

25  evidence in the fire debris and therefore could not

1     A.    I don't remember what the instructions

2  were.

3     Q.    Okay.  Go ahead and look.

4     A.    I don't see what the highlighted areas

5  mean, so I don't know.

6     Q.    What were you asked to do?

7     A.    To determine what items could have

8  survived the fire.

9     Q.    All right.  In your report on Page 4 --

10     A.    Okay.

11     Q.    -- it says, under Number 2, third

12  paragraph, midway down:  I was asked to look at the

13  insureds inventory and determine what items would

14  have survived the fire if present in the home at

15  the time of the loss, and of those items which of

16  them left no evidence in the fire debris and

17  therefore could not have been present.

18           Was that your task?

19     A.    Yes.

20     Q.    Did you do that?

21     A.    Yes.

22     Q.    All right.  For the whole house?

23     A.    Yes.

24     Q.    Okay.  Then the next paragraph, it says:

25  I prepared a list of items claimed by Mr. and

1    Ms. Banks that could not have been in the home at

2    the time of the fire because such items would have

3    left visible evidence that was not found after

4    handsifting the fire scene.

5              Then a line down:  Based upon my

6    investigation, the following list describes those

7    items claimed by the Banks, but not found to be at

8    the home after the fire loss.

9              Did I read that correct?

10     A.    Yes, sir.

11     Q.    And then there's several pages of page

12   after page after page of items that you say were

13   not there, correct?

14     A.    Or would have survived the fire, yes.

15     Q.    Would have survived the fire, but were not

16   there?

17     A.    Yes.  According to this list, yes.

18     Q.    Did you make any analysis of whether the

19   items were there or not?

20     A.    Again, no.  I said I went off this list

21   that was provided to me to look at.

22     Q.    I see.  So, when that first one there says

23   Egg Cooker Chef's Choice, you don't know whether or

24   not that is actually -- what was actually at the

25   house or not?

1       A.      No, I don't.  I was just asked if it would

2   have survived the fire or not.

3       Q.      Okay.  Is that true for every item in the

4   list?

5       A.      Yes.

6       Q.      So, the only thing you're opining -- the

7   only thing you're offering an opinion on as to

8   these items in this list is whether or not they

9   would have survived a fire of the magnitude at the

10  Banks' house?

11      A.      Yes.

12      Q.      And nothing else?

13      A.      Right.

14      Q.      So, when you say based upon my

15  investigation, the following list describes those

16  items claimed by the Banks, but not found to be at

17  the home after the fire loss, that's not really

18  what you're giving an opinion of?

19      A.      Where are we?

20      Q.      I'm sorry.  Bottom of Page 4, last

21  sentence.

22      A.      That's a true statement.

23      Q.      Well, are you saying the items were there

24  or not?  I hear you telling me:  On one hand, I

25  only looked to see weather or not they would

1  survive the fire; then part two of the assignment
2  that you told me was to determine which of the
3  items there was actual evidence of on the scene?
4      A.    I had two lists to compare.  I had the one
5  from Enservio, and the one provided by the Banks.
6  Now, what I did was take both lists and decide or
7  try to determine and give my opinion depending on
8  location of the item and where it was, that if the
9  item would have survived the fire or if it could
10  have survived the fire, and it wasn't found which
11  meant that it wasn't there.
12      Q.    So, what you were doing is assuming that
13  Enservio's list is correct?
14      A.    Yes.
15      Q.    But if it's not correct, then that's not
16  something you should rely on; you would agree with
17  that?
18      A.    I did rely on it.
19      Q.    Okay.  What about -- okay.  Go to the end
20  of that first list and you start your report back
21  again.  There's not a page number.
22      A.    (Witness complies.)
23            Okay.
24      Q.    Got it?
25      A.    I'm there.  Conclusion; is that right?

