# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## WINCHESTER DIVISION

CINCINNATI INSURANCE COMPANY, )
                                     )
        **Plaintiff/Counter-Defendant,** )
                                     )
**v.**                                   )      **No. 4:12-CV-32**
                                   )      **JURY DEMAND**
**LARRY BANKS AND**               )
**WANDA SUE BANKS,**            )
                                   )
        **Defendants/Counter-** )
        **Plaintiffs.**                )

## RESPONSE IN OPPOSITION TO DEFENDANT/COUNTER-PLAINTIFFS' MOTION IN LIMINE NO. 1 TO EXCLUDE TESTIMONY AND OPINIONS OF MARK SELLS

Comes now Plaintiff/Counter-Defendant, Cincinnati Insurance Company ("Cincinnati"), by and through counsel, and responds in opposition to Defendant/Counter-Plaintiff's Motion in Limine No. 1 to Exclude the Testimony and Opinions of Mark Sells. As outlined below, Sells should be allowed to offer testimony concerning the cause of the fire, the contents in the Banks' house before, during and after the fire, what constitutes normal contents, what contents would have survived the fire if present at the house, and the debris samples which tested positive for medium to heavy petroleum distillates.

## ***DAUBERT* STANDARD**

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), the United States Supreme Court "established guidelines for district courts to use in determining the admissibility of expert testimony." Pride v. BIC Corp., 218 F.3d 566, 577 (6th Cir.2000). These guidelines were essentially adopted by

Congress when it amended Federal Rule of Evidence 702 in 2000.  Advisory Committee

Comments to Rule 702.  Rule 702 currently provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Analyzing Rule 702 in light of <u>Daubert</u> and its progeny, the United States District

Court for the Western District of Tennessee recently opined:

> A proposed expert witness "must first establish his expertise by reference to 'knowledge, skill, experience, training, or education.' " *Pride,* 218 F.3d at 577 (quoting Fed. R. Evid. 702). Next, a proffered expert witness must testify as to his or her " 'scientific, technical or otherwise specialized knowledge.' " *Id.* (citing Fed.R.Evid. 702). The *Daubert* Court further explained, that "[i]n short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability." 509 U.S. at 590, 113 S.Ct. 2786. The district court's function as a gatekeeper, "is 'to determine whether the principles and methodology underlying the testimony itself are valid'-not to second guess the validity of conclusions generated by otherwise valid methods, principles, and reasoning." *Pride,* 218 F.3d at 577 (quoting *United States v. Bonds,* 12 F.3d 540, 556 (6th Cir.1993)); *see also Daubert,* 509 U.S. at 595, 113 S.Ct. 2786 (emphasizing that the focus of the inquiry "must be solely on principles and methodology, not on the conclusions that they generate."). "[T]he *Daubert* Court identified several factors that a district court should consider when evaluating the scientific validity of expert testimony, notably: the testability of the expert's hypotheses ..., whether the expert's methodology has been subjected to peer review, the rate of error associated with the methodology, and whether the methodology is generally accepted within the scientific community." *Id.* (citing 509 U.S. at 593-94, 113 S.Ct. 2786). However, this list is not exclusive and relevant

reliability may also be established by personal knowledge and experience. *Kumho Tire Co.,* 526 U.S. at 150-51, 119 S.Ct. 1167. Finally, the testimony must assist the trier of fact. *Pride,* 218 F.3d at 578. Thus, the "testimony must "fit" the facts of the case, that is, there must be a connection between the scientific research or test being offered and the disputed factual issues in the case...." *Id.* (citing *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786).

Thompson v. State Farm Fire & Cas. Co., 548 F. Supp. 2d 588, 590-91 (W.D. Tenn.

2008). Importantly, the Western District furthered:

The inquiry pursuant to Rule 702 is "a flexible one." *Daubert,* 509 U.S. at 594, 113 S.Ct. 2786; *see also Kumho Tire Co.,* 526 U.S. at 152, 119 S.Ct. 1167 ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."). Likewise, a trial court's decision whether or not to admit expert testimony pursuant to *Daubert* is reviewed under an abuse of discretion standard. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are still available to the opposing party to attack "shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786. The party proffering the expert testimony must demonstrate by a preponderance of proof that the potential expert witness meets requirements discussed above. *Pride,* 218 F.3d at 578 (citing *Daubert,* 509 at 592 n. 10, 113 S.Ct. 2786).

