# EXHIBIT 2

**In The Matter Of:**

*CINCINNATI INSURANCE vs.*
*LARRY BANKS*

---

*MARK SELLS*
*January 08, 2013*

---

*Alpha Reporting Corporation*
*236 Adams Avenue*
*Memphis, TN 38103*
*901-523-8974*



ALPHA REPORTING CORPORATION

Original File Mark Sells Deposition.txt
Min-U-Script® with Word Index

1          Q.     What is a guide?

2          A.     It's a -- suggestions, maybe kind of a

3     guideline to guide you through an incident.

4          Q.     Do you follow it?

5          A.     Yes.

6          Q.     Do you recognize it as an authoritative

7     reference that you follow during the course of your

8     fire investigations?

9          A.     No.

10         Q.     You do not?

11         A.     No.

12         Q.     You follow it, but you do not find it to

13     be authoritative?

14         A.     No.

15         Q.     Is that correct?

16         A.     That's correct, I do not.

17         Q.     All right.  Is there any other document or

18     treatise that you note to be more authoritative

19     than the NFPA 921?

20         A.     No.

21         Q.     If the NAFI and the IAAI had adopted NFPA

22     921 as the standard, would that change your opinion

23     as to the authoritativeness of the document?

24         A.     Could you rephrase the question?

25         Q.     Yes.  If you're wrong and NAFI and the

1      A.    Yes.

2      Q.    Would you agree that it requires a lack of

3  expectation bias?

4      A.    Yes.

5      Q.    Do you know what that is?

6      A.    Yes.

7      Q.    What is the methodology that you use to

8  conduct a fire investigation?

9      A.    Okay.  Well, there's seven steps.  First,

10  you're going to have to recognize the need for an

11  investigation; you're going to have to define a

12  problem; you got to collect data, and then you have

13  to analyze the data, form an hypothesis, test that

14  hypothesis; and at the end of the investigation,

15  you come up with a final hypothesis.

16      Q.    And you are referring to the scientific

17  methods of the NFPA 921?

18      A.    Yes.

19      Q.    What is the first -- do you have to

20  conduct that same methodology separately from both

21  origin and cause?

22      A.    No.

23      Q.    So, there is one process?

24      A.    Right.  Normally.

25      Q.    Okay.  All right.  Do you try to determine

1    conducting the report -- if there was any
2    information that had come to light since I left the
3    scene, things of that nature.
4         Q.   And did he provide you with any
5    information?
6         A.   No, he didn't.
7         Q.   Any conversations with him concerning the
8    Banks' case since that time?
9         A.   Not that I recall.
10        Q.   The scientific method that you mentioned
11   earlier, I would like to walk through the steps of
12   that.  The first one that you referenced was
13   recognizing the need, correct?
14        A.   Yes.
15        Q.   And that simply is if a fire has occurred,
16   you need to determine the cause and origin,
17   correct?
18        A.   Yes.
19        Q.   Second step was what?
20        A.   To define the problem.
21        Q.   And what is the nature of that step?
22        A.   That would be -- of course, a fire would
23   cause a problem in a residential structure,
24   commercial structure, either one.
25        Q.   Again, the problem is we have a fire, we

1  don't know the cause and origin?

2      A.    Right.

3      Q.    All right.  The third step is collecting

4  data, correct?

5      A.    Yeah.

6      Q.    What is involved in that step?

7      A.    You've got interviews, physical evidence,

8  witness statements, things of that nature.

9      Q.    Fire patterns?

10     A.    Yes.

11     Q.    Fuel loads?

12     A.    Physical evidence, yes.

13     Q.    I'm trying to get a little more specific.

14     A.    Okay.

15     Q.    Fire patterns.

16     A.    Fire patterns, fuel loads, construction

17  types.

18     Q.    Ventilation?

19     A.    Occupancy.

20     Q.    Photographs?

21     A.    Yes.

22     Q.    Sketching -- sketching out the structure?

23     A.    Diagrams.

24     Q.    Diagrams.  Do you take notes?

25     A.    Some.

1        Q.    Any other data collection I'm missing that

2    we haven't covered, generally?  I know there may be

3    some specific things that we'll get to later.

4        A.    I think generally we've done a good job.

5        Q.    What's the next step?

6        A.    Analyzing the data.

7        Q.    And how do you analyze the data?

8        A.    You want to look and see if you've got a

9    burn pattern, for example:  What could have caused

10   that burn pattern?  What are the fuel loads?  What

11   the witnesses actually said, the fire department

12   actually says, things of that nature, and then try

13   to determine what's pertinent to the investigation.

14       Q.    And do you agree that you as a fire

15   investigator should not consider speculative data

16   or data that you don't know to be true?

17       A.    Right.  Yes.

18       Q.    All right.  What's the next step?

19       A.    Where was we at?

20       Q.    It was analyze the data.

21       A.    Analyze the data, form an hypothesis.

22       Q.    And how do you go about forming a

23   hypothesis?

24       A.    Well, with the information that you've

25   gathered, you want to try to put together a

1    scenario that could have possibly caused the fire.

2        Q.    And do you develop multiple hypotheses?

3        A.    Yes.

4        Q.    And then what's next?

5        A.    Well, you have to test the hypothesis.

6        Q.    And testing the hypothesis is done through

7    what's called deductive reasoning, correct?

8        A.    Deductive reasoning, yes, sir.

9        Q.    And tell me about that.

10        A.    It's just in a nutshell, just saying that

11   your hypothesis could actually work and does make

12   sense; and basically does it make sense?  Would it

13   have actually caused the fire?

14        Q.    And there are methods by which the

15   hypothesis can be scientifically tested, correct?

16        A.    Sure.

17        Q.    And those might be laboratory testing?

18        A.    Laboratory results.

19        Q.    Fire modeling?

20        A.    Right.

21        Q.    Anything else?

22        A.    That's all that comes to my mind right

23   now.

24        Q.    And one of the necessary components of

25   testing the hypothesis is to decide if there is any

Case 4:12-cv-00032-WBC   Document 132-2   Filed 09/10/13   Page 8 of 64   PageID #: 3229

1    other hypothesis that could be supported by the

2    same set of facts?

3         A.    Right.

4         Q.    And if more than one hypothesis can be

5    supported by the same set of facts, then in some

6    occasions, at least, then the fire might have to be

7    labeled as undetermined, at least the cause?

8         A.    I don't think, not at this point that

9    we're at.

10        Q.    All right.

11        A.    No.

12        Q.    Okay.  What if a hypothesis is incapable

13   of being tested, what do you do?

14        A.    If it's impossible of being tested?

15        Q.    Yes.

16        A.    I couldn't imagine why it would be

17   impossible, but I guess the answer to that would

18   have to be undetermined if it's impossible to test.

19        Q.    Okay.  And what's the next step?

20        A.    Was we at test the hypothesis?

21        Q.    Yes.

22        A.    Okay.  The next step would be come to a

23   final hypothesis.

24        Q.    And a final hypothesis is your opinion?

25        A.    Is your opinion on what's caused the fire;

1     A.    Not to my knowledge.

2     Q.    All right.  December 6th is the next

3  day which is the first day that we used the

4  excavator?