 1      Q.    No, you've got two different lists.

 2      A.    Let's see.  Goodness gracious.

 3      Q.    May I help you?

 4      A.    Sure.

 5      Q.    The way I read your report, and I read it

 6  a bunch, several times, you had two lists.  The

 7  first list was items that you said were not at the

 8  fire scene, and then you come to a second bit of

 9  discussion and start a second list.  And if you go

10  to the next page, Mr. Sells, and look at the

11  paragraph that starts:  There was evidence of other

12  items claimed by the Banks, but not in the quantity

13  claimed.  And so then you go on to list other

14  things.  What is this list of?

15      A.    It says:  The following is a list of items

16  claimed by the insureds that were either not

17  present or were not present in the quantities

18  claimed.

19      Q.    All right.  And did you do an analysis of

20  the personal property on site at the fire scene?

21      A.    Again, off the same lists.  Off these

22  lists provided to me.

23      Q.    Answer this question first:  Did you do

24  any analysis at the fire scene to develop this

25  list?

1      A.    No.

2      Q.    This list was developed purely from the

3   Enservio list.  You went through their list, you

4   went through the Banks' list; and if something

5   could have survived the fire, you put it down?

6      A.    Yes.

7      Q.    You're not offering any opinion as to

8   whether or not an item of personal property was at

9   the fire at the time of the scene or not?

10     A.    No.

11     Q.    I want to make sure this is crystal

12  clear.  You don't know what was at the fire scene

13  at the time of the fire, you don't know what was

14  not at the fire scene at the time of the fire as it

15  relates to contents?

16     A.    Some.

17     Q.    What?

18     A.    To the left part of the structure that I

19  actually did the excavation inventory on, I can

20  speak to that.

21     Q.    You can speak to that, even though in your

22  original report you said you could not give an

23  opinion as to the quality or quantity; and even

24  when you wrote this report, you said that too?

25     A.    Yes, I can speak to it.  Yes.

1      A.    This is in the dining room area.

2                  (WHEREUPON, the previously

3                  mentioned document was

4                  marked as Exhibit No. 41.)

5  BY MR. MCWHERTER:

6      Q.    What are Rattan chairs, R-A-T-T-A-N?

7      A.    I don't know.

8      Q.    How do you know if evidence would have

9  survived a fire if you don't know what it is?

10     A.    Depending on where it's at, I can testify

11 to, if there was a chair in that room, would it

12 burn.

13     Q.    Part of your testimony would hinge on your

14 ability to know what the item is composed of,

15 right?

16     A.    No.

17     Q.    So, it don't matter if it's steel, wood,

18 leather, plastic, doesn't matter to you; you can

19 know?

20     A.    To a degree -- well, there's a lot of -- a

21 lot of factors you've got to plug into asking that

22 question.

23     Q.    Well, the first question is:  Do you know

24 what a Rattan chair is?

25     A.    No.

1     Q.    Do you know what it's made of?

2     A.    No.

3     Q.    Did you find any linens?

4     A.    Where?

5     Q.    Anywhere in the house.

6     A.    There was some in a closet in the house.

7  I remember it -- I believe it was in--what are we

8  calling that room now--Bedroom 2.

9     Q.    Okay.  Was it your opinion that the linens

10 would have been destroyed in this fire, or that

11 they would have survived the fire?

12    A.    They would have survived.

13    Q.    The linens would have, yes?

14    A.    Yes.

15    Q.    In Bedroom 2?

16    A.    Right.

17    Q.    Where were the linens in Bedroom 2?

18    A.    In the closet.

19    Q.    Okay.  Did you find any other linens

20 anywhere else?

21    A.    No, not in my search.  That's about where

22 I ended it.  It seems like there may have been some

23 in the China cabinet, or something like that

24 possibly.

25    Q.    Show you a picture of a debris pile

1     Q.    Pizza wheel, do you know what that is?

2     A.    Yes.

3     Q.    Did you find one of those?

4     A.    No.  Again, I didn't inventory items where

5  this would have been.