Id. at 591.

## EXPERT OPINIONS

Cincinnati hired expert Mark Sells to investigate the fire which occurred at the

Banks' home on November 28, 2011. Contrary to the Banks' suggestion, Sells will provide

expert opinions on (1) the cause and origin of the fire and (2) what contents would have

survived if at the home at the time of the fire. As outlined in his curriculum vitae attached

as Exhibit 1, Sells has extensive education, training, and experience in the field of fire

investigation. Indeed, he has investigated more than 600 fires over the course of his

career and is a Certified Fire and Explosion Investigator and Tennessee State licensed

private investigator.  Id.  As such, he is more than qualified to render these expert opinions.

## I.  CAUSE AND ORIGIN OPINION

Sells employed NFPA 921 as a guideline in his investigation into the cause and origin of the fire.   (Depo. of Mark Sells P. 20, L. 2-5 attached as Exhibit 2).  Indeed, Sells followed the scientific method espoused by NFPA 921 in forming his opinion which is summarized in the chart below.  (Depo. of Mark Sells P. 27, L. 7-18).



```
Is the hypothesized cause consistent with all known facts?
Are contradictions resolved?
Does another cause hypothesis explain the data equally well?

                        ↓

             Select Final Hypothesis
                 Cause of the fire
               List of potential causes
        Insufficient information to determine the cause
```

**FIGURE 18.2, NFPA 921**

Specifically, Sells recognized the need for an investigation, defined the problem, collected data, analyzed the data, formed hypotheses, tested those hypotheses, and formed his final conclusion. (Depo. of Mark Sells P. 27, L. 7-18).

Sells completed the first two steps of NFPA 921's methodology as he recognized the need for an investigation as the fire had occurred and defined the problem as determining the cause and origin of that fire. (Depo. of Mark Sells P. 31, L. 10 thru P. 32, L. 2). Sells then collected and analyzed data over the course of several days from the Banks' home. (Report of Mark Sells Dated November 13, 2012 attached as Exhibit 3). Specifically, Sells began by hand shoveling debris in the office. Id. at P. 2. There, he found an unusual burn pattern in the center floor which he identified as a saddle burn but no furnishings. Id. Sells took debris samples from this area which later tested positive for ignitable fuel liquid.[1] Id. Sells then hand shoveled debris in bedroom 2 and found only a small dresser and bed with headboard. Id. He noted there were no clothes or hangers in bedroom 2's closet. Id. Sells also hand shoveled debris in bedroom 3 and found only a small dresser and bed. Id. There, Sells noted the closet was void of any hangers or clothes. Id. Based on his experience and analysis of his findings in these rooms, Sells determined they did not contain normal, common, or standard contents. Id.

---

[1] See Response in Opposition to Motion to Exclude Expert Testimony of Christine Foran.

Sells continued the process of hand shifting debris in Mrs. Banks' dressing room with the aid of heavy equipment. Id. Based on his conversation with Mr. and Mrs. Banks[2], Sells believed high-dollar jewelry to be located in this area but in fact the only jewelry found was costume jewelry. (Id.; Depo. Mark Sells, P. 82, L. 2 thru P. 84, L. 21). Additionally, Sells found a dresser in this area but it did not contain any clothes, buttons, or zippers. (Report of Mark Sells Dated November 13, 2012 at P. 2; Depo. Mark Sells, P. 96, L. 6-19). Indeed, a minimal amount of clothes and shoes was found in Mrs. Banks' dressing room. (Report of Mark Sells Dated November 13, 2012 at P. 2-3). Further, he could not locate a .38 caliber handgun, which the Banks asserted should have been in this area, even though such items survive fire and are recoverable in Sells' experience. Id. at 3. Similarly, Sells did not find any evidence of the 20 three-ring binders which the Banks claimed were located in the library although he hand shifted through this area and in his experience the metal portions of these binders would have survived the fire. Id.

Sells continued the process of sifting through the debris throughout the home's three-story addition over the course of several days and photographed and documented

---

[2] While Sells did not "interview" the Banks, he did speak with them at the scene. Sells summarized that conversation as follows:

> Larry and Sue Banks arrived at the loss location during the afternoon. The Banks were asked if they were home at the time of the fire. They said they were at Sue's Mrs. Banks' [sic] doctor appointment in Nashville, TN at the time of the fire. Sue Banks began to tell me of about [sic] the valuables in the home. She told of crystal and china located in the dining room, also she stated her jewelry was in her dressing room. She described diamond rings and other items valued in the thousands of dollars.