5     A.    Right.

6     Q.    What did you do on that day?

7     A.    We started our excavation -- well, let's

8  see.  This front wall right here in the area that

9  was determined to be the dressing room, the reason

10  for that was because it was reported to be that

11  there was a large amount of high-dollar jewelry in

12  that area.  So that area was handsifted into the

13  excavator's bucket was set up that high.  We was

14  able to come up the side.  There's a wall, a block

15  wall, that comes up the side of that room there; we

16  was able to get up there and handsift it.  That

17  part of the dressing room floor had not collapsed

18  at this point.

19     Q.    All right.

20     A.    So, that area was handsifted, looking for

21  the jewelry and things of that nature.

22     Q.    And what -- when you say handsifted, what

23  do you mean by that?

24     A.    Well, like I said, we set the bucket of

25  the frontend loader up there.  We had a shovel and

1  trowel, sifting the debris, like this; you get a

2  shovel full into the bucket, and just a continuous

3  motion like that.

4      Q.    Did you use a sifter?

5      A.    No.

6      Q.    Okay.  Why not?

7      A.    Sifting wouldn't have done any better than

8  the trowel and shovel.  You're taking just not much

9  more than a spoon full of debris at a time and

10 going through it.

11     Q.    And who all participated in that process?

12     A.    Myself, Russell Robinson, that was it; and

13 of course, our heavy equipment operator.

14     Q.    And what part of the dressing room was the

15 jewelry located?

16     A.    Just a few feet inside from the wall --

17 from the front wall we started at, just a few feet

18 inside.

19     Q.    Where was it located pre-fire, I guess is

20 my question; is that what your answer is?

21     A.    Reported to me, it was on a dresser.  To

22 the best of my knowledge, there was some type of

23 the dividing wall in here, and there was a dresser

24 and there was a jewelry box on this dresser which

25 fit with where we was finding the jewelry.

1     Q.     Was the dresser on the inside or the

2  outside of the dividing wall?

3     A.     On the outside.

4     Q.     Was the dividing wall still there?

5     A.     Pieces of it.

6     Q.     Okay.  So, it was on the outside of the

7  dividing wall, the dresser was?

8     A.     Yes.  If there was a dividing wall right

9  here, it was inside.

10     Q.     All right.  And you found evidence of the

11  dresser?

12     A.     Yes.

13     Q.     And you found some jewelry?

14     A.     Yes.

15     Q.     And the nature of the jewelry was what?

16     A.     Not a jewelry expert, but it appears to me

17  to be costume jewelry.

18     Q.     And then did you perform an inventory of

19  the jewelry?

20     A.     I collected all of it and put it in a box

21  and put it in evidence.

22     Q.     And were there holes in the floor?

23     A.     Not in that area.

24     Q.     Not at all?

25     A.     No.

Case 4:12-cv-00032-WBC   Document 132-2   Filed 09/10/13   Page 12 of 64   PageID #: 3233

1      A.    Yes, maybe a couple of more feet.  And as

2  you can see, versus the other picture, more debris

3  has been removed.  We have, at this point, already

4  located the jewelry, collected it; now we're

5  getting to the dresser.

6      Q.    And is that the dresser right there?

7      A.    Yes, sir.  All the way up to...

8      Q.    So, I'll draw a line; is that accurate?

9      A.    Well, actually the dresser goes further

10  out this way.  You see the drawer, how it's black?

11      Q.    Is this part of the dresser, too?

12      A.    Yes.

13      Q.    Okay.

14      A.    All the way from here to there, but that's

15  the greatest burn in the dresser and that's why

16  that picture was taken.

17      Q.    Okay.  So, is that accurate now, I've got

18  four lines describing where the dresser is?

19      A.    Yes.

20      Q.    All right.  Okay.  And that is on the

21  outside of the divider wall in the dressing area?

22      A.    Yes.

23      Q.    All right.  That's Exhibit 14.  Exhibit

24  15, which I'm marking now, is essentially the same

25  photograph, just a little more closer up?

1          Q.    Okay.   Does the evidence support that
2    flashover was reached in the Banks' house?
3          A.    I can't speak to that.
4          Q.    Did you do any test or analysis to
5    determine if flashover was reached anywhere in the
6    Banks' house?
7          A.    No.
8          Q.    Do you agree that fire can spread through
9    a -- by radiant heat even through a brick wall?
10          A.    With the proper fuel load, it might.
11          Q.    All right.   Let's keep on moving along.
12    You had described to me, the process of scooping
13    out the debris out of the three-story addition, was
14    one scoop sorted at a time?
15          A.    Yes.
16          Q.    Are there any photographs of that
17    sifting/sorting process?
18          A.    That's what these are; these are pieces of
19    the flooring that was brought out at a time, that's
20    rugs that we got out, more flooring, it goes on and
21    on and on, out of that stack.
22          Q.    All right.   You've handed me a group of
23    pictures of rugs and flooring?
24          A.    Flooring, yes.
25          Q.    So, we'll mark this group as Exhibit 19.

1                  (WHEREUPON, the previously

2                  mentioned documents was

3                  marked as Collective

4      ⌐⌐⌐⌐⌐⌐⌐        Exhibit No. 19.)

5    BY MR. MCWHERTER:

6        Q.    Okay.  But are there any photographs of

7    when the operator dumped the stuff, the debris, out

8    of pictures, any pictures of that?

9        A.    No, I don't believe so.

10       Q.    Why not?

11       A.    Because I was working.  I showed the

12   finished product of it.

13       Q.    Did you show it in its form when it was

14   poured out before you sifted it or during?

15       A.    You want to see a bucket of debris; is

16   that what you're asking?

17       Q.    No, I want to see where you said take the

18   bucket, spread it out on the ground.

19       A.    No, I don't have a picture of that.

20       Q.    Okay.  Now, after it was spread out on the

21   ground, what did you do with it after that?

22       A.    Sifted it.

23       Q.    And then what did you do with it?

24       A.    Put it back in the bucket and then placed

25   it in the debris pile.

1      Q.   Okay.   And that was done time and time

2   again?

3      A.   Over and over and over.

4      Q.   And there was never a photograph of any of

5   those?

6      A.   Just pictures of the product.   Nothing of

7   the machine actually moving it, spreading it out,

8   no.

9      Q.   All right.   And we've got pictures of the

10  rug here.   Did you take any photographs of any

11  other contents that you found?

12     A.   Sure.   We've got -- this picture here is

13  showing some type of spring from a piece of

14  furniture.   It's a close-up of that, it's on the

15  ground.

16     Q.   All right.   Let's talk about this

17  picture.   We'll mark this 20.

18                   (WHEREUPON, the previously

19                    mentioned document was

20                    marked as Exhibit No. 20.)

21  BY MR. MCWHERTER:

22     Q.   What is it -- the fact that there's no --

23  we assume -- you assume that this is a spring from

24  some type of furniture?

25     A.   Couch or chair.

1    Q.   All right.  Was there any evidence of the

2  furniture around that spring, other than the spring

3  itself?

4    A.   Yeah, there was small pieces of wood left.

5    Q.   All right.  Did you take any photographs

6  of those?