6     Q.    No, you did not find one?

7     A.    No.

8     Q.    Did you look for one?

9     A.    No.

10    Q.    Okay.  What's your opinion of the origin

11  of the fire?

12    A.    Master bedroom, master bedroom area.

13    Q.    Did you identify a point of origin --

14    A.    No.

15    Q.    -- or just an area of origin?

16    A.    An area.

17    Q.    And looking at our Exhibit 7 -- I had you

18  mark a copy instead of the original on the basement

19  put an "X".  I had you "X" a copy instead of the

20  original exhibit.

21    A.    Okay.

22    Q.    All right.  Looking at Exhibit 7, can you

23  identify for me by way of an "X" or circle the area

24  of origin that you identified?

25    A.    (Witness complies.)

1      Q.   All right.  So, you've circled an area in
2  the master bedroom.  You circled the laundry room
3  and master foyer, correct?
4      A.   Yes.
5      Q.   And that was intentional?
6      A.   Yes.
7      Q.   So, one of those three rooms, all of which
8  are in the new addition?
9      A.   Correct.
10     Q.   What were your hypotheses for the area of
11  origin?
12     A.   Initially, electrical was examined early
13  on.  I noticed unexplained fire patterns that I
14  could not explain which was another hypothesis I
15  came up with, you know.  We did testing.
16     Q.   What were your hypotheses, your
17  alternative hypotheses, as to the origin, not --
18  how did you come up with it?  What were the various
19  options?  What does a hypothesis mean to you?
20     A.   An educated guess -- theory.
21     Q.   All right.  So what were the alternatives
22  hypotheses as to the origin of the fire?
23     A.   To the origin, there wasn't.
24     Q.   There were not any?
25     A.   No.

1      Q.    You just had one?

2      A.    Right.

3      Q.    And that was?

4      A.    In the master bedroom area.

5      Q.    Okay.  Did you -- what data did you

6   collect in coming up with a hypothesis that the

7   origin of the fire originated or that the fire

8   originated in the master bedroom; what all did you

9   consider?

10     A.    Witness statements from a neighbor seeing

11  the fire very early on and was the 911 caller.

12     Q.    Did you talk to that gentleman?

13     A.    Yes, I did.

14     Q.    And he's identified in your report as

15  Mr. Adams?

16     A.    Adams.

17     Q.    What did he tell you?

18     A.    Said that he first saw the smoke, that it

19  was a -- in the woods back behind the house.  He

20  walked up to the road and looked a little bit

21  closer and could see fire in the main level at the

22  master bedroom area.

23     Q.    All right.  And did you do any fire

24  pattern analysis?

25     A.    Yes.

1   burns?

2       A.   Not in this instance, no.

3       Q.   Generally speaking?

4       A.   No.

5       Q.   Cannot?

6       A.   No.

7       Q.   And if NFPA 921 says differently, would

8   that change your mind?

9       A.   No.

10      Q.   All right.  Because you don't view NFPA

11  921 as a standard?

12      A.   It's a guide.

13      Q.   It's a guide that you follow.  What's the

14  difference in a guide and a standard?

15      A.   Standard is pretty well something you have

16  to do.  A guide kind of guides you through a

17  situation.

18      Q.   And in your mind, NFPA 921 is a guide that

19  you choose to follow, but you don't have to?

20      A.   Correct.

21      Q.   And why do you choose to follow it?

22      A.   Because it's a good guide.

23      Q.   Was flashover reached in the office?

24               MR. CHASTAIN:  Objection.  Asked

25        and answered.

1    A.   No.

2    Q.   Was the saddle burn in the area of the

3  desk?

4    A.   There was no desk.

5    Q.   Let me ask you this:  If you assume that

6  the desk was there, would the desk have provided

7  fuel for that saddle burn?

8    A.   Not to cause that kind of burn, no.

9    Q.   And what -- what kind of burn would a desk

10 fuel cause?