> Mr. Banks began to talk about the kitchen. According to Mr. Banks, He stated he owns a restaurant and was a chef. He reported that his kitchen had very expensive cooking equipment. He also said that the kitchen, and [sic] was full of professional grade cooking utensils. He said he had paid several thousands of dollars for these items.

(Report of Mark Sells Dated November 13, 2012 at P. 2).

each and every item he located in the fire debris. (Depo. Mark Sells, P. 116 thru 126; P. 136, L. 2-5, P. 143-144). Sells opined the exact quality and quantity of contents in this area could not be determined but a determination as to the quantity could be made within a reasonable degree of certainty. (Depo. Mark Sells, P. 126, L. 24 thru P. 127, L. 14). Based on his experience and review of a 'virtual tour' of the home taken shortly before the fire which he understood to be representative of the contents in the home immediately prior to the fire, he determined the quantity of contents found in the third-story addition's debris was inconsistent with the occupancy. (Depo. Mark Sells, P. 130, L. 3-21; P. 132, P. 21 thru 133, L. 4). Aware of this inconsistency in the contents, Sells additionally examined the contents in the relatively undamaged original portion of the home. (Depo. Mark Sells, P. 133, L. 10-11). There, he found only one family photograph, no photo albums, and minimal cooking equipment and utensils. (Depo. Mark Sells, P. 133, L. 12 thru P. 135, L. 14).

Sells was able to analyze fire patterns which showed the fire moving from three-story addition to the original part of the house. (Depo. of Mark Sells, P. 190, L. 4-10). Specifically, Sells deposed:

Q:   Did the fire come into the older part of the house, the one-story ranch portion of the house, through its attic?

A:   At some point, yes.

Q:   What does that mean, "at some point"?

A:   I think we had a fire in the office before it got above—in the attic.

Q:   Okay. And what do you base that opinion on?

A:   By the material lost, the charred, the fire pattern on the floor, the deep saddle burn.

(Depo. Mark Sells, P. 190, L. 11-21). Regarding the saddle burn, Sells deposed such burns are caused by something burning in one spot for a long time or a very intense fire, and that such fires are caused by fuel loads or an accelerant being puddled. (Depo. Mark Sells, P. 192, L. 15-24; P. 193, L. 18-23). Additionally, Sells found fire patterns in the office showed the fire traveled both upward and downward. (Depo. Mark Sells, P. 200, L. 11-24).

Sells had electrical engineer, Matt Forbes, examine the scene. (Depo. of Mark Sells P. 227-28; Exhibit 7 to Initial Report of Mark Sells attached as Exhibit 4). Arc mapping could not be performed because electrical wires had been destroyed. (Depo. Mark Sells, P. 226, L. 2-14, Exhibit 7 to Initial Report of Mark Sells). Forbes examined the washer, dryer, hot water heater, and a dehumidifier and concluded none of these appliances caused the fire. (Exhibit 7 to Initial Report of Mark Sells). Forbes could not make an engineering determination as to the cause of the fire because there was too much damage. (Exhibit 7 to Report of Initial Mark Sells).

In keeping with NFPA 921's methodology, Sells then formed hypotheses based on the data collected and his analysis of it. (Depo. of Mark Sells P. 33, L. 24 thru P. 34, L. 3). Specifically, Sells found the area of origin was the master bedroom area which included the master bedroom, laundry room, and master foyer as circled in Exhibit 7 to his deposition. (Depo. of Mark Sells P. 187, L. 10 thru P. 188, L. 9). This area of origin is not in dispute.



(Exhibit 7 to Deposition of Mark Sells). He developed three hypotheses as to the cause of the fire. Specifically, Sells hypothesized the fire was electric, caused by negligence, or caused by human involvement. (Depo. of Mark Sells P. 227, L. 5-16).