7    A.   I'm sure I did.  But to me, that spring

8  would definitely tell me there's definitely some

9  furniture here versus some burnt sticks of wood.

10  So that was my intent with that picture.

11    Q.   Do you know where that photograph was

12  taken; what part of the structure?

13    A.   It was in the collapsed part.

14    Q.   You don't know which part?

15    A.   It would have been the main level.

16    Q.   How do you know that this spring was on

17  the main level as opposed to the third level?

18    A.   Through the layering process that I spoke

19  of earlier.

20    Q.   All right.  And what part of the house was

21  this -- what part of the main level was this spring

22  taken?

23    A.   Toward the center.

24    Q.   The master bedroom area?

25    A.   Yes, I would say somewhere even with the

1    stairs right in here.

2         Q.    Was there any furniture there pre-fire?

3    That's a closet, right?

4         A.    I don't know what was there pre-fire.  It

5    could have been on this side or this side of this

6    wall, I don't know.  Because when you collapse,

7    things move.  But all I can tell you is there was a

8    piece of furniture in that area.

9         Q.    Okay.  What other photos have you got?

10        A.    This is actually part of the process where

11   we were doing the layering.  As we got deeper in,

12   that's the trackhoe bringing it out and spreading

13   it out over there for me.

14        Q.    Hold on.  Hold on.  Let's do this one,

15   21.  Show me where this is on the diagram.

16        A.    Right out the front door.

17                         (WHEREUPON, the previously

18                          mentioned document was

19                          marked as Exhibit No. 21.)

20   BY MR. MCWHERTER:

21        Q.    All right.  This is the front door.  Okay,

22   I'm with you.

23        A.    This -- well, if this was in the basement,

24   which we're in here, that wall that comes out this

25   way is this wall.

1      Q.    What is this white...

2      A.    Sheetrock.

3      Q.    Okay.

4      A.    The fire didn't reach into the basement

5  until it collapsed.

6      Q.    So, how does this show me where -- where

7  is anything that you were sifting through?

8      A.    You can see right here, the debris pile

9  was up here; we get right here, we're layering into

10  this way.

11      Q.    Okay.  You're just showing me this is the

12  area in which you were doing it?

13      A.    That's where we started doing it.  That's

14  one of the areas, yes.

15      Q.    Is that, right above this Exhibit 21

16  sticker, the place that you were doing the sifting

17  process after it was dumped on the ground?

18      A.    No.  No, it was out here.  You can see the

19  debris.  See it outside the wall?  That is part of

20  the pile.  I didn't know that I had this picture,

21  and I just seen it; and I was showing you because

22  earlier you asked if I had a picture to describe

23  that process.  Well, this is probably the best

24  picture I've got of that process happening.

25      Q.    Okay.

1  A. Here's a piece of debris, shows some type

2 of wood from the furniture. Here's a television

3 that we found in the debris, and I believe that to

4 be a satellite or cable box. Okay. It had been

5 reported to Stephan Pierce that the Banks had

6 reported to him about a dehumidifier being on a

7 recall list. They were asked what model it was,

8 what brand it was, we couldn't get an answer; we

9 got a location. While we were layering, we did

10 locate the dehumidifier.

11  This was the area right below that

12 electrical plug, some more part of the cord. A

13 sample was taken in that area there, there it is as

14 it was discovered. And there it was when we began

15 layering in that area.

16  Q. Okay. Any other photographs of contents

17 of the addition?

18  A. I believe so. Washer/dryer. This appears

19 to be a hide-a-bed I'm assuming. Some type of

20 electrical box. I couldn't really identify what it

21 was; mattress springs found, heating furnace. This

22 is a picture of debris. There's various springs,

23 furniture springs in there. That appears to be it

24 from the addition.

25  Q. Okay. You've now identified, to the best

Case 4:12-cv-00032-WBC   Document 132-2   Filed 09/10/13   Page 20 of 64   PageID #: 3241

1  you can, all photographs of all items of contents

2  that you pulled out during the sifting process that

3  were in the 3600-square-foot addition to the home,

4  correct?

5      A.    Besides the clothing and rifle and stuff.

6      Q.    Which we've already got photographs of?

7      A.    Right.

8      Q.    Okay.  Let's mark these.  This is what

9  you've described as a piece of electrical

10  equipment, not sure what?

11     A.    Yes.

12     Q.    We'll mark it as 22.

13                  (WHEREUPON, the previously

14                   mentioned document was

15                   marked as Exhibit No. 22.)

16  BY MR. MCWHERTER:

17     Q.    We'll mark as Collective Exhibit 23, the

18  springs, mattress springs or furniture springs?

19     A.    Let me see them.  No, those are two

20  different things; that's like a sleeper-sofa, these

21  are mattress springs.

22     Q.    All right.  So, we're going to mark the

23  mattress spring as 23.

24                  (WHEREUPON, the previous;y

25                   mentioned document was

1                     marked as Exhibit No. 23.)

2                     MR. MCWHERTER:   The sleeper-sofa

3          spring is 24.

4                     (WHEREUPON, the previously

5                     mentioned document was

6                     marked as Exhibit No. 24.)

7     BY MR. MCWHERTER:

8          Q.    And you -- I thought these were the same

9     thing you said one time, washer and dryer?

10         A.    These are the washer and dryer there.

11         Q.    Okay.

12         A.    And that's the heating -- the heat

13    exchanger or return, whatever you want to say, its

14    section under here.

15         Q.    Is -- that's not the same piece of

16    equipment?

17         A.    As you can see, this is moved; and see,

18    that is this.

19         Q.    Okay.

20         A.    The washer was sitting on top of it; and

21    when the engineer was doing his thing, he moved it.

22         Q.    So, 25 is...

23         A.    The heat exchanger.

24         Q.    The heat exchanger.

25                    (WHEREUPON, the previously

**Alpha Reporting Corporation**

1              mentioned document was

2              marked as Exhibit No. 25.)

3         MR. MCWHERTER:  In your opinion,

4    26 is the washer and dryer.

5              (WHEREUPON, the previously

6              mentioned document was

7              marked as Exhibit No. 26.)

8  BY MR. MCWHERTER:

9    Q.    27 is a piece of furniture, you said?

10   A.    Yes.

11   Q.    Ruminants?

12   A.    Yes.

13             (WHEREUPON, the previously

14             mentioned document was

15             marked as Exhibit No. 27.)

16             THE WITNESS:  That was with the

17   TV, so I believe that to be a satellite or

18   cable box; and there's part of a TV as well.

19             MR. MCWHERTER:  Mark that as 28.

20             (WHEREUPON, the previously

21             mentioned document was

22             marked as Exhibit No. 28.)

23             MR. MCWHERTER:  29 is the TV.

24             (WHEREUPON, the previously

25             mentioned document was

Case 4:12-cv-00032-WBC   Document 132-2   Filed 09/10/13   Page 23 of 64   PageID #: 3244

1                              marked as Exhibit No. 29.)

2                              MR. MCWHERTER:  And then I'm going

3              to mark as a collective group 30, the

4              various photos of the area of the

5              dehumidifier and the dehumidifier itself.