11   A.   You may have a larger one, you may have

12 more than one, but you're not going to have such a

13 condensed area and such a deep burn from a desk.

14              VIDEOGRAPHER:  Two minutes,

15     please.

16 BY MR. MCWHERTER:

17   Q.   Okay.  Anything else about the area of the

18 office that led you to believe that the cause of

19 the fire was incendiary origin, or that the cause

20 of the fire was human involvement?

21   A.   The positive samples and lack of contents

22 helped me form my hypothesis.

23   Q.   Those are the two things?

24   A.   Yes, sir.

25   Q.   All right.  Anything else?

1      Q.   -- verbally?  Okay.  What were the fuels
2  you identified for the fire in the area of origin?
3      A.   Can you rephrase that?
4      Q.   One of our necessary components of a fire
5  is fuel, whether it's clothing, wood, whatever it
6  might be.
7      A.   Are you talking about combustible
8  materials --
9      Q.   Yes.
10     A.   -- in the area?  There's all kinds.
11  You've got wood.  You had wood structure, structure
12  members, construction items that have been brought
13  in, furniture, that type thing.
14     Q.   Do you --
15     A.   Ignitable liquids.  There are several
16  things to factor on there.
17     Q.   All right.  My question is:  What were the
18  fuels in the area of origin?
19     A.   Okay.  It would have been construction
20  materials, some furnishings, and ignitable liquid.
21     Q.   All right.  How did you identify a
22  ignitable liquid as a fuel in the area of origin?
23     A.   We got positive samples near the area of
24  origin.
25     Q.   Okay.  The samples were taken from the

1    office, correct?

2        A.    Yes.

3        Q.    There were no positive samples in the area

4    of origin that you identified, correct?

5        A.    Right.

6        Q.    All right.  So, how'd you jump to the

7    conclusion that there's an ignitable liquid in the

8    area of origin with no proof of that?

9        A.    I said near the area of origin.

10        Q.    All right.  But my question is:  What were

11    the fuels in the area of origin?

12        A.    Possible fuels or actual fuels?

13        Q.    Well, you can only consider data known to

14    be true?

15        A.    Right.

16        Q.    You told me that within the first ten

17    minutes.

18        A.    Right.

19        Q.    So, what were the fuels that you know for

20    a fact to be present in the area of origin?

21        A.    Again, construction materials.

22        Q.    Okay.

23        A.    Some furnishings, ignitable liquids.

24        Q.    All right.  How do you know for a fact,

25    know to be true that there were ignitable liquids

1    in the area of origin?

2        A.    I said near the area of origin.

3        Q.    I don't know if you're not hearing me or

4    just don't want to answer the question.  You can

5    only consider facts known to be true, correct?  I

6    am asking you:  What were the fuels in the area of

7    origin?  Not near the area of origin.  What fuels

8    were in the area of origin that you identified?

9        A.    Construction materials.

10       Q.    Right.  And furnishings?

11       A.    I don't know that.

12       Q.    Okay.  Construction material's the only

13   fuel there?

14       A.    That I know was there.

15       Q.    Okay.  Well, you found evidence of

16   furniture mattresses, furniture springs, pieces of

17   furniture, right?

18       A.    Yeah.

19       Q.    Okay.  So, that was there?

20       A.    Also found positive samples for ignitable

21   liquids.

22       Q.    That was near, not in, right?  Correct?

23       A.    I don't know that that furnishing was in

24   the area of origin either.