    Sells then tested these hypotheses. Importantly, NFPA 921 and <u>Daubert</u> do not require that the investigator attempt to replicate the event or perform certain tests. <u>Travelers Indem. Co. v. Indus. Paper & Packaging Corp.</u>, 2006 WL 1788967 (E.D. Tenn. June 27, 2006). Rather, hypotheses are tested under NFPA 921 through deductive reasoning. Specifically, NFPA 921 § 4.3.6 states an investigator engages in deductive reasoning where "the investigator compares his or her hypothesis to all the known facts as well as the body of scientific knowledge associated with the phenomena relevant to the specific incident." NFPA 921 § 4.3.6. Here, contrary to the Banks' assertion which blatantly mischaracterizes Sells' testimony by stating he relied on only two factors in

reaching his conclusions, Sells testified he relied on three factors in light of his experience and scientific knowledge in reaching his conclusion the fire was incendiary: (1) debris samples which tested positive for ignitable liquids, (2) he had observed unusual burn patterns at the scene, and (3) he had observed a lack of contents. (Depo. of Mark Sells PP. 199-203).

The Banks assert this conclusion is faulty because Sells did not conclusively rule out the fire was caused by negligence or an electrical issue. Again mischaracterizing Sells' testimony, the Banks assert, "If **any** hypothesis could be supported by the same set of facts or is incapable of being tested, then the fire must be classified as 'undetermined.'" (Doc. 98 at P. 15 emphasis added). In fact, Sells testified:

Q. And one of the necessary components of testing the hypothesis is to decide if there is any other hypothesis that could be supported by the same set of facts?

A. Right.

Q. and if more than one hypothesis can be supported by the same set of facts, then in some occasions, at least, then the fire might have to be labeled as undetermined, at least the cause?

A. I don't think, not at this point that we're at.

Q. All right.

A. No.

Q. Okay. What if a hypothesis is incapable of being tested, what do you do?

A. If it's impossible of being tested?

Q. Yes.

A. I couldn't imagine why it would be impossible, but I guess the answer to that would have to be undetermined if it's impossible to test.

(Depo. of Mark Sells P. 34, L. 24 – P. 35, L. 18).   Moreover, the Banks' assertion is inconsistent with NFPA 921 which repeatedly makes clear a conclusion may be reached where one of the hypothesis is determined to be probable even though other hypotheses are not conclusively ruled out or even capable of being tested.  Specifically, NFPA 921 § 4.3.6 and 18.6 respectively provide:

> NFPA 921 § 4.3.6
>
>> …The testing process needs to be continued until all feasible hypotheses have been tested and one is determined to be uniquely consistent with the facts, and with the principles of science.  **If no hypothesis** can withstand an examination by deductive reasoning, the issue should be considered undetermined.
>>
>> ***
>
> NFPA 921 § 18.6
>
>> **Testing the Cause Hypothesis.**  Each of the alternate hypotheses that were developed must then be tested using the Scientific Method.  If one remaining hypothesis is tested using the 'scientific method' and is determined to be probable, then the cause of the fire is identified.

Thus, Sells was clearly within the bounds of the scientific method as set forth in NFPA 921 when he ruled the fire was incendiary even though he did not conclusively rule out electrical or negligence as a cause of the fire.

Additionally, the Banks assert Sells' conclusion is faulty because it is based, in part, on the fact samples from the office floor tested positive for ignitable liquids while no samples from the master bedroom, which is the undisputed area of origin, tested positive.  In support of this proposition, the Banks misleadingly suggest the office was completely separated from the master bedroom by a brick wall.  In fact, the office was

only partially separated from the master bedroom by a brick wall as it contained a door way which served as a thoroughfare between the older portion of the house and newer addition as demonstrated by below diagrams drawn by Defendant/Counter-Plaintiff Sue Banks:



OFFICE Diagram

x _Sue Barker_

Assisted by W Barker

(Exhibit No. 18 to Depo. of Jeremy Woods attached as Exhibit 5). Indeed, Sells testified the positive samples recovered from the scene were in line with a path of ignitable liquid which he hypothesized began in the middle of the office, traveled through the master bedroom, and out the master bedroom's back door. (Depo. of Mark Sells PP. 255-258).