6                              THE WITNESS:  The dehumidifier is

7              in there.

8                              MR. MCWHERTER:  It confirms what

9              those are?

10                             THE WITNESS:  Yes.

11                             (WHEREUPON, the previously

12                               mentioned documents was

13                               marked as Collective

14                               Exhibit No. 30.)

15    BY MR. MCWHERTER:

16        Q.    And then 31 is what?

17        A.    You can see, there's just various

18    furniture springs around in this area.

19        Q.    Okay.

20                             (WHEREUPON, the previously

21                               mentioned document was

22                               marked as Exhibit No. 31.)

23    BY MR. MCWHERTER:

24        Q.    Now, it's your opinion that no

25    determination could be made as to the quantity or

1   quality of the contents in the three-story

2   addition, correct?

3       A.   To the quality, especially.  But to the

4   quantity, there was a lot less than appeared to be

5   normal.

6       Q.   Have you opined -- have you given the

7   opinion that you could not determine the quantity

8   of contents in the three-story addition?

9       A.   Yes.

10      Q.   Is that your opinion?

11      A.   Yes.  I couldn't do it, not 100 percent.

12      Q.   Well, within any reasonable degree of

13  certainty?

14      A.   Yes, with reasonable degree I can.

15      Q.   You can.  Okay.  Look at your report,

16  Exhibit 4.

17      A.   Yeah, I know what it said.

18      Q.   All right.  I just want to know why your

19  opinion changed?

20      A.   Because this is based off of 100 percent

21  fact.

22      Q.   Everything in here is 100 percent fact?

23      A.   Well, based off of it.

24      Q.   Your opinion as to origin and cause is 100

25  percent fact and true.

1      A.    Appears so.   After he corrected it, it was
2   not sent back to me to review.
3      Q.    Okay.  Look up at the paragraph above that
4   you said the content remains are not consistent
5   with the occupancy.  Evidence indicated some of the
6   contents had been removed prior to the time of the
7   loss.  Is that your opinion?
8      A.    Yes.
9      Q.    All right.  Do you -- in order to know if
10  contents had been removed, you had to know what was
11  there before?
12     A.    Correct.
13     Q.    Right.  And what contents do you believe
14  had been removed?
15     A.    Again, I had the virtual tour of the house
16  where it was on the market where it showed loads
17  and loads of contents and they were taken just
18  before this fire.
19     Q.    When?
20     A.    I'm not sure, but just within a couple of
21  months I believe.
22     Q.    All right.  Did you interview the Banks?
23     A.    Again, no.
24     Q.    To ask them about what items may have been
25  removed?

1        A.    The information.

2        Q.    You didn't interview them, you told me you

3    didn't?

4        A.    I got reported back to.  You didn't ask me

5    if I had learned anything from Stephen Pierce.

6        Q.    Yeah, I did.

7                   MR. CHASTAIN:  No, you didn't, not

8         in this conversation.

9    BY MR. MCWHERTER:

10        Q.    What conversation?  Well, let's talk about

11    it now.

12        A.    At this point, where I determined this, I

13    was still on scene.  You asked me if I had learned

14    anything from Stephen Pierce after my investigation

15    was completed.

16        Q.    Okay.  And that's the supplemental report

17    that you did on the contents?

18        A.    No, no.

19        Q.    We're not jiving, and I'm not blaming you;

20    it's probably my fault.

21        A.    Let me see if I can explain this.  I was

22    still doing the investigation on scene.  Stephen

23    Pierce had reported to me; and when he had given me

24    the video, that nothing had been removed from the

25    house from the time of this video.

1      Q.    He told you that?

2      A.    Yes.

3      Q.    And did you take that as true?

4      A.    Yes.

5      Q.    All right.  Did you ever talk to the Banks

6  to verify that?

7      A.    Again, no.

8      Q.    What else did he tell you about the

9  contents?

10      A.    To pay special attention to the amount of

11  contents.

12      Q.    Okay.  And moving on a general inspection

13  of the remaining original portion of the home,

14  we're showed it to be devoid of personal affects,

15  such as family photographs.  So, is it your

16  testimony here today under oath that there were no

17  family photographs?

18      A.    There was one.

19      Q.    One and no more?

20      A.    Uh-huh (Affirmative response.)

21      Q.    And your absolutely positive about that?

22      A.    Not that I seen.  Normally when you do a

23  walk-through, you see pictures hanging on the wall

24  everywhere.

25      Q.    One family photograph?

1       A.    That's correct, that's all I seen.

2       Q.    And you inspected the scene, correct?

3       A.    Yes.

4       Q.    You sifted the scene?

5       A.    Yes.

6       Q.    You've looked at every item of personal

7   property you could on the original section of the

8   home?

9       A.    No.

10      Q.    You did not?

11      A.    No.

12      Q.    Okay.  We'll get to that later.  But just

13  one, one photograph?

14      A.    That's all I seen.

15      Q.    What about family photo albums?

16      A.    I didn't see any.

17      Q.    None?

18      A.    No.

19      Q.    Then you say the kitchen was lacking

20  cooking utensils, such as pots, pans, and

21  silverware.  Is it your testimony that there were

22  no pots, pans, and silverware?

23      A.    Not that there weren't, I said it was

24  lacking.

25      Q.    Lacking?  What does that mean?

1      A.    Not a large amount.

2      Q.    And -- okay.

3      A.    If I would have meant none, I would have

4  wrote none.

5      Q.    How many -- I understand and I appreciate

6  that.  How many does it have to be in order to be

7  lacking?

8      A.    Well, any reasonable person would believe

9  a man with a kitchen like they had would have more

10  than just two little items in a drawer and stuff

11  like that, you would expect a large amount of

12  cooking utensils.

13     Q.    How much silverware did you find?

14     A.    Very minimal.

15     Q.    How much?

16     A.    I didn't take an inventory of this, just

17  very minimal.  It appeared to be lacking.

18     Q.    You had not taken an inventory?

19     A.    No.  I did not take a contents inventory,

20  no.

21     Q.    All right.  You also offered the opinion

22  that items that were on the Banks' contents list

23  were not there, haven't you?

24     A.    Yes.

25     Q.    In order to do that, wouldn't you have to

Case 4:12-cv-00032-WBC   Document 132-2   Filed 09/10/13   Page 30 of 64   PageID #: 3251

1      Q.    All right.  I want to fast-forward to that

2   point in time, and tell me what the scope of the

3   additional work was that you were asked to do.

4      A.    I was given an inventory list and asked to

5   look at it to see if I could identify any items

6   that were on it that I may have found during my

7   excavation of the addition.

8      Q.    Have you done any analysis of the portion

9   of the home that remained after the fire --

10     A.    Yes.

11     Q.    -- as to the personal property?

12     A.    Yes.

13     Q.    Okay.  Specifically with respect to that

14   portion, what have you done?

15     A.    I've done the debris removal and

16   reconstruction of the bedrooms and the office and

17   the hallway.

18     Q.    Okay.  All right.  Looking at the diagram

19   that we previously marked as an exhibit, you

20   referenced the office and Bedrooms 2 and 3; did you

21   do a contents analysis on those three rooms?