25       Q.    All right.  Did you consider that there

```
 1  might be furnishings there?
 2      A.    There might be.
 3      Q.    All right.  What are some potential
 4  accidental causes of a fire?
 5      A.    There's several.  There's electric.
 6  There's negligence.  There's housekeeping.  There's
 7  -- the list goes on and on, like that.
 8      Q.    Can you think of any others?
 9      A.    Some type of mechanical failure, code
10  violations, failure of an electrical piece of
11  equipment, candles.
12      Q.    Candles, cigarettes, combustibles too
13  close to a lamp, right?
14      A.    Those are kind of rare, but yes.
15      Q.    Even static electricity can cause a fire,
16  correct?
17      A.    With the right fuel.
18      Q.    Okay.  But it can cause a fire?
19      A.    With ignitable liquid, it can.
20      Q.    That's a good question.  Is it your
21  testimony that static electricity cannot start a
22  fire to a residence without ignitable liquid?
23      A.    I've never encountered one or heard of
24  one.
25      Q.    All right.  What's your opinion?
```

1    when you check the arcs?

2         A.    Arc mapping.

3         Q.    Are you capable of doing arc mapping?

4         A.    I have taken classes on it, yes.

5         Q.    All right.  Do you know how to do it?

6         A.    Yes.

7         Q.    Have you done it in the past?

8         A.    Yes.

9         Q.    Did you do it in this case?

10        A.    No.

11        Q.    Why not?

12        A.    In the area where it would have been too

13   much material lost to actually be able to look at

14   it to come up with anything good.

15        Q.    All right.  The electrical fire had been

16   destroyed -- excuse me -- the electrical wires had

17   been destroyed?

18        A.    Right.

19        Q.    If you were able to utilize arc mapping,

20   what would that show you?

21        A.    It would show you the area that the

22   electricity was first piped in.

23        Q.    And that was unable to be done?

24        A.    Correct.

25        Q.    All right.  What was the -- what were the

1   potential ignition causes in the area of origin;
2   meaning, what were the various hypotheses that you
3   considered as the causative agent that started the
4   fire?
5       A.   The hypothesis I considered, possibly
6   electrical.
7       Q.   Okay.  Were you able to rule out
8   electrical?
9       A.   No, I wasn't.
10      Q.   Okay.  What else?
11      A.   Could have been any kind of negligence
12  involved.  Human involvement.  Those were the
13  initial three that I thought.
14      Q.   Okay.  And how did you rule out
15  negligence?
16      A.   I couldn't.
17      Q.   All right.  So, negligence is a possible
18  cause?
19      A.   It was a hypothesis, it's not my opinion.
20      Q.   Okay.  Can you rule it out sitting here
21  today?
22      A.   No.
23      Q.   All right.  And you can't rule out
24  electrical sitting here today?
25      A.   No.  We did have an electrical engineer

1  come in and he did everything possible to try to

2  either confirm or deny electrical, and was unable

3  to do so.

4      Q.   He opined that there was insufficient

5  information to make an engineering determination as

6  to the cause of the fire, correct?

7      A.   But he did eliminate some items in the

8  area of origin.

9      Q.   Items he looked at was the dehumidifier,

10  correct?

11      A.   Right.

12      Q.   Do you know what types of tests he

13  performed on the dehumidifier?

14      A.   I don't.

15      Q.   Do you know what types of tests he

16  performed on the washer and dryer?

17      A.   I don't.

18      Q.   Do you know what types of tests he

19  performed on any of the various appliances that he

20  may have looked at?

21      A.   I don't.

22      Q.   Did you make any conclusions as to what

23  heat producing devices were within the area of

24  origin, other than the ones you've mentioned?

25      A.   No.

1  have a time frame.

2      Q.   There's only one area of origin, was the

3  master bedroom.  There wasn't multiple places of

4  origin, correct?

5      A.   Not that could be found.  It was a large

6  area.

7      Q.   You weren't able to pinpoint a precise

8  point of origin?

9      A.   No.

10      Q.   Just a general area of origin?

11      A.   Right.

12      Q.   Did you notify the Banks that you were

13  going to excavate the scene prior to doing so?

14      A.   No, I was instructed not to, not to bother

15  them.

16      Q.   All right.  Did you tell Cincinnati that

17  the owner should be notified before the scene was

18  altered?