The office sustained damage during the fire and therefore, while outside the area of origin, was clearly within the fire scene. Where ignitable liquids are found at the fire scene, NFPA 921 holds an investigator may conclude the fire is incendiary regardless of whether an ignition source is determined:

**18.4.4.3** There are times when there is no physical evidence of the ignition source found at the origin, but where an ignition sequence can logically be inferred using other data. Any determination of fire cause

should be based on evidence rather than on the absence of evidence; however, there are limited circumstances when the ignition source cannot be identified, but the ignition sequence can logically be inferred. This inference may be arrived at through the testing of alternate hypotheses involving potential ignition sequences, provided that the conclusion regarding the remaining ignition sequence is consistent with all known facts (*see Basic Methodology chapter*). The following are examples of situations that lend themselves to formulating an ignition scenario when the ignition source is not found during the examination of the fire scene. The list is not exclusive and the fire investigator is cautioned not to hypothesize an ignition sequence without data that logically supports the hypothesis.

**(A)**   Diffuse fuel explosions and flash fires.

**(B)**   **When an ignitable liquid residue (confirmed by laboratory analysis) is found at one or more locations within the fire scene and its presence at that location(s) does not have an innocent explanation. (*See Incendiary Fires chapter*).**

**(C)**   When there are multiple fires (*See Incendiary Fires chapter*).

**(D)**   When trailers are observed. (*See Incendiary Fires chapter*).

**(E)**   The fire was observed or recorded at or near the time of inception or before it spread to a secondary fuel.

NFPA 921 § 18.4.4.3 (emphasis added). Thus, Sells' opinions were clearly in line with

the guidelines of set forth in NFPA 921.

To refute this conclusion, the Banks cite to a string of product liability cases[3]

involving fire investigations to establish Sells' testimony should be excluded as

---

[3] As outlined below, the cases cited to by the Banks are inapposite to the instant case:

Bartion Brands, Ltd. V. O'Brien & Gere, Inc. of N. America, 2009 WL 1767386 (W.D. Ky. June 22, 2009) (excluding testimony of experts as to cause and origin where their investigation was limited to the design of a chimney's baghouse);

Pride v. The BIC Corp., 54 F.Supp.2d 757 (E.D. Tenn. 1998) (excluding the testimony of the expert who concluded the seal on a BIC lighter was cockeyed due to a manufacturing defect and this defect caused the fire without performing any testing);

unreliable.  However, the Banks fail to draw any parallels between those cases and the instant one.  The reason for this failure is simple, those cases generally involved experts who did not test their respective hypotheses that a product failed in a particular way or for a particular reason.  For instance, in <u>Pride v. The BIC Corp.</u>, 54 F.Supp.2d 757 (E.D. Tenn. 1998), the Court excluded the testimony of the expert who concluded the seal on a BIC lighter was cockeyed due to a manufacturing defect and this defect caused the fire without performing any testing.  <u>Id.</u> at 762.

Cincinnati asserts the facts of the instant case are much more in line with those at issue in <u>Thompson v. State Farm Fire & Cas. Co.</u>, 548 F. Supp. 2d 588 (W.D. Tenn. 2008).  There, as in the instant case, the plaintiff's expert determined a house fire was incendiary and the defendant moved to exclude his testimony.  <u>Id.</u> at 590.  Much like Sells, the Court found the expert had years of experience investigating numerous fires, attendance at training programs in fire investigation, and licensure as a private investigator in Tennessee.  <u>Id.</u> at 591.  As such, the Court found the expert was

---

<u>American & Foreign Ins. Co. v. General Electric Co.</u>, 45 F.3d 135 (6th Cir. 1995) (excluding testimony of expert regarding alleged defect in circuit breaker where his testing was inadequate as raw data was discarded and his instruments not calibrated);

<u>Meemic Ins. Co. v. Hewlett-Packard Co.</u>, 717 F.Supp.2d 752 (E.D. Mich 2010) (excluding testimony of proposed expert who asserted a defective power adaptor caused fire where his opinion based solely on observations of the power adaptor rather than testing of hypothesis);

<u>Indiana Ins. Co. v. General Elec. Co.</u>, 326 F.Supp.2d 844 (N.D. Ohio 2004) (excluding expert testimony where the proposed expert failed to collect data or perform necessary destructive testing to determine whether refrigerator caused fire);

<u>Lockridge v. Scripto-Tokai Corp.</u>, 2005 U.S. Dist. Lexis 47962 (M.D. Tenn. March 17, 2005) (excluding expert testimony where the proposed experts failed to collect data, examine all evidence, develop alternative hypotheses, or perform necessary testing which conformed with ASTM methods);

<u>Knotts v. Black & Decker, Inc.</u>, 204 F.Supp.2d 1029 (N.D. Ohio 2002) (excluding expert testimony where the proposed experts failed to independently collect data, ignored evidence, failed to develop hypotheses, and failed to conduct testing on the product).