22     A.    Yes.

23     Q.    Okay.  Did you do a contents analysis on

24   anything away from the fire away from the newer

25   part of the structure?

1      A.    I stopped here at this wall.  I did the

2  hallway, these rooms, and I photographed and just

3  made some notes, but really no detailed analysis.

4      Q.    So, you don't -- let me ask it this way:

5  If -- I'm going to make something up.  If Mr. and

6  Ms. Banks claimed that an ice cream maker was in

7  the kitchen, you've not ever gone through and

8  searched and looked for a particular item to

9  determine if something they claimed was there or

10 not?

11     A.    No.

12     Q.    The only thing that you have analyzed, at

13 least what you're telling us today, is the older --

14 excuse me.  The new addition, plus the office,

15 Bedroom 2 and Bedroom 3?

16     A.    And the hallway.

17     Q.    And the hallway?

18     A.    Yes, sir.

19     Q.    Look at, if you would, page -- your pages

20 aren't numbered.  It's page 4 of your report under

21 "Personal Property Examination."

22     A.    Okay.

23     Q.    And the first paragraph describes that you

24 were provided a personal property list that was

25 created by a company called Enservio, and Mike

1          A.    Mike Caldwell.

2          Q.    Okay.   Have you done any independent

3    analysis to check his work?

4          A.    No.

5          Q.    Next paragraph:   While I made no specific

6    determination as to the quantity and quality of the

7    items claimed to have been in the left side of the

8    home, destroyed by the fire, during my initial

9    investigation, I handsifted the area and completely

10   familiar with the evidence that remained in the

11   fire debris.

12              Did I read that correctly?

13         A.    Yes.

14         Q.    So, just a few months ago, November 2012,

15   you were still issuing the opinion that you had

16   made no and have made no specific determination as

17   to the quantity and quality of items claimed to

18   have been in the left side of the home, correct?

19         A.    Correct.

20         Q.    Then you said:   I was asked to look at the

21   -- I think it's a type-o -- list insureds inventory

22   and determine what items would have survived the

23   fire if present in the home at the time of the

24   loss, and of those items which of them left no

25   evidence in the fire debris and therefore could not

```
1  have been present.  I was able to confirm that some
2  items were present in the home such as three
3  televisions, an iron, and a washer and dryer.
4            Did I read that right?
5       A.    Yes.
6       Q.    Were those the only items that you were
7  able to confirm that were present?
8       A.    That was on the list.  That was on the
9  list that I was presented.
10      Q.    All right.  What list were you working
11 from?
12      A.    It would have been...
13      Q.    Exhibit C?
14      A.    Yes, I guess.  Let's look at Exhibit C and
15 see what it is.
16      Q.    Did you get it?
17      A.    No, I haven't.
18      Q.    It's Exhibit C to your -- and I'll tell
19 you, I've got it right here.  It's the Banks'
20 personal property list with items highlighted by
21 Enservio.  Yours is not a colored copy, but mine
22 is; maybe we should get a colored copy.
23            MR. MCWHERTER:  Do you mind if I
24      swap those out?
25            MR. CHASTAIN:  No, that's fine.
```

Alpha Reporting Corporation

1          MR. MCWHERTER:  I'm going to swap

2    out your Exhibit C for mine, so we'll have a

3    colored photograph.  Do you have a complete

4    copy or one without photos?

5          MS. BOYTE:  It has some photos.

6    You took part of it.

7          MR. MCWHERTER:  Is this it?

8          MS. BOYTE:  Yes.

9          MR. MCWHERTER:  Here, you find

10   it.  I don't want to mess it up.

11   BY MR. MCWHERTER:

12   Q.   All right.  We're going to get this list

13   for you to look and confirm that's what you were

14   working from, but how did you go about going

15   through the list and analyzing whether it was in

16   the house or not at the time of the fire?

17   A.   I don't think that's what I was asked to

18   do.  I was asked to -- if it would have survived

19   the fire.

20   Q.   Okay.  Now, we've got it fixed.  We've got

21   a color copy of Exhibit C in there and there it is.

22   A.   Okay.

23   Q.   So, is that the format that you received

24   it in with highlighting?

25   A.   I believe so.

1          Q.    And which items were you looking at; just

2    the highlighted items, or all items?

3          A.    The highlighted items were what was found

4    by Enservio; is that correct?  I'll have to reread

5    this.

6          Q.    No, that's not what I understand.

7          A.    Okay.

8          Q.    I...

9          A.    What am I looking at then?

10         Q.    Well, I don't want to tell you because

11   you're the one that was doing the work, so I want

12   you to tell me what your task was; what you were

13   working from?  I'll tell you that I believe to be

14   the highlighted item, the ones that Enservio says

15   were not there.

16         A.    Okay.  It could just be the opposite.  It

17   could be the ones that were there, I don't know.

18         Q.    What were you asked to do?

19         A.    Let me read it and see what I can find in

20   my instructions.

21         Q.    Well, do you have any independent memory

22   as we sit here today what your task was?

23         A.    Barely.  I've done several cases since

24   then.

25         Q.    You don't know?

1      A.    I don't remember what the instructions
2   were.
3      Q.    Okay.  Go ahead and look.
4      A.    I don't see what the highlighted areas
5   mean, so I don't know.
6      Q.    What were you asked to do?
7      A.    To determine what items could have
8   survived the fire.
9      Q.    All right.  In your report on Page 4 --
10      A.    Okay.
11      Q.    -- it says, under Number 2, third
12   paragraph, midway down:  I was asked to look at the
13   insureds inventory and determine what items would
14   have survived the fire if present in the home at
15   the time of the loss, and of those items which of
16   them left no evidence in the fire debris and
17   therefore could not have been present.
18          Was that your task?
19      A.    Yes.
20      Q.    Did you do that?
21      A.    Yes.
22      Q.    All right.  For the whole house?
23      A.    Yes.
24      Q.    Okay.  Then the next paragraph, it says:
25   I prepared a list of items claimed by Mr. and

1    Ms. Banks that could not have been in the home at

2    the time of the fire because such items would have

3    left visible evidence that was not found after

4    handsifting the fire scene.

5          Then a line down:  Based upon my

6    investigation, the following list describes those

7    items claimed by the Banks, but not found to be at

8    the home after the fire loss.

9          Did I read that correct?

10   A.    Yes, sir.

11   Q.    And then there's several pages of page

12   after page after page of items that you say were

13   not there, correct?

14   A.    Or would have survived the fire, yes.

15   Q.    Would have survived the fire, but were not

16   there?

17   A.    Yes.  According to this list, yes.

18   Q.    Did you make any analysis of whether the

19   items were there or not?

20   A.    Again, no.  I said I went off this list

21   that was provided to me to look at.

22   Q.    I see.  So, when that first one there says

23   Egg Cooker Chef's Choice, you don't know whether or

24   not that is actually -- what was actually at the

25   house or not?

1    A.   No, I don't.  I was just asked if it would

2  have survived the fire or not.

3    Q.   Okay.  Is that true for every item in the

4  list?