19      A.   I did notify Cincinnati that we needed to

20  do that, and I passed it on.

21      Q.   You don't know what came of that?

22      A.   I don't know.

23      Q.   Do you agree that it's the investigator's

24  responsibility to preserve evidence as much as

25  possible and take care to avoid destruction of

1          Q.    Last sentence on Page 5:   Forensic

2     evidence of ignitable liquids in the living area

3     where they would not commonly exist, along with the

4     absence of personal property precludes accidental

5     ignition.   Is that your opinion?

6          A.    Yes.

7          Q.    Was the -- okay.   Look at the next page,

8     please.

9          A.    Okay.

10         Q.    Starting with Paragraph 2 and going down

11    for six paragraphs.   That portion of the report was

12    prepared by Matt Forbes, an engineer, correct?

13         A.    Correct.

14         Q.    And Mr. Forbes essentially opined that

15    there was too much damage to make an engineering

16    determination for fire causation?

17         A.    Right.

18         Q.    All right.   The next paragraph is your

19    opinion, not Mr. Forbes', correct?

20         A.    Yes.   I don't know how that would have got

21    in with his.

22         Q.    The reason I say that, attached to the

23    report is a actual synopsis that Mr. Forbes

24    apparently prepared and sent to you?

25         A.    Yes.

1      Q.    And that last paragraph is not in there?

2      A.    I don't know how it got there.

3      Q.    So, this paragraph which reads:  Fire

4  pattern analysis indicates that the fire originated

5  in the area of master bedroom.  That's your thought

6  process and your opinion, not his?

7      A.    Right.

8      Q.    And evidence indicating ignition from

9  introduction of external heat source.  Again,

10  that's yours, not his?

11      A.    Correct.

12      Q.    All right.  Was forcible entry necessary

13  by the fire department?

14      A.    It was reported that it was.

15      Q.    All right.  Do you know if the doors were

16  locked or unlocked?

17      A.    I do not.

18      Q.    Do you know if there are any suspects as

19  to who may have caused the fire, if it was

20  intentionally started?

21      A.    I do not.

22      Q.    Have you had any conversations with

23  Mr. Robinson, or Mr. Woods, or Mr. Butch Stuart,

24  concerning the cause of the fire say in the past

25  year?

1          Q.    Do you have any knowledge from another

2    source as to what was in it?

3          A.    No.

4          Q.    Did you make any determination as to what

5    the first fuel ignited was?

6          A.    Yes.

7          Q.    Which was?

8          A.    Ignitable liquid vapors.

9          Q.    In the master bedroom, correct?

10         A.    Repeat the question, please.

11         Q.    I asked you what the first fuel ignited

12   was, you said ignitable liquid vapors --

13         A.    Yes.

14         Q.    -- and I said in the master bedroom or in

15   the area of origin that you identified?

16         A.    Yes.

17         Q.    And other than the positive sample in the

18   office, do you have any evidence of that at all --

19         A.    No.

20         Q.    -- in the report?  I'm now talking about

21   not the origin-and-cause report, but the other

22   report, the more recent expert report dated

23   November 2012.  I want to make certain that I don't

24   have a misunderstanding as to what you're doing, so

25   I'm not surprised later.

```
 1        A.    Okay.

 2        Q.    There are two lists in your report?

 3        A.    Yes, sir.

 4        Q.    Based on what you've told me today, it's

 5   my understanding what you've done is compared the

 6   lists and made a list of items that you believe

 7   should have survived the fire and that evidence

 8   should have existed of those particular items?

 9        A.    Correct.

10        Q.    That's what those lists are?

11        A.    Correct.

12        Q.    And nothing more?

13        A.    Correct.

14        Q.    Okay.  In preparing that opinion, did you

15   consider different items will -- how do you say

16   that word, pyrolysised?

17        A.    Pyrolysised.

18        Q.    Pyrolysised at different temperatures,

19   correct?

20        A.    Exactly.

21        Q.    And did you determine the pyrolysis -- did

22   I say that right?

23        A.    Right.

24        Q.    Temperature of each of the items on the

25   list?
```

1      A.    No.

2      Q.    Okay.  Have you formulated any opinion as

3   to what the temperature of the fire at the Banks'

4   house reached?