"sufficiently qualified by knowledge, skill, experience, training, and education to assist the trier of fact." Id.

The Court then examined the defendant's allegation the expert's testimony was unreliable because he failed to follow NFPA 921. Id. at 592. Specifically, the defendant argued the expert's opinion was inappropriately based on his findings that the fire was hot and fast, caused copper to melt, and created irregular burn patterns. Id. at 592-93. The Court held NFPA 921 is not a standard but rather a guideline to be used by fire investigators. Id. at 592 (quoting NFPA 921, ch. 1.1 (2001 ed.)). Indeed, the Court explained that because every fire is unique "'[d]eviations from these procedures…are not necessarily wrong or inferior but need to be justified.'" Id. (quoting NFPA 921, ch. 1.2 (2001 ed.)).

Addressing the defendant's allegation the expert inappropriately based on his findings that the fire was hot and fast and caused copper to melt, the Court found NFPA 921 did not preclude the expert from considering such evidence. Id. at 593-96. Moreover, the Court rejected the defendant's contention that the expert should have followed the methodology proposed by John Lentini[4] which purported such evidence should not be relied upon. Id. at 594. The Court found, "…this argument unpersuasive. Rule 702 'is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise.'" Id. (internal citations omitted). The Court further explained "*Daubert* and its progeny permit courts to consider an expert's experience in conjunction with the other *Daubert* factors." Id. The Court also found the expert appropriately considered irregular burn patterns in addition to other evidence as NFPA 921 merely cautioned against reaching a conclusion based on this

---

[4] The Court will recall John Lentini is serving as an expert for the Banks in the instant case.

factor alone.  Id. at 595.  Because the expert's testimony was reliable and would aid the trier of fact in determining whether the fire was incendiary, the Court concluded it was admissible.  Id. at 596.

Here, much like in Thompson, Sells' methodology was within the confines of NFPA 921 and thus his opinion the fire was incendiary is admissible.  Specifically, as outlined above, he appropriately considered the fact that he found unusual burn patterns in conjunction with the fact debris samples from the scene tested positive for ignitable liquids.  Moreover, Sells appropriately consider the abnormality of the contents he found on the scene as in his experience this factor was indicative of an incendiary fire.  As in Thompson, his testimony is reliable and will aid the trier of fact in reaching its conclusion.  Therefore, it is admissible under Rule 702.

The Banks additionally assert Sells' opinion as to the cause and origin of the fire must be excluded by arguing it did not sustain peer review.  Sells acknowledges factual changes were made to his report by Metts Hardy concerning his findings at the scene.  Specifically, Hardy changed the report to read that Sells found the home's "meter base was not properly grounded" as "there was no driven grounding rod or cable visible."  As clarified in his affidavit, Metts Hardy did not personally examine the scene of the fire.  (Affidavit of Mark Sells ¶ 5 attached as Exhibit 6).  Thus, Cincinnati avers he was not in a position to make such factual changes.  Importantly, whether the meter base was grounded or not is irrelevant as it did not cause or contribute to the fire as evidenced by its location in comparison with the area of origin as demonstrated below:



(Affidavit of Mark Sells ¶ 6).

Moreover, the Banks point to the fact Metts Hardy changed Sells' report to read "no determination could be made as to the quantity or quality of any components in the left side addition that was destroyed by the fire." Again, this is a factual determination to be made by persons at the scene—not Metts Hardy. Contrary to the Banks's assertion, Sells did clarify this statement in his second report changing the language from reading "No determination could be made as to the quantity or quality of any contents in the left side addition that was destroyed by the fire" to "While I made no **specific** determination as to the quantity and quality of items claimed to have been in the left side of the home destroyed by the fire during my initial investigation, I had hand-sifted the area and was completely familiar with the evidence that remained in the fire debris." Cf. Report of Mark Sells dated February 24, 2012 with Report of Mark Sells dated November 13, 2012 at P 4 (emphasis added).