5    A.   Yes.

6    Q.   So, the only thing you're opining -- the

7  only thing you're offering an opinion on as to

8  these items in this list is whether or not they

9  would have survived a fire of the magnitude at the

10  Banks' house?

11    A.   Yes.

12    Q.   And nothing else?

13    A.   Right.

14    Q.   So, when you say based upon my

15  investigation, the following list describes those

16  items claimed by the Banks, but not found to be at

17  the home after the fire loss, that's not really

18  what you're giving an opinion of?

19    A.   Where are we?

20    Q.   I'm sorry.  Bottom of Page 4, last

21  sentence.

22    A.   That's a true statement.

23    Q.   Well, are you saying the items were there

24  or not?  I hear you telling me:  On one hand, I

25  only looked to see weather or not they would

1   survive the fire; then part two of the assignment

2   that you told me was to determine which of the

3   items there was actual evidence of on the scene?

4      A.    I had two lists to compare.   I had the one

5   from Enservio, and the one provided by the Banks.

6   Now, what I did was take both lists and decide or

7   try to determine and give my opinion depending on

8   location of the item and where it was, that if the

9   item would have survived the fire or if it could

10   have survived the fire, and it wasn't found which

11   meant that it wasn't there.

12      Q.    So, what you were doing is assuming that

13   Enservio's list is correct?

14      A.    Yes.

15      Q.    But if it's not correct, then that's not

16   something you should rely on; you would agree with

17   that?

18      A.    I did rely on it.

19      Q.    Okay.   What about -- okay.   Go to the end

20   of that first list and you start your report back

21   again.   There's not a page number.

22      A.    (Witness complies.)

23          Okay.

24      Q.    Got it?

25      A.    I'm there.   Conclusion; is that right?

1      Q.    No, you've got two different lists.

2      A.    Let's see.  Goodness gracious.

3      Q.    May I help you?

4      A.    Sure.

5      Q.    The way I read your report, and I read it

6   a bunch, several times, you had two lists.  The

7   first list was items that you said were not at the

8   fire scene, and then you come to a second bit of

9   discussion and start a second list.  And if you go

10  to the next page, Mr. Sells, and look at the

11  paragraph that starts:  There was evidence of other

12  items claimed by the Banks, but not in the quantity

13  claimed.  And so then you go on to list other

14  things.  What is this list of?

15     A.    It says:  The following is a list of items

16  claimed by the insureds that were either not

17  present or were not present in the quantities

18  claimed.

19     Q.    All right.  And did you do an analysis of

20  the personal property on site at the fire scene?

21     A.    Again, off the same lists.  Off these

22  lists provided to me.

23     Q.    Answer this question first:  Did you do

24  any analysis at the fire scene to develop this

25  list?

1     A.    No.

2     Q.    This list was developed purely from the

3  Enservio list.  You went through their list, you

4  went through the Banks' list; and if something

5  could have survived the fire, you put it down?

6     A.    Yes.

7     Q.    You're not offering any opinion as to

8  whether or not an item of personal property was at

9  the fire at the time of the scene or not?

10    A.    No.

11    Q.    I want to make sure this is crystal

12  clear.  You don't know what was at the fire scene

13  at the time of the fire, you don't know what was

14  not at the fire scene at the time of the fire as it

15  relates to contents?

16    A.    Some.

17    Q.    What?

18    A.    To the left part of the structure that I

19  actually did the excavation inventory on, I can

20  speak to that.

21    Q.    You can speak to that, even though in your

22  original report you said you could not give an

23  opinion as to the quality or quantity; and even

24  when you wrote this report, you said that too?

25    A.    Yes, I can speak to it.  Yes.

1    there at the time of the fire?

2        A.    Yes.

3        Q.    And that it's your opinion:  There is no

4    evidence at all of the remains of any of those

5    items?

6        A.    Correct.

7        Q.    What items might remain of a desk after a

8    fire in a flashover type environment?

9        A.    Well, there are several factors to

10   consider in answering that; I don't think I have

11   enough information to give you a good answer.

12       Q.    Well, that's a fair question.  As it

13   relates to the office, the Banks' fire that

14   occurred on November 28, 2011, what evidence of a

15   desk that was in the office might exist after the

16   fire?

17       A.    You would have all the hardware from the

18   drawers, hardwares from the drawer slides.  A lot

19   of time, the feet part here are adjustable and

20   they're metal, felt-covered; you would have had all

21   that left, depending on the time that the fire was

22   -- how long it had actually burnt because this is

23   the course that the firefighters took to extinguish

24   the fire.

25              Depending on how long it burnt, you'd

1   probably have several pieces of the wooden

2   structure left.

3        Q.   Okay.  I'll hand you a photograph and I'll

4   represent to you that that's a photograph of the

5   Banks' office post-fire.  Do you see the metal item

6   depicted in that photograph?

7        A.   Yes.

8        Q.   What does it appear to be to you?

9        A.   Just by looking at it, I would say it was

10  a slide.  But I'm not sure if this is from the

11  office.

12       Q.   I'm just -- you can take my word for it

13  and make the assumption just for today--I'm not

14  going to hold you to it--that that picture was

15  taken post-loss of the office after the fire; what

16  does that appear to be?

17       A.   I don't have enough information to answer

18  it.

19       Q.   All right.  You don't -- you can't

20  recognize that item?

21       A.   No.

22       Q.   Okay.

23       A.   Not from just this one angle.

24            MR. MCWHERTER:  I'll mark that as

25       Exhibit 37.

1      Q.    Pizza wheel, do you know what that is?

2      A.    Yes.

3      Q.    Did you find one of those?

4      A.    No.   Again, I didn't inventory items where

5  this would have been.

6      Q.    No, you did not find one?

7      A.    No.

8      Q.    Did you look for one?

9      A.    No.

10      Q.    Okay.   What's your opinion of the origin

11  of the fire?

12      A.    Master bedroom, master bedroom area.

13      Q.    Did you identify a point of origin --

14      A.    No.

15      Q.    -- or just an area of origin?

16      A.    An area.

17      Q.    And looking at our Exhibit 7 -- I had you

18  mark a copy instead of the original on the basement

19  put an "X".  I had you "X" a copy instead of the

20  original exhibit.

21      A.    Okay.

22      Q.    All right.   Looking at Exhibit 7, can you

23  identify for me by way of an "X" or circle the area

24  of origin that you identified?

25      A.    (Witness complies.)

1     Q.    All right.  So, you've circled an area in
2  the master bedroom.  You circled the laundry room
3  and master foyer, correct?
4     A.    Yes.
5     Q.    And that was intentional?
6     A.    Yes.
7     Q.    So, one of those three rooms, all of which
8  are in the new addition?
9     A.    Correct.
10     Q.    What were your hypotheses for the area of
11  origin?
12     A.    Initially, electrical was examined early
13  on.  I noticed unexplained fire patterns that I
14  could not explain which was another hypothesis I
15  came up with, you know.  We did testing.
16     Q.    What were your hypotheses, your
17  alternative hypotheses, as to the origin, not --
18  how did you come up with it?  What were the various
19  options?  What does a hypothesis mean to you?
20     A.    An educated guess -- theory.
21     Q.    All right.  So what were the alternatives
22  hypotheses as to the origin of the fire?
23     A.    To the origin, there wasn't.
24     Q.    There were not any?
25     A.    No.