5      A.    No.

6      Q.    All right.  Have you performed any test on

7   any exemplar items of contents listed to determine

8   what temperature those items become unrecognizable

9   at?

10     A.    No.

11     Q.    Did you perform any test to determine how

12  long it would take at a particular temperature for

13  an item to pyrolysis?

14     A.    No.

15     Q.    I noticed that there were some things on

16  here that I don't typically see in fire cases, such

17  as statements like, well, we didn't find cotton

18  balls.  We didn't find ace bandages, Band-Aids.

19  Items like that burn if they're in an area that's

20  in total engulfment.  Do you agree with that?

21     A.    Yes, I do.

22     Q.    And there's no evidence left of such

23  items?

24     A.    Right.

25     Q.    And the same can be said for some items of

1    clothing.  Sure, you might have zippers or buttons,

2    but some items of cotton clothing are going to burn

3    up?

4         A.    Give me for example.

5         Q.    A pair of workout shorts?

6         A.    They still got the little -- some of them

7    have them little metal bands where the string comes

8    in through the front; some don't, I guess.

9         Q.    But -- and I'm -- I'm asking you to apply

10   this to the Banks' case as a general principle.

11   There are items of clothing that burn up beyond

12   recognition?

13        A.    It would take more information to answer

14   that question.  You'd have to be more specific as

15   to what you're talking about.

16        Q.    Well, how about my shirt that I've got on,

17   if it lighted on fire and the fire burned for a

18   period of time, say five hours, and the shirt is

19   right in the area of origin, there may be no

20   evidence left of this shirt by the time the fire is

21   put out, true?

22        A.    It's possible.

23        Q.    For the record, I'm wearing a nice cotton

24   shirt with plastic buttons, I guess.  Do you know

25   where the cotton balls and the ace bandages and the

1    asking?

2         A.    Or by finding.

3         Q.    Or by finding.  Good point.  But in order

4    to know if this type of stuff, for example, ace

5    bandages, cotton balls and such, would have

6    survived the fire, one of the critical components

7    of that is knowing where it's at?

8         A.    Exactly.

9         Q.    For example:  If it was in the master

10   bedroom, there may be no evidence of it at all; if

11   it's in the kitchen, there should be evidence?

12        A.    Yes.

13        Q.    Agree?

14        A.    I agree.

15        Q.    Have you formulated any new opinions since

16   you prepared your report?

17        A.    No.

18        Q.    If you had to do the fire investigation

19   over would you change anything?

20        A.    No.

21        Q.    You understand that your opinions can't

22   change people's lives?

23        A.    Yes.

24        Q.    Do you take that job seriously?

25        A.    Very seriously.

1    Q.   What evidence of pouring do you have,

2    other than the one positive or the two positive

3    samples in the office?

4    A.   It's my theory.

5    Q.   But there's no evidence outside of your

6    theory?

7    A.   In my experience and training and

8    education, when somebody does this, they pour a

9    line to the closest exit and out.  Now, if I would

10   have had samples going this way, I could have come

11   up with another exit and a theory.  That's why

12   hypothesis works for me.

13   Q.   Let me ask it again.  What is the evidence

14   that you have that there was any ignitable liquid

15   poured outside of the office anywhere?

16   A.   There is none, it burnt away.

17   Q.   Okay.  If it was ever there, it's gone.

18   And so because you found a positive sample in the

19   office, you have a theory that it was poured all

20   the way out the back door; there's no evidence of

21   that, but that's your theory?

22   A.   Correct.

23             (WHEREUPON, Exhibit No. 49

24             was marked.)

25   ///