Regardless, Mett Hardy's factual changes do not constitute the type of peer review contemplated by Daubert and is progeny. Rather, Daubert considers, as a factor, whether the expert's methodology has been subjected to peer review—not his

factual findings.  Thompson, at 590-91 Here, there is no legitimate claim that Sells failed to engage in proper methodology under NFPA 921.  Indeed, Metts Hardy did not make any changes in this regard.

Sells' opinion regarding the cause of the fire is based on scientific principle and will aid the jury in understanding the evidence.  Therefore, it is admissible pursuant to Rule 702.

## II.  CONTENTS OPINION

After completing his cause and origin investigation, Sells received a spreadsheet containing the personal property items claimed by the Banks.  (Report of Mark Sells dated November 13, 2012 at P. 4).  Sells examined the spreadsheet to opine what items would have survived if at the home at the time of the fire.  (Id.; Depo. of Mark Sells P. 147-156). For example, Sells opined:

Q:    What items might remain of a desk after a fire in a flashover type environment?

A:    Well, there are several factors to consider in answering that; I don't think I have enough information to give you a good answer.

Q:    Well, that's a fair question.  As it relates to the office, the Banks' fire that occurred on November 28, 2011, what evidence of a desk that was in the office might exist after the fire?

A:    You would have all the hardware from the drawers, hardwares from the drawer slides.  A lot of time, the feet part here are adjustable and they're metal, felt covered; you would have had all that left, depending on the time that the fire was—how long it actually burnt because this is the course that the firefighters took to extinguish the fire.

Depending on how long it burnt, you'd probably have several pieces of the wooden structure left.

(Depo. of Mark Sells P. 168, L. 7 thru P. 169, L. 2). While Sells could not recall what one of the hundreds of the items on his list, specifically a rattan chair, was at the time of his deposition, this fact should go to the weight of his testimony as opposed to its admissibility.

Contrary to the Banks' assertion, Sells is clearly qualified to provide testimony concerning what items survive a fire based on his experience of investigating more than 600 fires over the course of his career and his certification as a Fire and Explosion Investigator. Indeed, the Advisory Committee Comment to Federal Rule of Evidence 702 clearly provides:

> Nothing in this amendment is intended to suggest that experience alone-- or experience in conjunction with other knowledge, skill, training or education--may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.

Fed. R. Evid. 702. To this point, Sells has opined house fires burn between 1,200 and 1,600 degrees Fahrenheit and that metal survives house fires. (Affidavit of Mark Sells ¶¶ 7-8). Sells has additionally opined contents such as plastics and furnishings will typically survive a house fire in some identifiable form. (Affidavit of Mark Sells ¶ 9). Moreover, the Banks' suggestion that the exact temperature of the fire should have been determined fails as the exact temperature of a house fire depends on numerous factors and would require one to rebuild and furnish the home exactly as it stood and set it on fire. (Affidavit of Mark Sells ¶ 10).

As demonstrated by their counsel's line of questioning during his deposition, the Banks clearly misunderstood the nature of Sells' expert opinion believing he was opining as to what contents were at the home at the time of the fire. They now attempt to use their own confusion offensively by asserting Sells failed to create a contents inventory or interview the Banks to establish what items were in the house and where they had been

located.  To this point, the Banks point to Sells' deposition testimony concerning cotton balls, Ace bandages, and band-aids wherein he admitted he did not know where the Banks kept such items.  (Doc. 98 at P. 10).  These claims are simply irrelevant to Sells' expert opinion about what would have survived the fire and are asserted as a red herring. Thus, Sells should be allowed to provide expert testimony concerning what items would have survived the fire if at the home.  This opinion will aid the jury in understanding the evidence.  Therefore, it is admissible pursuant to Rule 702.

Importantly, the limitations of Sells' expert opinion concerning what contents would have survived the fire if at the home should not preclude his factual, lay testimony concerning what he determined to be at the home prior to the fire based on his review of the virtual tour of the Banks' home which was created shortly before the fire and his conversation with the Banks.  Moreover, it should not be construed to limit Sells' factual testimony concerning what he actually found in the fire debris during his meticulous process of hand shoveling through the damaged portions of the house and observations in the other portions of the home.  Such testimony is clearly allowed under Federal Rule of Evidence 701, which provides witnesses may testify in the form of opinions which are:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.  Thus, Sells testimony concerning what he knew to be in the home before and after the fire is admissible.