1      Q.    All right.  And were you able to do any

2  fire pattern analysis in the new addition?

3      A.    Not fire pattern analysis, no.

4      Q.    All right.  Were you able to do fire

5  pattern analysis in the older part of the home?

6      A.    Yes.

7      Q.    And what did that fire pattern analysis

8  tell you?

9      A.    It showed the fire moving from the

10  addition to the original part of the house.

11      Q.    Did the fire come into the older part of

12  the house, the one-story ranch portion of the

13  house, through its attic?

14      A.    At some point, yes.

15      Q.    What does that mean, "at some point"?

16      A.    I think we had fire in the office before

17  it got above -- in the attic.

18      Q.    Okay.  And what do you base that opinion

19  on?

20      A.    By the material lost, the charred, the

21  fire pattern on the floor, the deep saddle burn.

22      Q.    The office didn't have a roof when you got

23  there, did it?

24      A.    No.

25      Q.    Which tells you what?

1     Q.    Yes.

2     A.    Where we got the positive sample?

3     Q.    Yes, in that area.

4     A.    Yes, it did.

5     Q.    And there's also photographs of burned

6   subflooring, correct?

7     A.    Where we got the positive sample?  Where

8   are you talking about?

9     Q.    In the office.  In the office, period.

10     A.    I'd have to see what you're talking about.

11     Q.    Do you not remember?

12     A.    There's just a couple of holes in the

13   floor.  There was two holes in the floor, best what

14   I can remember without looking at a picture.

15     Q.    What causes saddle burns?

16     A.    Something burning in one spot for a long

17   time.

18     Q.    Okay.

19     A.    Either a long time, or very intense fire.

20     Q.    And what causes intense fires?

21     A.    Fuel loads.

22     Q.    And what causes a fire to burn for a long

23   time?

24     A.    Fuel loads.

25     Q.    What possible fuel loads were in the area

1   of the saddle burn that you found?

2        A.    There wasn't one.

3        Q.    All right.  What about the roof structure

4   that fell on top of the floor?

5        A.    It wouldn't have burned it in that general

6   of an area, plus it wouldn't give us a positive

7   sample for ignitable liquid.

8        Q.    We'll come back to that.  What happened to

9   all the roof rafters that fell into the office;

10  where did they go?

11       A.    They were there; they were excavated with

12  the debris.

13       Q.    All right.  And were there also roofing

14  shingles in that debris?

15       A.    Some, yes.

16       Q.    Was there also roof felt in that debris?

17       A.    I imagine there was; I can't answer that.

18       Q.    What else can cause saddle burns?

19       A.    An accelerant being puddled.

20       Q.    I'm sorry?

21       A.    An accelerant; an ignitable liquid being

22  puddled in an area, that's going to give you your

23  intense fire.

24       Q.    And can polyurethane burn can cause hot

25  temperatures like that, that might cause saddle

1  the old fire patterns, they have been altered by

2  the flashover; did you or did you not consider that

3  fact?

4      A.   Yes.

5      Q.   All right.  What impact did that have on

6  your opinions, if any?

7      A.   It didn't have any.

8      Q.   All right.  What were the other possible

9  reasons for the fire patterns that you've

10  identified as a result of considering that

11  flashover may have occurred?

12      A.   Which fire patterns are you...

13      Q.   Any fire patterns.  Let's start with

14  office.

15      A.   Okay.  Are you talking about the saddle

16  burn?

17      Q.   What other fire patterns --

18      A.   Well, there's material loss.

19      Q.   Which is?

20      A.   When material is being consumed by the

21  fire.

22      Q.   Okay.  And that in and of itself is what

23  you consider a fire pattern?

24      A.   Yes, it is a fire pattern.

25      Q.   Okay.

1     A.     Pointer arrows.

2     Q.     Sorry?

3     A.     Pointer arrows.

4     Q.     Tell me what that is?

5     A.     Wall studs, but you can use any wood

6  material.  Whichever side the fire is attacking it

7  from, it's going to make a pointer because it's

8  losing material.  If we've got it this way, it's

9  going to lose material and it's going to make

10  pointer arrows and that shows you fire travel.

11     Q.     Did the fire patterns in the office

12  identify the fire going upward or downward?

13     A.     Couldn't make a conclusion.  Looks like to

14  me, it went both ways.

15     Q.     Okay.  And does the fact that it appeared

16  that it may go both ways, does that have any impact

17  on the way you analyze a scene?

18     A.     Yes.

19     Q.     Or any significance to you?

20     A.     Yes.

21     Q.     Tell me what that significance is.

22     A.     Fire does not burn down.  If I've got

23  patterns coming down, tells me I need to look

24  further at the evidence.

25     Q.     Can embers and debris burn holes in

1   floors?

2        A.    No.

3        Q.    That's your opinion today under oath?

4        A.    Yes.

5        Q.    Embers and debris cannot burn a hole in

6   the floor, period?

7        A.    An ember?

8        Q.    Embers?

9        A.    How many embers?

10       Q.    Fallen debris from a roof?

11       A.    What type of floor?

12       Q.    Wood floor.

13       A.    Hardwood floor or laminate wood?

14       Q.    Hardwood.

15       A.    It just depends on how much material has

16  fallen down on it.

17       Q.    All right.  Is it possible is the first

18  question?

19       A.    If a lot of material fell on it, it's

20  possible.

21       Q.    And did you consider that that may have

22  occurred in the office of the Banks' home?

23       A.    No.

24       Q.    Was that a hypothesis that you considered?

25       A.    No.

1      Q.    Why not?

2      A.    The pattern was too small for it to be a

3   bunch of roofing material to fall.

4      Q.    What pattern was too small?

5      A.    The saddle burn.

6      Q.    The one -- what you're saying is the hole

7   in the floor where the saddle burn is was too small

8   to have been caused by falldown?

9      A.    No, that's not what I'm saying.  You asked

10  me if this one was caused by roofing falldown; no,

11  it wasn't.

12     Q.    And how do you know that?

13     A.    Because we've got positive ignitable

14  liquid samples from this saddle burn --

15     Q.    All right.

16     A.    -- with no fuel load there to explain that

17  kind of burn.

18     Q.    But the fuel load can come from the

19  falldown is what I'm getting at?

20     A.    Wouldn't it had done it somewhere else as

21  well?

22     Q.    I don't know.

23     A.    I do know, and it didn't.  It did not.  It

24  did not cause that.

25     Q.    Was there a rug in the room?

1       A.    No.

2       Q.    Was the saddle burn in the area of the

3  desk?

4       A.    There was no desk.

5       Q.    Let me ask you this:  If you assume that

6  the desk was there, would the desk have provided

7  fuel for that saddle burn?

8       A.    Not to cause that kind of burn, no.

9       Q.    And what -- what kind of burn would a desk

10 fuel cause?

11      A.    You may have a larger one, you may have

12 more than one, but you're not going to have such a

13 condensed area and such a deep burn from a desk.

14                VIDEOGRAPHER:  Two minutes,

15      please.