## ADMISSIBLE AS RELEVANT TO BAD FAITH CLAIM

Even if Mark Sells' testimony was deemed inadmissible as unreliable, it would still be admissible for the purpose of demonstrating Cincinnati's good faith basis in denying the claim and therefore is admissible as it is relevant to the Banks' bad faith claim. Tennessee's bad faith statue is codified as Tenn. Code Ann. § 56-7-105, which provides:

> (a) The insurance companies of this state, and foreign insurance companies and other persons or corporations doing an insurance or fidelity bonding business in this state, in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy or fidelity bond on which the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, in addition to the loss and interest on the bond, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, **that it is made to appear to the court or jury trying the case that the refusal to pay the loss was not in good faith**, and that the failure to pay inflicted additional expense, loss, or injury including attorney fees upon the holder of the policy or fidelity bond; and provided, further, that the additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury including attorney fees thus entailed.

Tenn. Code Ann. § 56-7-105 (emphasis added).

The words 'not in good faith' are antithetical in meaning to the words 'in good faith.' The words 'not in good faith' imply a lack of good or moral intent as the motive for the refusal to pay a loss. They describe the state of mind which underlies and causes the act of refusal to pay. It is the existence of this state of mind as the cause of the act, and the resulting damage to the victim of the act, which the statute penalizes. Phillips v. N. River Ins. Co., 14 Tenn. App. 356, 365 (Ct. App. 1931); Independent. Life Ins. Co. v. Knight, 2 Tenn. App. 259, 265-66 (Ct. App. 1926). To determine the state of mind of an

CT Larry Banks Studio #2 Roly Mot Exc Sells 130831
Case 4:13-cv-00032-WBC  Document 132  Filed 09/10/13  Page 22 of 24  PageID #: 3214

22

insurer, the Court must look to what investigative measures it took. The Tennessee Court of Appeals has specifically opined:

> It should be said that bad faith is a state of mind which is evident by acts inconsistent with acts of good faith. In other words, bad faith is the opposite of good faith. Good faith on the part of counsel for the Insurance Company and for Hammond, required them to make an investigation of the facts and apply their knowledge of the law thereto and their experience as lawyers in the trial of such cases, without partiality to either the insurer or the insured.

Tennessee Farmers Mut. Ins. Co. v. Hammond, 43 Tenn. App. 62, 121-22, 306 S.W.2d 13, 38-39 (Ct. App. 1957).

Here, Cincinnati reviewed and relied upon Mark Sells' investigation and opinions in denying the Banks' claims. Thus, his opinions are admissible to show Cincinnati's state of mind as it is relevant to the bad faith claim.

## CONCLUSION

Based on the foregoing, the Banks' motion to exclude the testimony of Mark Sells should be denied and Sells should be allowed offer testimony concerning the cause of the fire, the contents in the Banks' house before, during and after the fire based on his factual findings, what constitutes normal contents, what contents would have survived the fire if present at the house, and the debris samples which tested positive for medium to heavy petroleum distillates.

Respectfully submitted,

 s/ Parks T. Chastain_____
 s/ E. Jason Ferrell_____
**PARKS T. CHASTAIN**
Registration No. 13744
**E. JASON FERRELL**
Registration No. 24425
Attorneys for Plaintiff, Cincinnati Insurance
Company

**BREWER, KRAUSE, BROOKS,**
**CHASTAIN & BURROW, PLLC**
P. O. Box 23890
Nashville, TN 37202-3890
(615) 256-8787

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of September, 2013, a true and correct copy of the foregoing **RESPONSE IN OPPOSITION TO DEFENDANT/COUNTER-PLAINTIFFS' MOTION IN LIMINE NO. 1 TO EXCLUDE TESTIMONY AND OPINIONS OF MARK SELLS** was filed electronically. Notice of this filing will be sent by operation of the court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U. S. Mail. Parties may access this file through the court's electronic filing system.

J. Brandon McWherter, Esquire
Jonathan L. Bobbitt, Esquire
Clinton H. Scott, Esquire
Gilbert Russell McWherter, PLC
101 North Highland Avenue
Jackson, TN 38301


_s/ Parks T. Chastain_____
**PARKS T. CHASTAIN**


PTC:MAC:dmt