16 BY MR. MCWHERTER:

17      Q.    Okay.  Anything else about the area of the

18 office that led you to believe that the cause of

19 the fire was incendiary origin, or that the cause

20 of the fire was human involvement?

21      A.    The positive samples and lack of contents

22 helped me form my hypothesis.

23      Q.    Those are the two things?

24      A.    Yes, sir.

25      Q.    All right.  Anything else?

Case 4:12-cv-00032-WBC   Document 132-2   Filed 09/10/13   Page 54 of 64   PageID #: 3275

1    when you check the arcs?

2        A.    Arc mapping.

3        Q.    Are you capable of doing arc mapping?

4        A.    I have taken classes on it, yes.

5        Q.    All right.  Do you know how to do it?

6        A.    Yes.

7        Q.    Have you done it in the past?

8        A.    Yes.

9        Q.    Did you do it in this case?

10       A.    No.

11       Q.    Why not?

12       A.    In the area where it would have been too

13   much material lost to actually be able to look at

14   it to come up with anything good.

15       Q.    All right.  The electrical fire had been

16   destroyed -- excuse me -- the electrical wires had

17   been destroyed?

18       A.    Right.

19       Q.    If you were able to utilize arc mapping,

20   what would that show you?

21       A.    It would show you the area that the

22   electricity was first piped in.

23       Q.    And that was unable to be done?

24       A.    Correct.

25       Q.    All right.  What was the -- what were the

1    potential ignition causes in the area of origin;
2    meaning, what were the various hypotheses that you
3    considered as the causative agent that started the
4    fire?
5        A.    The hypothesis I considered, possibly
6    electrical.
7        Q.    Okay.  Were you able to rule out
8    electrical?
9        A.    No, I wasn't.
10       Q.    Okay.  What else?
11       A.    Could have been any kind of negligence
12   involved.  Human involvement.  Those were the
13   initial three that I thought.
14       Q.    Okay.  And how did you rule out
15   negligence?
16       A.    I couldn't.
17       Q.    All right.  So, negligence is a possible
18   cause?
19       A.    It was a hypothesis, it's not my opinion.
20       Q.    Okay.  Can you rule it out sitting here
21   today?
22       A.    No.
23       Q.    All right.  And you can't rule out
24   electrical sitting here today?
25       A.    No.  We did have an electrical engineer

1    come in and he did everything possible to try to

2    either confirm or deny electrical, and was unable

3    to do so.

4         Q.    He opined that there was insufficient

5    information to make an engineering determination as

6    to the cause of the fire, correct?

7         A.    But he did eliminate some items in the

8    area of origin.

9         Q.    Items he looked at was the dehumidifier,

10   correct?

11        A.    Right.

12        Q.    Do you know what types of tests he

13   performed on the dehumidifier?

14        A.    I don't.

15        Q.    Do you know what types of tests he

16   performed on the washer and dryer?

17        A.    I don't.

18        Q.    Do you know what types of tests he

19   performed on any of the various appliances that he

20   may have looked at?

21        A.    I don't.

22        Q.    Did you make any conclusions as to what

23   heat producing devices were within the area of

24   origin, other than the ones you've mentioned?

25        A.    No.

1        Q.    Perform tests or samples, or that sort of

2   thing, until you got the debris out; you weren't

3   able to do it in its existing condition?

4        A.    Correct.

5        Q.    You had mentioned a few times that the

6   sample positive sample that you got back from the

7   lab made the comment that they were in line with

8   the door in line with what?

9        A.    A travel path, a walk path.

10       Q.    From door to door?

11       A.    From the center of the office into the

12  master bedroom.

13       Q.    You assume that's the office.

14       A.    Okay.

15       Q.    And that that's the entry to the master

16  bedroom area into the addition.  Where would the --

17  where would the door into the office be from the

18  hallway?

19       A.    Back here.

20       Q.    In a straight line, roughly?

21       A.    I don't know if this measurement is even

22  close to being right, but...

23       Q.    Right.  But generally, the doors were in a

24  location across from one another?

25       A.    I'm assuming they are, but this hallway

1   was -- had a dogleg in it.  So there could have

2   been an offline...

3        Q.   The hallway you're talking about is the

4   one that comes into the master bedroom, right?

5        A.   No, that's coming from the living room

6   toward the office.

7        Q.   I said master bedroom.  I'm sorry.  I'm

8   tired.

9        A.   I understand.

10        Q.   The hallway you're talking about is the

11   one that -- before you get to the office, the one

12   that curves around?

13        A.   Right.  And what I was getting at is I

14   don't know if -- because of the way that

15   construction was, I don't know if this door lined

16   up straight with this one; I don't know that.

17        Q.   All right.  Well, what is the straight

18   line you're talking about?  The sample would be in

19   this area, right?

20        A.   If we're talking -- and this is the master

21   bedroom.  You've got a rear door back here -- and

22   I'm forming my hypothesis.  Are positive samples...

23        Q.   Positive samples are here and here?

24        A.   No, they're here and here.  So if you come

25   in--I was hypothesizing--and you do a splash and

1   you do a pour and you come out like this, that's my
2   line I'm talking about.  This is a traveled line.
3   If I would have had a sample here and something
4   else that it fit with, something you could actually
5   picture a person doing, and it wouldn't be physical
6   for a person to do that, I might not be able to tie
7   the samples together.  But I can actually picture
8   somebody walking in here and pouring this route.
9        Q.   What is -- what's the straight line you're
10  talking about?
11       A.   I didn't mean straight line, but in line I
12  guess I should have said.
13       Q.   That theory holds true for anywhere in the
14  room; you could walk out the door and out the back
15  door, right?
16       A.   Well, okay.  You have to be able to
17  connect.  It's kind of like connecting the dots.
18  If you can't connect them, then maybe there was
19  something else.  But to me, in theory, this works
20  for me and my hypothesis.
21       Q.   Okay.  How are you connecting the dots
22  from the positive sample to the addition?
23       A.   By this being poured this direction into
24  the office into the master bedroom and out the back
25  door.

1     Q.    What evidence of pouring do you have,

2  other than the one positive or the two positive

3  samples in the office?

4     A.    It's my theory.

5     Q.    But there's no evidence outside of your

6  theory?

7     A.    In my experience and training and

8  education, when somebody does this, they pour a

9  line to the closest exit and out.  Now, if I would

10 have had samples going this way, I could have come

11 up with another exit and a theory.  That's why

12 hypothesis works for me.

13    Q.    Let me ask it again.  What is the evidence

14 that you have that there was any ignitable liquid

15 poured outside of the office anywhere?

16    A.    There is none, it burnt away.

17    Q.    Okay.  If it was ever there, it's gone.

18 And so because you found a positive sample in the

19 office, you have a theory that it was poured all

20 the way out the back door; there's no evidence of

21 that, but that's your theory?

22    A.    Correct.

23              (WHEREUPON, Exhibit No. 49

24               was marked.)

25 ///

BANKS_FULL



EXHIBIT



12/18/2012

BANKS_FULL

12/18/2012

Page: 75

BANKS_FULL



2nd Floor

Case 4:12-cv-00032-WBC   Document 132-2   Filed 09/10/13   Page 64 of 64   PageID #: 3285